# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

UNITED STATES *ex. rel,*
MARY J. PATZER

      Plaintiff/Relator,

v.

SIKORSKY AIRCRAFT CORPORATION,
SIKORSKY SUPPORT SERVICES, INC.
      and                Civil Action File No.    **11-C-560**
DERCO AEROSPACE, INC.
      Defendants.

## FIRST AMENDED COMPLAINT FOR DAMAGES & INJUNCTIVE RELIEF UNDER 31 U.S.C. § 3730 FALSE CLAIMS ACT

NOW COMES Plaintiff/Relator Mary Patzer, by her attorneys, Nola J. Hitchcock Cross and Mary C. Flanner of Cross Law Firm, S.C. and as and for her First Amended Complaint against the above named Defendants states as follows:

## I. INTRODUCTION

1.    This is an action by Plaintiff / Relator Mary Patzer to recover damages and civil penalties on behalf of the United States of America ("United States") arising from false billing statements and claims made or caused to be made by Sikorsky Aircraft Corporation ("Sikorsky"), Sikorsky Support Services, Inc. ("SSSI") and Derco Aerospace, Inc ("Derco") (collectively "Defendants") to the United States and its agents and intermediaries in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), including as amended during the relevant period.

2. Beginning sometime on or about November 9, 2005 and continuing until at least April 2012 ( "relevant period"), Defendants, acting in concert, devised a scheme to systematically and improperly submit, and did systematically and improperly submit, false claims to the United States Government seeking fraudulently inflated reimbursements from the United States Department of Defense ("DoD"), for certain aircraft parts, material and services obtained from vendors for Naval Air Systems Command ("NavAir") contracts. Defendants, acting in concert, created and carried out a scheme to knowingly and impermissibly mark-up intra-company transactions, and to pass them through to the United States Government. Defendants' concealment of the mark-up from the United States Government was material to the Government's decision to pay the fraudulent invoices as it led the government to pay the higher price. As a result of submitting these knowingly false claims, Defendants fraudulently obtained payments in excess of $50 Million Dollars ($50,000,000.00) from the United States Government which they either knew, or in the absence of a reckless disregard for the truth should have known, they were not entitled to receive.

3. The FCA provides that any person who knowingly submits or causes to be submitted to the United States government a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 for each such claim submitted and three times the amount of damages sustained by the government. The FCA empowers persons with information regarding such false claims to bring an action on behalf of herself and the United States to share in any recovery.

4. Pursuant to the FCA, Plaintiff/Relator Mary Patzer ("Patzer" or "Relator") seeks to recover on behalf of the United States and herself for damages and civil penalties arising from fraudulent and improper charges contained in claims for payment that the Defendants

submitted or caused to be submitted to the United States Government for impermissible markups seeking fraudulently inflated reimbursements involving a NavAir contract and related extensions as well as for damages for Patzer's termination by Derco in retaliation for her attempts to stop Defendants' fraudulent conduct, and for fees and costs.

5.      Prior to filing her original Complaint in this action, Patzer provided written disclosure of her claims and met with an Assistant United States Attorney for the Eastern District of Wisconsin and investigators from the United States Department of Justice to inform them of her intent to pursue this action and to provide relevant information. Patzer also provided the government with a disclosure statement containing substantially all of the evidence in her possession at that time relevant to the allegations herein.

## II. PARTIES

6.      Defendant Sikorsky Aircraft Corporation ("Sikorsky") is a Delaware corporation and is a wholly owned subsidiary corporation of United Technologies Corporation. Sikorsky's principal place of business is in Stratford, Connecticut, and it is the parent company of both Defendant Sikorsky Support Services, Inc. and of Defendant Derco Aerospace, Inc. According to its website, Sikorsky, "is a world leader in the design, manufacture and service of military and commercial helicopters; fixed-wing aircraft; spare parts and maintenance repair and overhaul services for helicopters and fixed-wing aircraft; and civil helicopter operations."

7.      Defendant Sikorsky Support Services, Inc. (d/b/a Sikorsky Aerospace Maintenance) ("SSSI") is a Delaware corporation and a service subsidiary of Sikorsky, with its principal corporate offices located in the city of Stratford, state of Connecticut, 06615.  SSSI supports military and commercial operators with aviation maintenance, logistics and technical services.

3

8. Defendant Derco Aerospace, Inc. ("Derco") is a Wisconsin corporation with its principal place of business at 8000 West Tower Avenue in Milwaukee, Wisconsin. Derco is a wholly owned subsidiary of Defendant Sikorsky Aircraft Corporation. According to its website, Derco "is a world leader in providing aircraft spares distribution, logistics solutions, repair services and technical solutions to military and commercial customers around the globe, supporting military and commercial fleets in 67 countries."

9. Except as otherwise stated, Defendants are referred to collectively herein as "Defendants".

10. Plaintiff / Relator Patzer is a United States citizen and a resident of the city of Sun Prairie, county of Dane, state of Wisconsin, residing at 274 Kelvington Drive, 53590. Patzer commenced her employment with Derco on July 15, 2002 as a Senior Financial Analyst. In late 2003, Derco promoted Patzer to Assistant Controller for Financial Reporting and Sarbanes-Oxley Compliance. By 2009, Derco had re-titled Patzer's position to Assistant Controller of US Government Accounting and Sarbanes Compliance.

11. As Derco's Assistant Controller of US Government Accounting and Sarbanes Compliance, Patzer worked directly under Derco's Controller, Amy Skaar, and Patzer's second level supervisor was Derco's Chief Financial Officer, Peter Winkler. Patzer was the lead and point of contact for all Defense Contract Management Agency ("DCMA") and Defense Contracting Audit Agency ("DCAA") audit activity.

12. In the course of her employment, Patzer gained first-hand knowledge of fraudulent and improper billing schemes and practices by Derco and its parent and affiliated Defendant companies.

4

13.     Patzer brings this action on behalf of the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

## III. JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this court for actions brought pursuant to 31 U.S.C. § 3730.

15.     The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) which authorizes nationwide service of process, and because Derco has its principal office in this district.

16.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Derco has its principal office in this district.

## IV. DEFENDANTS' FRAUDULENT CONDUCT

### A. Contract Number N00019-06-D-0017 Contracting Process & Terms

17.     Sikorsky, SSSI and Derco are considered to be affiliates and are the same entity for the purposes of contracting with the United States Government.

18.     In response to a United States Navy Naval Air Systems Command ("NavAir") Request for Proposal ("RFP") seeking bids for an "Indefinite Delivery / Indefinite Quantity Contract" pertaining to NavAir's "T-34 / T-44 / T-6 Contractor Logistics Support Program", Defendants entered into a contract with the United States Government, initially covering the period of July 1, 2006 through September 30, 2010, to provide certain logistics and maintenance

5

support for T-34, T-44 and T-6 aircraft owned and/or maintained by the United States Navy and used to train military aviators ("NavAir Contract RFP").

19.     In describing the goods and services being sought, Section B of the NavAir Contract RFP set forth a schedule of Contract Line Items Numbers ("CLINs") and "Sub-Line Item Numbers" ("SLINS"). Each identified a particular service or product to be provided and described the contractual payment methodology.  Depending on the line items at issue, the U.S. Government provided certain contract methods of paying including: 1) a "firm fixed price contract" for ordering and maintaining the inventory of T-34 / T-44 aircraft replacement parts, and 2) a material or "cost reimbursement contract" which reimbursed the actual cost of certain T-34 / T-44 aircraft replacement parts and material necessary to repair/maintain the aircraft.

20.     With regard to the items subject to cost reimbursement, the NavAir Contract RFP for those CLINs, which pertained to the acquisition of aircraft replacement parts and material used to maintain and repair the T-34 and T-44 aircraft (CLINs XO23 and XO45, respectively) stated that the U.S. Government would reimburse the contractor's "actual cost" along with "authorized indirect costs and material burdens." The RFP stated that "Fee/Profit is unallowable on the actual price of parts and material, services, and shipping costs."

21.     With regard to the "firm fixed price" amounts to be paid to the successful bidder for performing the aircraft parts and material inventory management and acquisition function (included in CLINs X005 and X029), paragraph f., in Section B-5, of the NavAir RFP made clear the Government's prohibition against any contractor or subcontractor recovering amounts in addition to such "firm fixed price" through "mark-ups" or "add-ons" to the "actual cost" of the aircraft replacement parts and material. The Government agreed to reimburse those items

subject to the "firm fixed price" at "actual cost" plus "approved indirect costs and applicable burdens".

**B. Award of Naval Air Systems Command Contract for *T-34/T-44/T-6A Contractor Logistics Support Program* (RFP Number N00019-05-R-0046) to Defendant Sikorsky Support Systems, Inc. (NavAir Contract Number N00019-06-D-0017), and Implementation of Defendants' Scheme to Defraud the United States Government.**

22.     On or about June 1, 2006, the United States Navy Air Command ("NavAir") awarded the contract to Defendant SSSI, contract number N00019-06-D-0017, for the "T-34/T-44/T-6 Contractor Logistics Support Program" ("NavAir Contract"). SSSI agreed to provide depot-level aircraft maintenance and logistics support for the USN T-34, T-44 and T-6 trainer aircraft programs and the contract terms consisted of the NavAir RFP, number N00019-05-R-0046, along with Defendant SSSI's proposal to the NavAir RFP, and the fully executed Standard Form 33.

23.     In 2006, Derco issued a press release stating that "Derco Aerospace, Inc. recently secured a subcontract from Sikorsky Support Services, Inc. (SSSI) in support of the T-34/T-44/T-6A Contractor Logistics Support (CLS) Program from the U.S. government. Derco estimates that the subcontract could be worth as much as $20 million per year over 4.25 years if the Navy exercises all of its contract options."

24.     Derco included the $20 million dollar figure in its press release because that amount reflected the profit from the scheme with the co-Defendants to impermissibly mark-up Derco's purchase price paid to its vendors for parts and to pass such inflated invoices on to Defendant SSSI for payment by the United States Government, which also included the contract permitted general and administrative percentage ("G&A").

25.     The contract work was performed at Naval Air Station Pensacola, Florida; Naval Air Station Whiting Field, Florida; Naval Air Station Corpus Christi, Texas and other assorted

7

satellite sites, and the contract administration work was handled by Derco Aerospace in Milwaukee, Wisconsin, with Patzer as the lead for contract compliance.

26.     Contract Number N00019-06-D-0017 states in pertinent part, "For parts and material or services procured from a vendor, the actual cost shall be the actual catalog/market price from the vendor.  Fee/Profit is UNALLOWABLE on the actual price of parts and material, services and shipping costs……."

27.     With regard to the "firm fixed price" amounts to be paid to the contractor for performing the aircraft parts and material inventory management and acquisition function included in CLINs X005 and X029, the NavAir Contract RFP made clear the Government's prohibition against any contractor or subcontractor recovering amounts in addition to such "firm fixed price" through "mark-ups" or "add-ons" to the "actual cost" of the aircraft replacement parts and materials which the Government agreed to reimburse at "actual cost" plus "approved indirect costs and applicable burdens".

28.     At about the same time, Defendant SSSI entered into an Inter-Entity Work Authorization ("IWA") with Defendant Derco Aerospace, a wholly owned subsidiary of Defendant SSSI's parent company, Defendant Sikorsky Aircraft Corporation, to perform work under contract number N00019-06-D-0017 including, but not limited to, ordering component parts and materials from vendors. Consistent with the policy of the ultimate parent company, United Technologies ("UTC"), in its IWA, Defendants confirmed and signed off on the fact that the contract was not for "commercial" items.

29.     As part of her duties as Derco's Assistant Controller of US Government Accounting and Sarbanes Compliance, Plaintiff / Relator Patzer was responsible for preparing the required Form CASB DS-1 "Cost Accounting Standards Board Disclosure Statement"

("Disclosure Statement"), which was reviewed, approved, certified as correct, and signed by Derco's Chief Financial Officer. As part of the Disclosure Statement, Derco was required to accurately describe its accounting practices for selling between its sister companies. Derco submitted the Disclosure Statement to the United States Defense Contracting Audit Agency ("DCAA").

30.     The Disclosure Statement describes and certifies the accuracy of Derco's cost accounting practices, which stated that all sales transactions between United Technology Corporation ("UTC") companies, such as between Derco and SSSI involving non-commercial products and services, are passed through at cost. The "at cost" requirement pertaining to non-commercial products and services is dictated by both UTC policy (UTC Financial Manual, Section 29.3.5) and applicable Federal Acquisition Regulations ("FARs") which govern and are incorporated by reference into NavAir Contract N00019-06-D-0017. Patzer knew that each of the defendant UTC companies were similarly required by law to submit Disclosure Statements describing their accounting practices including those pertaining to selling between the sister companies. She believed each company described its practices as complying with the law and UTC company policy.

31.     Pursuant to FAR 44.101, "Contractor means total contractor organization or a separate entity of it, such as affiliate." FAR 2.1 defines "Affiliates" as associated business concerns or individuals if, directly or indirectly, (1) Either one controls or can control the other; or (2) A third party controls or can control both. For the purposes of contracting with the U.S. Government, SSSI and Derco are considered to be the same entity, as they are both subsidiaries of Sikorsky Aircraft Corporation, which is itself a subsidiary of United Technologies

Corporation. Under the applicable regulations, Derco may not charge a mark-up on parts or services to SSSI.

32.     Pursuant to FAR subpart 2.1 a "commercial item" is "any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes and has been sold, leased, or licensed to the general public; or has been offered for sale, lease, or license to the general public."

33.     The parts and materials SSSI provided to the United States Navy under contract number N00019-06-D-0017 were not commercial items as the parts and materials are not sold or offered for sale by Derco to the general public. There is no catalog price list for such items. The IWA signed and confirmed by Defendants' agents, stated that the parts and materials were not "commercial" items.

34.     In their scheme, Defendants used Derco as an intermediary between the vendors and SSSI, to obtain the parts and materials that ultimately were sold and billed to the United States Government under contract number N00019-06-D-0017.

35.     Derco placed orders with vendors, such as Hawker Beechcraft, for parts and materials that were ultimately sold and billed to the United States Government under contract number N00019-06-D-0017.  Upon receipt of the orders, the vendors submitted invoices to Derco for the parts and materials that the vendors shipped directly to the naval training locations.

36.     Patzer oversaw the accounts payable function, including issuing payments to Hawker Beechcraft and other vendors on this program for parts and materials ordered by Derco under government contract number N00019-06-D-0017.

37.     Although Derco already had parts and invoicing software, Derco purchased and

installed separate IFS brand software at the Milton naval location to implement Defendants' mark-up scheme for invoices submitted under the U. S. Government contract number N00019-06-D-0017.

38.     The separate IFS software was utilized to implement Defendants' scheme to prepare the inter-entity invoices that Derco submitted to SSSI, which in turn SSSI submitted to the U.S. Government, and allotted the funds to its subsidiary Derco Aerospace.   The separate software required double accounting entries.

39.     According to UTC policy, all invoices that Derco submits to SSSI must break out and list separately any mark-ups or add-ons. Plaintiff / Relator Patzer has first-hand knowledge that on invoices Derco submitted to SSSI regarding contract number N00019-06-D-0017, no profit, mark-ups, or any other add-ons were listed separately from the actual cost of the item or service.  Rather she learned that Derco hid the mark-up by incorporating it into the amount of the listed price.

40.     CLINS X023-X026, X045-X048, X063-X064 in Contract N00019-06-D-0017 are "cost reimbursable."  Derco purchased parts and materials on behalf of SSSI for these CLINS. Under the NavAir contract, SSSI is required to invoice the actual price from the vendor, such as Hawker Beechcraft, to the United States Government without mark-up. The contract allows a G&A percentage to be added but not a mark-up. SSSI added the permitted G&A amount on top of the vendor price with the illegal mark-up.

41.     Plaintiff / Relator Patzer has first-hand knowledge that, in violation of the FARs, the terms of contract number N00019-06-D-0017, and UTC's own policy, Defendants engaged in a scheme to purchase, program, and utilize the new IFS software to impermissibly mark-up the invoice price received from the vendors and conceal that they had done so.  Derco's new IFS

software was programmed to add the mark-up onto the cost item as if the total cost plus mark-up were merely the cost of the item or service alone and without showing that Derco had added the mark-up. Derco then sent the invoices to SSSI for its submission to the government to obtain payment.

42.    SSSI submitted claims for payment to the U.S. Government that were fraudulent based on the impermissible mark-up it knew Derco had surreptitiously included on the invoices. Defendants knew the U.S. Government relies on the accuracy of the invoices complying with the contract and all applicable regulations in making its payment decision.  Defendants programmed the IFS software so that the billings appear on their face to be legitimate cost only invoices, although management of all the related companies knew or should have known that the mark-up violated the NavAir contract and applicable FARs.

43.    Defendant Derco's involvement in servicing the NavAir Contract included 1) providing its IFS licensed software to Defendant SSSI, so that each company could covertly mark-up invoices while making the invoices appear that the price submitted to the U.S. Government was merely the cost billed by the vendor; and 2) providing Defendant SSSI, in both electronic and paper formats, monthly invoices for hundreds of T-34 / T-44 aircraft replacement parts, repairs and material reflecting amounts inflated approximately 32% above "actual cost. " To the inflated amount, Defendant SSSI added an additional 2.75% - 5.0% in "indirect costs and applicable burdens" (depending on the contract year), and submitted hundreds of line items to the U.S. Government's Defense Finance and Accounting Service ("DFAS") each month as part of its claim for payment pursuant to the NavAir Contract.

44.    The scheme by which the Defendants fraudulently overcharged the U.S.

Government, or caused the U.S. Government to be fraudulently overcharged, for the aircraft replacement parts and material resulted in an unauthorized and illegal "cost-plus-a-percentage-of-cost" compensation claim and payment, which is specifically prohibited under the terms of the NavAir Contract, applicable FARs and the United States Code.

45.     As clearly stated in the IWA between Defendants SSSI and Derco, the aircraft parts and material used by Defendant SSSI to repair and maintain T-34 / T-44 aircraft are not commercial items as that term is defined under FAR subpart 2.1.

46.     Contrary to Defendant Derco's certifications in the Disclosure Statement it submitted to the United States, the products and services that Defendant Derco invoiced to Defendant SSSI under the NavAir Contract were not passed through to Defendant SSSI at actual cost, but were instead invoiced to Defendant SSSI at cost plus mark-up.

47.     As the NavAir Contract was to expire as of December 2010, NavAir extended the contract to March 2011.


## V. <u>DERCO RETALIATED AGAINST RELATOR/ PLAINTIFF PATZER BECAUSE SHE PROTESTED FALSE CLAIMS AND TRIED TO STOP THEIR SUBMISSION</u>

48.     Patzer began her employment with Derco in 2002. By 2009 she was its Assistant Controller of US Government Accounting and Sarbanes Compliance. During her employment, she received performance ratings of "Fully Competent" and "Exceptional". For her 2009 performance, she received a performance raise of 6.5%. Her final salary was $91,000, with bonus opportunity. She received a bonus in 2009 in the amount of $4,000.

49.     Around August and September 2010, Patzer became aware of facts that led to her belief that Derco and SSSI were improperly charging on invoices submitted to the United States

Case 2:11-cv-00560-LA   Filed 12/02/14   Page 13 of 22   Document 46

Government. In September she learned that Sikorsky also knew this and that upper management at all three Defendant companies were aware of the improper billing and had not stopped it. Patzer learned that Defendant Derco provided and, upon information and belief, intended to continue to provide inflated invoices for T-34 / T-44 aircraft replacement parts and material for all contracts related to extensions/modifications to the NavAir contract. To the already inflated priced invoices, Defendant SSSI added general and administrative overhead charges and then submitted the false claims electronically as vouchers to the U.S. Government each month using the Department of Defense "Wide Area Work Flow" ("WAWF").

50.     Patzer discussed the issue of improper billing, which was resulting in substantial overpayments, with Peter Winkler, CFO of Derco, and with Sikorsky's US Government Accounting Manager, Dawn Kawtucki, whom she considered to be her mentor and was her upper management contact for government accounting issues.

51.     Subsequent to that discussion, Kawtucki reported to Patzer that she held a conference call with Winkler, CFO of Derco, and with the CFO of SSSI. Patzer was not advised of the outcome of this conference call. Kawtucki stated to Patzer words to the effect of, "whoever set this up did not have an understanding of Government contracting."

52.     For several weeks prior to contacting Kawtucki, Patzer had had on-going discussions about the issues of non-compliance that she had discovered with Derco's CFO, Winkler. He made statements that indicated he was not going to remedy the issues. Patzer then approached Kawtucki due to Winkler's unresponsiveness to Patzer's concerns.

53.     After the conference call with Kawtucki, Winkler told Patzer that he would give her an IWA for the NavAir contract stating that it was for a commercial purchase. He never

provided that document to her. If he had done so, the changed IWA would have falsely identified the purchase as commercial and would not have remedied the overpayment issue.

54.     Patzer continued to express her concerns about false billing to Kawtucki. On September 30, 2010 she sent Kawtucki an email. In it, Patzer told Kawtucki that she would not lie for anyone. Her reference was to the DCAA auditor who was at Derco auditing support for its Disclosure Statements and Kawtucki knew this. Patzer wanted Kawtucki to know she would provide the auditor with correct information which meant she would reveal that Derco was billing contrary to its Disclosure Statement.

55.     Soon after exposing the non-compliance issues to Kawtucki, and within about an hour of her "I will not lie" email, Patzer was told that her position, albeit not her duties, was "eliminated", allegedly due to a "reduction in force." After telling Patzer that her position was eliminated, Derco immediately walked Patzer out and terminated her employment on September 30, 2010. Patzer was the only employee who worked under Derco's Chief Financial Officer whose employment was terminated.

56.     Derco replaced Patzer with an employee who had little knowledge or experience regarding government contract compliance. This person did not have knowledge about the FARS, IWAs, and contract requirements that Derco was violating with the support of SSSI and Sikorsky.

57.     Within days of her termination, Patzer contacted the ethics hotline at UTC, which has an ombudsman. She reported that she had discovered that Derco was overcharging the government on the NavAir contract by illegally marking-up every part and repair service and submitting the overcharges to the government of about 100 million dollars. She received the response that the company would investigate but it would take longer than the 2 week turnaround

time promised on the hotline site. That was the last response she received about her report and no one from any of the UTC group of companies ever contacted her as part of an investigation for more information. The assigned case number was 046909.

**COUNT ONE**
**AGAINST DERCO AND SIKORSKY**

**Submit, Cause to Be Submitted False Claims**
**To the United States of America**
**31 U.S.C. §§ 3729 (a)(1)(A)(2009) and 31 U.S.C. 3729(a)(1)(1986)**

58.     Patzer realleges and incorporates by reference the allegations set forth above, as though fully set forth herein.

59.     This is a claim for treble damages and civil penalties under the False Claims Act.

60.     Derco and Sikorsky violated 31 U.S.C. § 3729(a)(1)(A)(2009) [1] by knowingly causing SSSI to submit false claims for payment to the United States which included Derco's hidden mark-up of a percentage of the cost that Derco had paid its vendors. Derco and Sikorsky knew that SSSI would then add on top of the illegal mark-up a G&A percentage before submitting its vouchers to the US Government to be paid. Thus Derco and Sikosky caused SSSI to submit to the government payment vouchers based on Derco's invoices with the concealed illegal mark-up to which SSSI added an inflated G&A amount and both Derco and Sikrosky knew this.

61.     Through the impermissible mark-up of intra-company transactions passed through to the United States Government, as described *supra*, Derco and Sikorsky have knowingly

---

[1] To the extent of wrongdoing that occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(1).

caused SSSI to submit false claims to the government for the purposes of obtaining compensation to which they would otherwise not be entitled.

62. The United States, unaware of the falsity or fraudulent nature of the invoices submitted by SSSI based on the Derco invoices and the Defendants' Disclosure Statements, paid the vouchers.

63. By these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWO**
**AGAINST DERCO**

**Submit, Cause to Be Submitted False Claims**
**To the United States of America**
**31 U.S.C. §§ 3729** (a)(1)(A)(2009)

64. Patzer realleges and incorporates by reference the allegations set forth above, as though fully set forth herein.

65. This is a claim for treble damages and civil penalties under the False Claims Act.

66. Derco violated 31 U.S.C. § 3729(a)(1)(A) [2] by knowingly presenting to SSSI false claims for payment which it knew SSSI would submit for reimbursement to the United States, which included Derco's hidden mark-up of a percentage of its cost. Derco knew that SSSI would then add on top of the illegal mark-up a G&A percentage before submitting its vouchers to the US Government to be paid. Thus Derco submitted to SSSI for submission to the government payment vouchers based on Derco's invoices with its concealed illegal mark-up to which SSSI added an inflated G&A amount and Derco knew this.

---

[2] To the extent of wrongdoing that occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(1).

67.     Through the impermissible mark-up of intra-company transactions passed through to the United States Government, as described *supra*, Derco knowingly submitted to SSSI for this submission of false claims to the government for the purposes of obtaining compensation to which it would otherwise not be entitled.

68.     The United States, unaware of the falsity or fraudulent nature of the invoices submitted by SSSI based on the Derco invoices and the Defendants' Disclosure Statements, paid the vouchers.

69.     By these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT THREE
## AGAINST SSSI

### Federal False Claims Act 31 U.S.C. § 3729(a)(1)(B)
### Knowing Creation of False Record or Statement Material to False Claim

70.     Patzer re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

71.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B). [3]

72.     Through its agreements, SSSI caused Derco to create false invoices through fraudulent concealment, misrepresentations and submissions with non-reimbursable marked-ups on invoices described above. SSSI then used them and caused to be made or used false records or statements material to a false or fraudulent claim when it submitted vouchers based on Derco's inflated invoices and then further inflated the amounts by adding its G&A based on

---

[3] To the extent of wrongdoing that occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(2).

18

those amounts.

73.     Unaware of the falsity or fraudulent nature of the vouchers that SSSI made and the invoices it caused Derco to make, the United States paid amounts on the vouchers that otherwise would not have been allowed.

74.     By these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT FOUR**
**AGAINST SSSI**

**Federal False Claims Act, 31 U.S.C. 3729(a)(1)(G)**
**Knowing or Improper Avoidance of Repayment of Government Funds**

75.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

76.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G). [4]

77.     By SSSI's actions and inactions described above, both when submitting vouchers and supporting invoices, and later when its managers and upper level employees reviewed the applicable FARs, and when Patzer brought the overpayment issue to the attention of Kawtucki and Winkler, SSSI knew it had received overpayments on the submitted invoices and vouchers. SSSI failed to timely return such funds despite a legal obligation to do so once it had knowledge of the fraudulent receipts, pursuant to the Federal False Claims Act, 31 U.S.C.§ 3729 (a)(1)(G).

78.     By its payments on the claims submitted by SSSI, the United States has been damaged, and continues to be damaged in a substantial amount.

---

[4] To the extent of wrongdoing that occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3729(a)(7)

# COUNT FIVE
## AGAINST DERCO

### Federal False Claims Act 31 U.S.C. § 3730(h)
### Unlawful Retaliation Against Relator

79.     Patzer reasserts and incorporates by reference paragraphs 1-21 and 48-57 set forth above as if restated herein.

80.     The FCA, 31 U.S.C. §3730(h)(1)(2010), provides: "(h) Relief From Retaliatory Actions. (1) In general - Any employee… shall be entitled to all relief necessary to make that employee… whole, if that employee is… discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee… in furtherance of an action under this section or other efforts to stop 1or more violations of this subchapter."

81.     Derco discharged Patzer because of her lawful conduct in furtherance of her efforts to stop Derco, SSSI, and Sikorsky from violating the requirements for submission of claims for payment to the United States Government. Patzer tried to stop Derco from billing SSSI contrary to its Disclosure Statement on parts and repairs contrary to the NavAir contract and applicable FARs. The billing was also contrary to representations made to the government in Derco's Disclosure Statement.  After persisting during the month of September in reporting her concerns on multiple occasions about the illegal billings to Winkler, Derco's CFO, and then to Kawtucki, Sikorsky's US Government Accounting Manager, including a statement to Kawtucki that she would not lie about the billing method to the government, Derco terminated Patzer.

82.     Patzer has been damaged by Derco's retaliatory termination of her employment in an amount as of yet undetermined, but specifically including loss of income and benefits and damage to her career.

# PRAYER FOR RELIEF

**WHEREFORE** Plaintiff/Relator Patzer, on behalf of the United States of America and herself individually, requests the following:

A.   An Order for injunctive relief requiring that Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §3727, *et seq.;*

B.   An entry of judgment in favor of the United States of America, and against each of the three Defendants in an amount equal to three (3) times the damages sustained by reason of the Defendants' wrongful and fraudulent conduct, together with the maximum civil penalties of $11,000 per marked-up item or service billed to the government, as set forth in 31 U.S.C. §3729(a)(1) and an Award to Plaintiff/Relator of the maximum allowable Relator share of all amounts recovered from the Defendants by the United States, whether from damages, penalties or alternative remedies, pursuant to 31 U.S.C. §3730(d), based on the facts and circumstances involved in this case;

C.   An entry of Judgment in favor of Plaintiff/Relator and against Defendant DERCO Aerospace for reinstatement to her position of Assistant Controller – US Government Accounting, Sarbanes Compliance with her original seniority status, payment for back-pay and benefits, with interest, doubled, together with special damages in an amount to be determined by the Court, pursuant to 31 U.S.C. § 3730(h);

D.   An Award to Plaintiff/Relator Patzer for payment of all reasonable attorneys' fees and costs incurred in prosecuting this action as authorized by the 31 U.S.C. §3730(d); and

E. Such other and further relief to the United States and to the Plaintiff/Relator as the Court may deem just and proper under the circumstances.

**PLAINTIFF/RELATOR DEMANDS THE ABOVE ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY ON ALL ISSUES SO TRIABLE.**

Dated this  2nd  day of December, 2014.

**Cross Law Firm, S.C.**
Attorneys for Mary Patzer

**Cross Law Firm, S.C.**
Lawyer's Building
845 North 11th Street
Milwaukee, WI  53233
Phone: (414) 224-0000
Fax: (414) 273-7055

By:     s/Nola J. Hitchcock Cross
        Nola J. Hitchcock Cross
        Wisconsin Bar Number: 1015817
        Mary C. Flanner
        Wisconsin Bar Number: 1013095