# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA, ex rel.**
**MARY J. PATZER; PETER A. CIMMA,**
         **Plaintiffs,**

    **v.**                          **Case Nos.**   **11-C-0560**
                                                   **14-C-1381**

**SIKORSKY AIRCRAFT CORPORATION,**
**SIKORSKY SUPPORT SERVICES, INC., and**
**DERCO AEROSPACE, INC.,**
         **Defendants.**

---

## DECISION AND ORDER

Mary Patzer and Peter Cimma separately commenced *qui tam* actions under the False Claims Act ("FCA") against Sikorsky Aircraft Corporation and two of its subsidiaries, Sikorsky Support Services, Inc. ("SSSI") and Derco Aerospace, Inc. After the United States intervened and filed its own complaints in each case, I entered an order consolidating them. Before me now are two motions to dismiss filed by the defendants. One motion seeks dismissal, under Federal Rule of Civil Procedure 12(b)(6), of certain parts of the government's complaints. The other motion seeks dismissal of the complaint filed by relator Peter Cimma pursuant the False Claims Act's "first to file" rule.

## I. BACKGROUND

The background facts stated below are derived from four of the complaints that the relators and the United States have filed in these two cases: (1) Relator Mary Patzer's complaint; (2) relator Peter Cimma's complaint; (3) the United States's intervenor complaint in the *Cimma* case; and (4) the United States's second amended

complaint in the *Patzer* case. For purposes of the present motions, I accept the facts alleged in these complaints as true. I begin by discussing the government's allegations in its complaints in the two cases to the extent that they are relevant to the defendants' motion to dismiss certain parts of those complaints. I then discuss the procedural history of this case, the allegations of the relators' complaints, and some additional allegations from the government's complaint in the *Cimma* case, all of which are relevant to the defendants' motion to dismiss relator Cimma's complaint.

## A. The Government's Allegations

On June 1, 2006, defendant SSSI—a wholly owned subsidiary of defendant Sikorsky Aircraft Corporation—became the prime contractor on a government contract for maintenance of the Navy's T-34, T-44, and T-6 "trainer" aircraft. The prime contract required SSSI to provide on-site maintenance services for the aircraft at Naval bases located in Pensacola, Florida; Whiting Field, Florida; Corpus Christi, Texas; and at certain satellite locations. The prime contract also required SSSI to supply the parts needed to repair or maintain the aircraft.

The prime contract stated that SSSI would provide the on-site maintenance services at monthly "firm-fixed prices," which means that the Navy agreed to pay SSSI a single, fixed monthly price for its on-site services regardless of the amount of time or resources that SSSI expended in completing the work. The prime contract further provided that SSSI would supply parts on a "cost-reimbursable basis," which means that the government agreed to reimburse SSSI for the actual cost of the parts it supplied but prohibited SSSI from adding a profit margin of its own to the actual cost. The prime contract further provided that if SSSI procured parts from third-party subcontractors,

SSSI could only be reimbursed at the third party's catalog or market price. The prime contract also incorporated the text of the Federal Acquisition Regulation that prohibits a government contractor from procuring parts from subcontractors on a "cost plus a percentage of cost" basis.[1] *See* 48 C.F.R. 52.244-2(g) (OCT 2010).

The government alleges that, shortly before SSSI entered into the prime contract with the Navy, certain high-ranking officials within the Sikorsky organization hatched a scheme to illegally inflate the prices that the Navy would pay for parts. The scheme involved SSSI's selecting Derco, another of Sikorsky's wholly owned subsidiaries, as a subcontractor to provide SSSI with the parts needed to service the Navy's aircraft. SSSI and Derco then agreed that SSSI would order the parts from third parties, but that Derco would pay for them. Although Derco would pay the third-parties' catalog prices for the parts, it would send an invoice to SSSI for the cost of the parts plus 32%. SSSI would then seek reimbursement from the government for the price it paid to Derco, namely, Derco's cost plus 32%. The government alleges that this scheme allowed the Sikorsky family of companies to profit from the sale of parts to the government, even though the prime contract between the government and SSSI provided that no profit could be earned on the sale of parts, and even though both federal procurement law and the text of the prime contract prohibited cost-plus-a-percentage-of-cost purchasing. *See* 10 U.S.C. § 2306(a); 41 U.S.C. § 3905(a); 48 C.F.R. § 52.244-2(g).

---

[1] Cost-plus-a-percentage-of-cost subcontracting occurs when a prime contractor agrees to pay its subcontractor based on a predetermined percentage of the subcontractor's actual costs. *See Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1150 (Fed. Cir. 1983). Such contracting is forbidden because it enables the subcontractor to profit by driving up the government's costs. *See Muschany v. United States*, 324 U.S. 49, 61 (1945).

The government alleges that the scheme described above resulted in SSSI's breaching its contracts with the Navy and caused both SSSI and Derco to become unjustly enriched through their violations of federal procurement law. Moreover, the government alleges that each time SSSI submitted a request for reimbursement relating to one of Derco's invoices, it violated the False Claims Act by knowingly presenting a false or fraudulent claim for payment or approval. *See* 31 U.S.C. § 3729(a)(1)(A).[2] The government alleges that Derco and Sikorsky also made false claims or statements in connection with this scheme and therefore are also liable under the False Claims Act.

The defendants do not move to dismiss the government's claims for breach of contract or unjust enrichment. Nor do they dispute that the government has stated claims for relief under the False Claims Act based on SSSI's submitting claims for payment of Derco's cost-plus-a-percentage-of-cost invoices. However, the defendants move to dismiss the government's complaints to the extent they seek relief under the Anti-Kickback Act, 41 U.S.C. §§ 8701–07, and to the extent they assert that the defendants made "reverse" false claims, *see* 31 U.S.C. § 3729(a)(1)(G). I describe the facts relating to these claims below.

1.    **Anti-Kickback Act**

The government's allegations under the Anti-Kickback Act pertain to a series of "chargebacks" between SSSI and Derco. In the subcontract between SSSI and Derco, Derco agreed to send some of its own personnel to the Naval air stations to assist SSSI

---

[2] In 2009, Congress passed the Fraud Enforcement Recovery Act, which amended and renumbered the liability provisions of the False Claims Act. Because the government's claims in this case involve conduct that occurred both before and after the 2009 amendments, both versions of the law are relevant. However, except where noted, I will cite to the post-2009 version.

with logistics services. However, despite this agreement, Derco never sent its own personnel to the air stations; instead, SSSI directly hired and paid all the on-site personnel. But SSSI could not bill the government for the cost of these employees, because under its contract with the Navy, SSSI agreed that it would receive only a firm-fixed price for providing logistics services.

Five months into the performance of the contract, SSSI and Derco agreed that, because Derco was not providing on-site services, SSSI could take monthly chargebacks against the amount of Derco's invoices for parts to reflect the cost of the personnel that SSSI had hired. SSSI had hired six people to perform the work that Derco was supposed to perform, and the initial amount of the chargeback was based on the cost of these six employees.

The government does not allege that this initial chargeback arrangement resulted in a kickback. However, it does allege that, for two reasons, it resulted in SSSI receiving illegal payments. First, the government alleges that the chargeback had the effect of reducing the price that SSSI paid to Derco for parts, and that therefore SSSI had an obligation to pass those savings on to the government. The government contends that, by failing to reimburse the government for the costs of the parts that were effectively refunded to SSSI in the form of the chargebacks, SSSI submitted a "reverse" false claim. (I discuss the government's allegations concerning reverse false claims in more detail below.) Second, the government alleges that the chargeback arrangement allowed SSSI to inflate its overhead charges. Under SSSI's contract with the Navy, SSSI was allowed to add its own overhead rate of about 3% to Derco's invoices. Thus, the greater Derco's invoices, the more overhead SSSI could charge the Navy. By

submitting Derco's invoices to the government before removing the cost of the six employees that Derco never provided, and then later taking a chargeback against Derco, SSSI earned an additional 3% on the cost of those employees that it would not have earned had Derco simply removed the cost of the employees from its invoices before sending them to SSSI.

Although the government does not allege that this initial chargeback arrangement was a kickback, it alleges that SSSI and Derco later modified the arrangement and, in so doing, violated the Anti-Kickback Act.  About two years into the contract, SSSI's chief financial officer emailed one of Derco's vice presidents and told him that SSSI was not breaking even on labor revenue—a reference to the monthly firm-fixed price that SSSI charged the Navy for logistics services.  He also noted that Derco was making substantial profits on the sale of parts, and that SSSI benefited from adding its overhead rates to Derco's invoices.  He then asked Derco to allow SSSI to increase its monthly chargeback amount from the cost of six employees to the cost of between 10 and 25 employees.  Derco agreed, and starting in June 2008 the chargebacks were calculated based on the cost of 24 employees.  However, neither party supplied the 18 additional workers reflected in this chargeback.  The government alleges that Derco's agreeing to increase the chargeback amount from six to 24 employees when it had no legal obligation to do so amounted to a kickback that both rewarded SSSI for entering into the illegal cost-plus-a-percentage-of-cost subcontract and induced SSSI to continue it.

## 2.    Reverse False Claims

The False Claims Act provides remedies—treble damages and civil penalties— for fraud affecting the federal government.  In the present case, the government seeks

relief under three of the FCA's liability provisions. The first two provisions target "direct" false claims, which occur when a person makes false or fraudulent claims or statements designed to obtain government money. *See* 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B). In this case, the government alleges that every time SSSI submitted a "voucher" seeking payment of one of Derco's invoices—which contained prices calculated on a cost-plus-a-percentage-of-cost basis—it submitted a false claim for payment to the government. The third provision of the FCA relied on by the government creates liability for "reverse" false claims. Under this provision, a person is liable for treble damages and civil penalties for making false statements that are intended to prevent the government from collecting money owed to the government. *See* 31 U.S.C. § 3729(a)(1)(G).

The government's reverse FCA allegations are directed at defendant SSSI only. They are organized into three counts.[3] The first count (*Patzer* Count IV) is based on an email that an SSSI employee named Robert Shulman sent to a government procurement officer on August 5, 2009. Shulman's email was responding to a request by the procurement officer to explain how Derco arrived at the price it charged for certain parts. The officer specifically asked whether the price represented only the amount that Derco paid to a third party for parts or whether the price was what Derco paid plus some markup. Shulman responded by stating that Derco sold parts to SSSI at firm-fixed prices and that SSSI did not know how Derco "built up" its firm-fixed prices. (Second Am. Compl. ¶ 57.) The government alleges that this statement was a lie

---

[3] Technically, the government pleads four reverse FCA counts: three in its *Patzer* complaint and one in its *Cimma* complaint. However, the *Cimma* count is similar to one of the *Patzer* counts, and their differences are not relevant to the motion to dismiss.

because, at the time Shulman sent the email, he knew that Derco did not sell to SSSI at firm-fixed prices but instead added a 32% markup to each part.

In the government's view, Shulman's email was both a direct false claim and a reverse false claim. The government alleges that the email was designed to prevent the Navy from learning about the defendants' illegal cost-plus-a-percentage-of-cost scheme. If the Navy discovered the scheme, then SSSI would be unable to continue to submit claims for payment based on Derco's illegally inflated invoices. Thus, argues the government, the Shulman email was a false statement made to obtain future payments from the government and was therefore a direct FCA violation. Moreover, if the Navy discovered the scheme, it would demand that SSSI reimburse the government for the prior payments it made to SSSI that were based on Derco's illegally inflated invoices. Thus, argues the government, the Shulman email was also a false statement made to avoid repaying money that SSSI had already received and therefore was also a reverse FCA violation.

The government's second reverse FCA count (*Patzer* Count V) is based on "certificates of final indirect costs" that SSSI submitted to the government each year from 2006 to 2012. In these certificates, SSSI essentially certified to the government that any requests for payment it had previously submitted to the government were based only on costs that were allowable under federal procurement law. The government alleges that each of these certificates was false because SSSI's costs were based on the two illegal schemes involved in this case: Derco's cost-plus-a-percentage-of-cost pricing and the chargeback arrangement. The government contends that because the prior payments were based on the illegal pricing scheme and the illegal

chargeback arrangement, SSSI had an obligation to return those payments to the government. Thus, when SSSI falsely certified, in its certificates of final indirect costs, that the prior payments were based only on costs allowable under federal procurement law, it made false statements that were designed to avoid its obligation to repay the government for those illegal costs.

The government's final reverse FCA count (*Patzer* Count VI & *Cimma* Count VIII) is based on the chargeback arrangement. The government alleges that after it paid SSSI for costs SSSI claimed it incurred from Derco, Derco gave SSSI monthly credits against those costs in the form of the chargebacks. (Second Am. Compl. ¶ 105.) The government contends that once SSSI received a chargeback, it had an obligation to repay the government the costs related to the chargeback. The government alleges that SSSI's failure to do so amounted to a reverse false claim.

**B.      Procedural History of the Relators' Claims**

The present action began on June 10, 2011, when relator Mary Patzer, a former employee of Derco's, filed a complaint under the False Claims Act in this court. Her complaint identifies the essential facts that form the basis for the government's current claim that SSSI and Derco entered into an illegal cost-plus-a-percentage-of-cost subcontract in connection with the prime contract that the Navy awarded to SSSI in June 2006. Specifically, Patzer alleges that, in violation of the terms of the prime contract and federal procurement law, SSSI agreed to buy parts from Derco at Derco's cost plus 20%.[4] Patzer alleges that each time SSSI submitted one of Derco's invoices to the government for payment, it violated the False Claims Act. She further alleges

---

[4] Although Patzer's original complaint alleged that Derco's mark-up was 20%, the government now alleges that the markup was 32%.

that the defendants submitted false disclosure statements to the government in which they falsely verified that Derco's invoices did not include any profit or markup. Patzer also brings a claim for retaliation under 31 U.S.C. § 3730(h) on behalf of herself. She alleges that, on September 30, 2010, Derco terminated her employment when she questioned the legality of the defendants' cost-plus-a-percentage-of-cost pricing.

Patzer's complaint focuses on the defendants' conduct under the prime contract. She alleges that the contract continued until at least September 2010 (when she was terminated) and that she believes that it had been extended and was currently in effect at the time she filed her complaint in June 2011.

On March 8, 2013, Peter Cimma, an employee of SSSI, commenced his own action against Sikorsky, SSSI, and Derco in the United States District Court for the Northern District of Florida. Like Patzer, Cimma alleged that the defendants committed False Claims Act violations under the Navy-SSSI prime contract that was in effect from 2006 to 2011. Also like Patzer, Cimma alleged that the fraud consisted of SSSI's submitting Derco's invoices to the Navy for payment even though they were based on cost-plus-a-percentage-of-cost pricing. However, unlike Patzer, Cimma also alleged that the illegal cost-plus-a-percentage-of-cost scheme continued under a successive Navy-SSSI contract that became effective on April 1, 2011. This contract, which the parties refer to as the "bridge contract," was entered into after the original prime contract expired. It was a short-term contract meant to ensure that SSSI continued to service the Navy's trainer aircraft while the Navy accepted competitive bids from other contractors for a full-term replacement contract. Cimma alleged that the bridge contract contained largely the same terms as the original prime contract and prohibited cost-

plus-a-percentage-of-cost pricing. He alleged that, contrary to the terms of this contract and federal procurement law, SSSI continued to submit Derco's invoices to the Navy for payment even though they were based on cost-plus-a-percentage-of-cost pricing.

As required by the False Claims Act, both Patzer and Cimma filed their complaints under seal, and thus each relator was unaware of the other's suit. Several weeks after Cimma filed his complaint, however, the United States Department of Justice informed each relator that they had each filed similar suits. The relators then conferred and agreed to share any relator awards for claims relating to the prime contract and the bridge contract. After they entered into this agreement, Cimma voluntarily dismissed the action that he had commenced in Florida.

On August 8, 2014, Cimma filed a new complaint against Sikorsky, SSSI, and Derco under the False Claims Act in the Florida district court. In this complaint, Cimma limited his allegations to the bridge contract. Again, he alleged that the Derco invoices that SSSI submitted to the government for payment under the bridge contract were based on the defendants' illegal cost-plus-a-percentage-of-cost pricing scheme. Cimma also alleged that the defendants created a false "Firm-Fixed Price List" on March 22, 2011. (Cimma Compl. ¶¶ 36–41.) For various reasons that I do not need to explain here, government regulations required SSSI to provide the Navy with a list of the prices that Derco would charge for the parts that SSSI intended to purchase from Derco during the bridge contract. Cimma alleges that the defendants had Derco create a list that contained purported firm-fixed prices for 514 aircraft parts. According to Cimma, these prices were simply the average cost of the parts plus a 32% markup. Moreover, Cimma alleges that the defendants represented to the government that the list was a complete

list of all parts that SSSI intended to purchase from Derco over the life of the bridge contract when, in fact, SSSI intended to purchase thousands of other parts from Derco that did not appear on the list. Cimma alleges that SSSI intended to purchase these other parts from Derco on a cost-plus-a-percentage-of-cost basis.

In August 2014, the United States gave notice of its intent to intervene in the *Patzer* action. In October 2014, the United States filed its initial intervenor complaint in the *Patzer* action. Later that month, the United States filed a motion in the Florida district court to transfer Cimma's Florida action to this district. Cimma did not oppose the motion, and at that point the case was transferred here. After the United States filed its intervenor complaint in the *Cimma* action, I consolidated that action with the *Patzer* action.

Most of the claims in the government's complaint in *Cimma* are similar to the claims in its complaint in *Patzer*, except that the government's claims in *Cimma* focus on the bridge contract rather than the original prime contract. However, in *Cimma*, the government brings a claim against SSSI for violating the Truth-in-Negotiations Act and federal acquisition regulations based on its submitting the incomplete firm-fixed price list to the government in connection with the bridge contract.

As discussed above, the government's complaints in *Patzer* and *Cimma* also allege that SSSI engaged in a chargeback arrangement that resulted in violations of both the False Claims Act and the Anti-Kickback Act. Neither Patzer's original complaint nor any of Cimma's complaints contain allegations regarding this arrangement. However, Cimma now claims that he was the source of the information that the government used to develop its claims based on the chargeback arrangement.

The defendants move to dismiss Cimma's complaint on the ground that it is barred by the False Claims Act's first-to-file rule. As explained in more detail below, this rule prohibits any person other than the government from commencing a "related" action based on the facts underlying a pending action. 31 U.S.C. § 3730(b)(5). Here, the defendants contend that Cimma's action is related to Patzer's and therefore is within the scope of the rule.

## II. DISCUSSION

### A. Motion to Dismiss Certain Parts of the Government's Complaints

The defendants move to dismiss the government's complaints to the extent they allege violations of the Anti-Kickback Act and allege "reverse" false claims. To survive a Rule 12(b)(6) motion, a plaintiff must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In construing plaintiff's complaint, I assume that all factual allegations are true but disregard statements that are conclusory. *Iqbal*, 556 U.S. 678.

#### 1. Anti-Kickback Act

The Anti-Kickback Act ("AKA") states, in relevant part, that a person may not "provide, attempt to provide, or offer to provide a kickback" or "solicit, accept, or attempt to accept a kickback." 41 U.S.C. § 8702. The AKA defines a "kickback" as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is

provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with" a government contract. *Id.* § 8701(2).

The gist of the government's AKA claim is that Derco provided a kickback to SSSI—in the form of increasing the amount of the chargebacks from the cost of six employees to the cost of 24 employees—to reward SSSI for selecting Derco as its subcontractor on a cost-plus-a-percentage-of-cost basis and to induce SSSI to continue to use Derco as its subcontractor. The defendants contend that this theory fails for two reasons: (1) under the so-called intra-corporate conspiracy doctrine, it is legally impossible for two wholly owned subsidiaries of the same parent company to provide or accept kickbacks to/from each other, and (2) even if it were legally possible for two subsidiaries to provide or accept kickbacks, the government's factual allegations do not give rise to a reasonable inference that the chargeback arrangement was a kickback.

As noted above, the AKA's definition of "kickback" requires that a person provide something of value to another person "to improperly obtain or reward favorable treatment" in connection with a government contract. 41 U.S.C. § 8701(2). Implicit in this definition is the idea that each party to the kickback transaction is acting independently and could choose or could have chosen not to deal with the other. If such independence is lacking, and the parties are aware that such independence is lacking, then one party's providing something of value to the other could not be viewed as an incentive or reward for favorable treatment—the favorable treatment would occur whether or not the thing of value changed hands.

In the present case, SSSI and Derco were not operating at arm's length; they were both controlled by their parent company, Sikorsky. Moreover, the government alleges that a "high ranking official within [Sikorsky]" decided that "no other contractor [besides Derco would] be considered as SSSI's logistics and materials supply subcontractor." (Second Am. Compl. ¶ 23.) The alleged reason for Sikorsky's making this decision was that using Derco as SSSI's parts subcontractor was necessary to implement the illegal cost-plus-a-percentage-of-cost scheme that allowed Derco (and hence, derivatively, Sikorsky) to earn inflated profits on the sale of parts to the Navy. (*Id.* ¶ 25.) Under these alleged facts, it is simply implausible to think that SSSI could have used anyone other than Derco as its parts subcontractor. Obviously, Sikorsky would not have allowed SSSI to award the subcontract to a third party that was not affiliated with Sikorsky, for then Sikorsky would lose both the legitimate profits available under the subcontract and the illegal profits generated by the cost-plus-a-percentage-of-cost pricing. Thus, Derco knew that it was Sikorsky, rather than SSSI, that was responsible for awarding it the subcontract, and therefore Derco could not have intended to "reward" SSSI for the favorable treatment it received. Likewise, SSSI knew that it had no choice but to select Derco as its subcontractor on favorable terms, and therefore it could not have viewed the chargebacks as a reward for providing Derco with favorable treatment.

Now, I cannot rule out the possibility that some set of facts exists under which one wholly owned subsidiary could provide or attempt to provide a kickback to another. Thus, I do not accept the defendants' invitation to apply the intra-corporate conspiracy doctrine to the Anti-Kickback Act and hold that two affiliated companies are legally

incapable of providing kickbacks to each other. For purposes of this case, it is sufficient to find that the government has not pleaded facts that give rise to a reasonable inference that Derco provided, and SSSI accepted, a kickback. Accordingly, the defendants' motion to dismiss the counts of the government's complaints alleging violations of the Anti-Kickback Act (*Patzer* Count XII and *Cimma* Count VI) will be granted.

Before moving on, I note that my dismissal of the kickback counts does not mean that the government's allegations concerning the chargeback arrangement do not state claims for relief. As noted in the background section, the government alleges that the chargeback arrangement was illegal not only because it was a kickback, but also because it allowed SSSI to collect its 3% overhead rate on services that Derco never provided. Moreover, the government alleges that SSSI was obligated to repay any sums that the Navy paid to SSSI that were later subject to the chargebacks, and that SSSI failed to do so. The government contends that the defendants' conduct in these respects violated the False Claims Act. Thus, while the kickback counts will be dismissed, the government may continue to pursue its claims that the chargeback arrangement was illegal.

### 2. "Reverse" False Claims

The reverse false-claims provision of the FCA states that a person is liable to the government if that person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31

U.S.C. § 3729(a)(1)(G).  The FCA defines the term "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).[5]

SSSI contends that all three of the government's reverse FCA counts must be dismissed because the government cannot show that SSSI had an "obligation" to pay the government anything at the time of the alleged violations.  However, in each of its counts, the government identifies an obligation to pay the government that existed at the time of the alleged violation: (1) for the Shulman email, the government alleges that SSSI had an obligation to repay money that it previously received pursuant to the cost-plus-a-percentage-of-cost pricing scheme; (2) for the certificates of final indirect costs, the government alleges that SSSI had obligation to repay money that it previously received pursuant to the pricing scheme and money that it previously received based on costs that were later subject to Derco's chargebacks; and (3) in its remaining claim, the government alleges that SSSI had an obligation to repay money that it previously received based on costs that were later subject to Derco's chargebacks.  SSSI does not argue that any of these alleged obligations does not meet the definition of "obligation" in the False Claims Act, 31 U.S.C. § 3729(b)(3).  Instead, SSSI argues that because the

_____

[5] The 2009 amendments to the False Claims Act changed the language of the reverse false-claims provision.  Prior to 2009, this provision stated that a person is liable to the government if that person "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  Moreover, the pre-2009 version did not define the term "obligation."  Although the government alleges that both the pre-2009 and post-2009 versions of the reverse false-claims provision apply to this case, SSSI has not suggested that the difference in language between the two versions is relevant to its motion to dismiss.  In this opinion, I will apply only the post-2009 version and assume that the result would be the same under the pre-2009 version.

government has brought direct false claims based on the pricing and chargeback schemes, it cannot also bring reverse false claims based on these same schemes.

SSSI's argument relies on several district-court cases reasoning that a reverse false claim cannot be based on an allegation that the defendant failed to return the same money that it allegedly obtained from the government through submission of a direct false claim. *See, e.g., United States ex rel. Scharber v. Golden Gate Nat'll Senior Care, LLC*, 135 F. Supp. 3d 944, 965–66 (D. Minn. 2015). In the present case, however, not all of the government's reverse FCA claims allege that SSSI failed to return money that it previously obtained through submission of a direct false claim. Specifically, its third reverse-FCA theory (*Patzer* Count VI and *Cimma* Count VIII) does not involve such an allegation. Instead, the government alleges that after the government reimbursed SSSI for some of Derco's invoices, Derco credited SSSI with a chargeback, and that SSSI violated the reverse false-claims provision when it failed to return the money associated with the chargeback to the government. Although the government alleges that SSSI's initial submission of the invoices was a direct false claim because of the illegal cost-plus-a-percentage-of-cost pricing scheme, the government's reverse FCA theory is not based on that scheme. It is based on the chargeback scheme, which at least potentially involved different sums of money. Thus, in this count, the government alleges a straightforward reverse false-claim violation that is not connected to a direct false-claim violation.

The government's remaining two reverse-FCA counts do involve sums of money that SSSI allegedly obtained through submission of direct false claims. First, the government alleges that the Shulman email was a false statement designed to prevent

the government from discovering that SSSI had previously submitted false claims for payment that included Derco's illegal cost-plus-a-percentage-of-cost prices. Second, the government alleges that SSSI's annual certificates of final indirect costs were false statements designed to prevent the government from discovering that SSSI had previously submitted public vouchers for payment that included Derco's illegal cost-plus-a-percentage-of-cost prices and costs that had been subject to chargebacks.

In my view, however, the FCA does not prevent the government from pursuing direct and reverse false claims relating to the same money. A violation of the FCA occurs when a person submits a false claim or makes a false statement designed to obtain payment from the government or avoid making a payment to the government. *See U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 740–41 (7th Cir. 2007) (listing elements of certain FCA claims). Nothing in the text of the FCA indicates that if a person makes more than one false statement in connection with a single payment, he commits only one FCA violation. To the contrary, the FCA's liability provisions are based on the improper conduct or statements of the person involved, not on the money that the person may or may not have obtained as a result of the conduct or statements. Thus, if a person makes two false statements to the government in connection with the same money, he will commit two FCA violations. I see no reason why the result should be any different when the person makes two false statements in connection with the same money but one of the statements does not occur until after the person receives the government's money.

The cases SSSI cites seem to be concerned about a specific application of the reverse false-claims provision. Under that provision—particularly after the 2009

amendments—a person may be liable for making a reverse false claim even if the person never made a false statement. *See United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 255 (3d Cir. 2016). Rather, mere knowledge and avoidance of an obligation to pay money to the government may create liability. *Id.* Because mere avoidance of an obligation to pay the government can be enough to violate the reverse FCA provision, there is arguably some overlap between the direct and reverse false-claims provisions: Once someone receives the proceeds of a direct false claim, it is arguable that he has an obligation to immediately repay those very proceeds. If the person has an immediate obligation to repay, then any person who commits a direct false claim also commits a reverse false claim as soon as he receives the government's money unless he immediately repays it. In the cases cited by SSSI, the district courts were concerned that recognizing a reverse false claim under these circumstances would erode the distinction between a direct false claim and a reverse false claim and create a double punishment for the same allegedly wrongful act. *See, e.g., Scharber*, 135 F. Supp. 3d at 966; *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 97 (D.D.C. 2014).

I do not share the concerns expressed by these courts. As discussed above, a direct FCA violation occurs not when the person receives money from the government, but when the person makes a false claim or statement. Thus, a direct false-claim violation is complete as soon as the person submits the false claim or makes the false statement. It is not unreasonable to think that if the person later receives money from the government based on his prior false claim or statement and does not return it, he could be deemed to have committed a second FCA violation. In this situation, the

person has committed two wrongful acts: (1) submitting the false claim or making the false statement, and (2) later avoiding an obligation to return money. Congress may have intended to allow the government to pursue both direct and reverse false claims under these circumstances.

In the present case, however, I do not need to decide whether Congress intended this result. This is so because the government alleges more than that SSSI failed to return money that it previously obtained through the submission of direct false claims. Instead, the government alleges that after SSSI submitted direct false claims and received government money as a result, it made *additional false statements*—the Shulman email and the annual certificates of final indirect costs—that were designed to prevent the government from obtaining repayment of the money. Thus, in this case, the government clearly alleges that SSSI committed distinct FCA violations—one for each false claim or statement. It is no different than if the government had alleged two direct FCA violations based on two different false claims or statements involving the same money. Accordingly, I conclude that the government can proceed with both its direct and its reverse FCA claims.

Of course, the government cannot recover the same damages more than once. So if the government proves that SSSI committed both direct and reverse FCA violations in connection with a single sum of money, it will be entitled to recover treble damages for that sum only once. But the FCA also allows the government to recover civil penalties, and perhaps the government will be entitled to recover separate civil penalties for the direct and the reverse false claims. This is a question of remedies to be addressed later in the case, if necessary.

**B.      Motion to Dismiss Complaint of Relator Cimma**

The FCA's first-to-file rule provides that "[w]hen a person brings an action under

[the *qui tam* provision of the FCA], no person other than the Government may intervene

or bring a related action based on the facts underlying the pending action." 31 U.S.C.

§ 3730(b)(5). The Seventh Circuit has explained the purpose of this rule as follows:

> Relators receive substantial awards for their services in bringing fraud to
> light—as much as 30% of the total to which the United States is entitled.
> See 31 U.S.C. § 3730(d). The lure of this payoff is what induces people to
> do the work to uncover fraud and to bear the risk and expense of the
> litigation. Me-too suits designed to divert some of the reward to latecomers
> do not serve any useful purpose, and they weaken the incentive to dig out
> the facts and launch the initial action. What's more, secondary suits that
> do no more than remind the United States of what it has learned from the
> initial suit deflect recoveries from the Treasury to rewards under §
> 3730(d). The False Claims Act offers private relators bonanzas for
> valuable information. If a suit makes a claim for compensation without
> revealing anything new, then it is sensible to block it under § 3730(b)(5)
> . . . . The author of the fraud won't escape when the first suit (or the
> ensuing federal investigation) tells the agency everything it needs to know,
> and the full recovery will go to the Treasury, without an unnecessary
> diversion.

*United States ex rel. Chovanec v. Apria Healthcare Group, Inc.*, 606 F.3d 361, 364 (7th

Cir. 2010).

The defendants contend that Cimma's suit is a related action under § 3730(b)(5)

because it is based on the same cost-plus-a-percentage-of-cost scheme as Patzer's

suit. Cimma responds that his action is distinct enough to avoid the first-to-file rule

because (1) his claims relate to the bridge contract only, and not to the prime contract

that is the subject of Patzer's complaint, and (2) he alleges that the defendants created

the fraudulent "firm-fixed price list" in March 2011, which Patzer does not mention in her

complaint. Cimma also contends that he was the source of the information that the

government used to develop its FCA and Anti-Kickback-Act claims based on the chargeback arrangement between SSSI and Derco.[6]

A later suit is barred by the first-to-file rule if it alleges claims based on the same material or essential facts alleged in the first suit. *Chovanec*, 606 F.3d at 365. Courts apply this standard on a scheme-by-scheme basis, rather than on a violation-by-violation basis. What I mean by this is that if the second suit alleges facts about the same fraudulent scheme as the first suit, then the second suit will be barred even if it supplies additional detail about the scheme or alleges that additional violations of the FCA occurred pursuant to that scheme. *See id.* at 364–65; *see also U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 121 (D.C. Cir. 2015) (stating that the first-to-file rule is applied "by comparing the complaints side-by-side, and asking whether the later complaint alleges a fraudulent scheme the government already would be equipped to investigate based on the first complaint"); *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Baxter Healthcare Corp.*, 772 F.3d 932, 937–38 (1st Cir. 2014) (stating that the FCA "does not guarantee that anyone with useful information about fraudulent conduct against the United States may recover damages by bringing a suit based on such knowledge" and that a second suit will be barred if the first suit "provided enough detail to ensure that the government knows the essential facts of a fraudulent scheme"); *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13, 32 (1st Cir. 2009) (stating

---

[6] Cimma also contends that because his action has been consolidated with Patzer's and he and Patzer have entered into an agreement to share relator awards, this case is no different than one in which one relator amends her complaint to add a second relator. I disagree. Patzer has not moved to amend her complaint to add Cimma as a plaintiff, and Cimma is the plaintiff in an entirely separate action. Moreover, the fact that their two actions were consolidated is irrelevant, as "[t]he FCA does not make an exception to the first-to-file rule for consolidated complaints." *United States ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 305 (4th Cir. 2017).

that later claim can be barred even if it incorporates somewhat different details); *U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009) (stating that second suit will be barred even if the second relator alleges "additional instance[s] of the previously exposed fraud"); *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc*, 149 F.3d 227, 234 (3d Cir. 1998) (stating that second suit is barred if first suit gave the government notice of the "essential facts of a fraudulent scheme").

Under this standard, Cimma's claims based on the cost-plus-a-percentage-of-cost scheme are barred. Patzer revealed the essential facts of that scheme in her complaint. It is true that Patzer's allegations pertained only to the original prime contract and did not allege that the scheme continued under the bridge contract. But that is only because Patzer was terminated before the prime contract gave way to the bridge contract. Patzer did not allege that the fraudulent scheme stopped when the term of the prime contract ended. Moreover, the scheme, as alleged by both Patzer and Cimma, was the same under both contracts: SSSI used Derco as its nominal parts supplier and submitted Derco's bills to the government for payment even though it knew that Derco's bills were based on illegal cost-plus-a-percentage-of-cost pricing. Thus, Cimma's allegations concerning the bridge contract do not allege a separate scheme; they allege only additional instances of the same fraud that Patzer previously exposed. Any reasonable investigation into Patzer's allegations would have discovered these additional instances of fraud.

Cimma also contends that his complaint is not related to Patzer's because he brought to light the defendants' fraudulent firm-fixed price list relating to 514 of the thousands of parts that Derco supposedly supplied. But again, this allegation merely

adds detail to the same scheme to submit false claims for payment to the government based on cost-plus-a-percentage-of-cost pricing. That is, Cimma alleges that the defendants created an incomplete list of Derco's purported firm-fixed prices in order to prevent the Navy from learning that the defendants had been submitting—and intended to continue to submit—invoices for payment that were based on cost-plus-a-percentage-of-cost pricing. Although this list may qualify as a false statement and give rise to an additional violation of the FCA, *see* 31 U.S.C. § 3729(a)(1)(B), the additional violation would be part of the same underlying scheme identified by Patzer—the scheme to have the government pay for trainer aircraft parts on a cost-plus-a-percentage-of-cost basis. Thus, Cimma's allegations concerning the list do not remove his action from the scope of the first-to-file rule.

Finally, Cimma argues that he was the source of the information that led the government to discover the alleged chargeback arrangement between SSSI and Derco, and that therefore he alerted the government to an entirely separate fraudulent scheme. I will assume, for purposes of this evaluating this argument, that the chargeback arrangement was a separate scheme from the cost-plus-a-percentage-of-cost pricing scheme and that, had Cimma filed a complaint alleging the essential facts of the chargeback scheme, his complaint would not fall within the scope of the first-to-file bar. The problem for Cimma is that his complaint in this action does not identify the essential facts of the chargeback arrangement.

The only part of Cimma's complaint that relates to the chargeback arrangement is his allegation that SSSI and Derco misrepresented to the Navy that Derco would be responsible for procuring parts when, in fact, the defendants expected that SSSI's

employees would procure the parts and that Derco's role would be limited to paying for the parts. (Cimma Compl. ¶¶ 5 & 43.) Cimma's complaint gives no hint that this allegation relates to a scheme that is separate from the cost-plus-a-percentage-of-cost scheme. Instead, Cimma alleges that the defendants misrepresented Derco's role as part of its scheme to inflate the price of parts by 32% above actual cost. (*Id.*) Cimma's complaint does not allege that SSSI billed the government for the cost of Derco's employees or that SSSI received a chargeback from Derco related to the cost of those employees. Moreover, Cimma's complaint does not allege that Derco later increased the amount of the chargebacks to include the cost of 18 additional employees that were never hired. Thus, when Cimma's complaint is read in isolation, and not alongside the additional facts alleged in the government's complaints, it does not suggest that the defendants engaged in an illegal chargeback scheme or any other scheme apart from the cost-plus-a-percentage-of-cost scheme.

In his brief in opposition to the defendants' motion, Cimma seems to acknowledge that his complaint does not contain the essential facts of the chargeback scheme. (Br. at 6–10.) But he states that the disclosures he provided to the government after he filed his complaint revealed the essential facts of that scheme. (*Id.* at 6.) He then requests leave to amend his complaint to include a count based on the chargeback scheme. (*Id.* at 10.)

As I have explained, Cimma's present complaint is based on the same fraudulent scheme as Patzer's complaint and does not allege facts relating to the supposedly separate chargeback scheme. Thus, Cimma's present complaint must be dismissed under the first-to-file rule. Although Cimma requests leave to amend his complaint, it is

not clear that an amendment—even one alleging an entirely different scheme—would allow Cimma's present action to continue. The first-to-file rule prohibits a second person from bringing a related *action*, not just a related complaint. Cimma brought a related action when he filed his current complaint alleging the same fraudulent scheme as Patzer's action. His later filing an amended complaint alleging a different scheme would not change that fact. Thus, because Cimma's action became a "related action" as soon as it was filed, the first-to-file rule would seem to require that it be dismissed even if Cimma could now amend his complaint to include allegations relating to a separate scheme. *Cf. United States ex rel. Shea v. Cellco Partnership*, 863 F.3d 923, 929–30 (D.C. Cir. 2017) (holding that filing an amended complaint does not end one action and begin a new one and therefore does not prevent dismissal under the first-to-file rule). However, a dismissal under the first-to-file rule is without prejudice, s*ee Kellogg Brown & Root Services, Inc. v. U.S., ex rel. Carter*, __ U.S. __; 135 S.Ct. 1970, 1978–79 (2015); *Chovanec*, 606 F.3d at 365, and therefore Cimma may be able to file a new action that is not related to Patzer's action.

At this point, I will not decide whether Cimma may file an amended complaint in this action or whether he is limited to bringing a new action, as the parties have not meaningfully briefed this issue. Instead, I will dismiss Cimma's complaint without prejudice and let him decide how to proceed. If he wishes to file an amended complaint in this action, he may file a motion for leave to file one, and then the parties can brief the question of whether a party may amend his compliant to avoid the first-to-file rule. Alternatively, Cimma may wish to ask Patzer to amend her complaint to add him as a party to her action. Or Cimma may decide that, because Patzer has agreed to share

any relator award that she receives with him, he does not need to maintain his own action or become a plaintiff in Patzer's action. Perhaps he would be content to participate in this case as a witness and wait to collect his share of the relator award from Patzer if she and the government prevail on their claims.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' partial motion to dismiss the government's complaints (ECF No. 86) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that the counts alleging violations of the Anti-Kickback Act (*Patzer* Count XII and *Cimma* Count VI) are dismissed. In all other respects, the motion is denied.

**IT IS FURTHER ORDERED** that the defendants' motion to dismiss Cimma's complaint (ECF No. 84) is **GRANTED**. His complaint is dismissed without prejudice.

Dated at Milwaukee, Wisconsin, this 20th day of July, 2018.

s/Lynn Adelman
LYNN ADELMAN
District Judge