# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA, ex rel.**
**MARY J. PATZER and PETER CIMMA,**
        **Plaintiffs,**

      **v.**                           **Case No. 11-C-0560**

**SIKORSKY AIRCRAFT CORPORATION,**
**SIKORSKY SUPPORT SERVICES, INC., and**
**DERCO AEROSPACE, INC.,**
            **Defendants.**

---

## DECISION AND ORDER

After relators Mary Patzer and Peter Cimma commenced separate actions against Sikorsky Aircraft Corporation and two of its subsidiaries, Sikorsky Support Services, Inc. ("SSSI") and Derco Aerospace, Inc., under the False Claims Act, the actions were consolidated, and the United States intervened to file its own complaint. The government alleges various counts, including violation of the False Claims Act and claims for common-law breach of contract and unjust enrichment, that arise out of a contract between SSSI and the United States Navy and a related subcontract between SSSI and Derco. According to the government, the central issue underlying its claims is whether SSSI and Derco entered into a subcontract that provided for payment on an illegal cost-plus-a-percentage-of-cost basis. Before me now are the parties' cross-motions for partial summary judgment on this issue.

## I. BACKGROUND

On November 9, 2005, the Navy requested proposals for a contract for maintaining trainer aircraft at Naval Air Stations in Corpus Christi, Texas, and Whiting

Field, Florida. Defendant SSSI bid on the contract. In its bid, SSSI proposed to use Derco as its subcontractor for "logistics support," which meant that SSSI intended to rely on Derco to procure the parts that SSSI would need to obtain to perform its maintenance and repair services for the Navy. (Pl. Prop. Findings of Fact ("PFOF") ¶ 4 & Def. Resp.) SSSI and Derco were both wholly-owned subsidiaries of Sikorsky Aircraft Corporation, which controlled both entities.[1]

On June 1, 2006, after receiving notification that the Navy had accepted SSSI's

proposal, SSSI executed contract N00019-06-D-0017 with the Navy. As is relevant here, the contract provided that any parts SSSI obtained in the course of performing its maintenance services had to be billed to the government on a cost-reimbursable basis, meaning that SSSI could not add its own profit to the parts it obtained. Although the contract did not prohibit SSSI's subcontractors from making a profit on the sale of parts, it did prohibit SSSI from entering into a subcontract in which SSSI agreed to pay the subcontractor on a cost-plus-a-percentage-of-cost basis. This prohibition was in line with federal procurement statutes and regulations, which expressly forbid "[t]he cost-plus-a-percentage-of-cost system of contracting." 10 U.S.C. § 2306(a); 48 C.F.R. § 16.102(c). In general, a cost-plus-a-percentage-of-cost system of contracting arises when a buyer commits itself to buying goods or services from a supplier without negotiating a fixed price for the goods or services at the time of contracting and instead agrees to pay the supplier the costs it incurs in performing the contract plus a profit

---

[1] I should note that, although SSSI and Derco were corporate affiliates, the issues raised by the present motions for summary judgment do not depend on this fact. Even if SSSI and Derco were unaffiliated companies operating at arms' length, they could not enter into a cost-plus-a-percentage-of-cost system of contracting and seek reimbursement from the government.

2

calculated as a percentage of those costs. *See Muschany v. United States*, 324 U.S. 49, 61–62 (1945). The reason Congress prohibited this type of arrangement in government contracting is that it gives the supplier an incentive to drive up the government's costs: because the supplier's profit is determined by a percentage of its future costs, the supplier has an incentive "to pay liberally for reimbursable items because higher costs mean[] a higher fee to him." *Id.* at 62.

After the Navy awarded the maintenance contract to SSSI, SSSI did not immediately enter into a written subcontract with Derco. However, on July 1, 2006, when SSSI began performing under the maintenance contract, SSSI started procuring the necessary parts through Derco. It did so by having personnel on site at the Navy Air Stations utilize Derco's software, known as "Industrial Financial Systems" or "IFS," to track and order the parts that SSSI needed to obtain to perform its maintenance services. The on-site personnel who ordered the parts, known as "buyers," were employed by SSSI. However, the defendants contend that, although the buyers were nominally employed by SSSI, they were functionally agents of Derco. The defendants explain that they originally intended to have Derco directly employ the buyers, but union contracts and other obstacles made it impractical to formally designate the buyers as Derco employees. So instead of Derco's employing the buyers, SSSI employed them, but ultimately Derco was financially responsible for the buyers and managed their operational functions. (Pl. PFOF ¶ 11 & Def. Resp.)

SSSI and Derco dealt with each other without a written agreement for the first two months of the maintenance contract. On August 31, 2006, however, Derco and SSSI signed a document known as the "Inter-Entity Work Authorization" or "IWA," which

they made retroactive to June 30, 2006. The government describes the IWA as a "subcontract." Pl. PFOF ¶ 13. The defendants, however, describe the IWA as a "basic ordering agreement" that "memorializ[ed] the terms under which Derco had provided and would provide 'Contractor Logistics Support' to SSSI under [SSSI's contract with the Navy]." (Resp. to Pl. PFOF ¶ 13.) Although the IWA contains various terms governing the relationship between SSSI and Derco, it does not contain terms that identify how Derco would be compensated for providing parts and other forms of logistics support. The IWA has a section entitled "Price & Delivery" (ECF No. 173–1 at p. 11 of 74), but this section does not identify specific prices or explain how SSSI and Derco would agree to prices or other compensation during performance of the subcontractor relationship. The only clause in the IWA relating to price is not actually a term that could be enforced, but a purported description of the IWA itself. This clause provides that "[t]his is an IWA for the purchasing of Firm Fixed Price aircraft components." (ECF No. 173-1 at p. 11 of 74, ¶ 5.1.) In government contracting, the term "firm-fixed price" means a price specified in the contract that is not subject to adjustment based on the contractor's performance costs. *See* 48 C.F.R. § 16.202-1. The IWA, however, does not identify any firm-fixed prices or incorporate by reference a price list containing firm-fixed prices.

According to the defendants, the reason the IWA does not contain a price list is that, at the outset of the contract, there was no reasonable way for SSSI and Derco to develop such a list. (Def. Resp. to Pl. PFOF ¶ 14.) They explain that neither the Navy nor its prior maintenance contractor provided Derco with a list of parts needed to support the contract, nor a usable purchasing history. (*Id.*) Because Derco and SSSI

had no practical way to agree to specific fixed prices at the outset of the subcontractor relationship, they instead "understood" that "Derco would be developing its fixed prices to SSSI by applying a markup, consisting of its estimated indirect costs and a reasonable profit, to its vendor's quoted price." (Def. PFOF ¶ 16.) As far as the record reveals, SSSI and Derco did not reduce this agreement to writing,[2] but they admit that they entered into such an agreement at the beginning of the subcontractor relationship. (*Id.*; Def. Resp. to Pl. Req. for Admission ¶¶ 1–4, ECF No. 158-4.) The defendants contend that, pursuant to this agreement, Derco established its prices to SSSI on an individual purchase-by-purchase basis by applying a 32% markup (representing its estimated overhead plus a reasonable estimated profit) to its vendors' quoted prices. (Def. PFOF ¶ 19.)

According to the defendants, Derco carried out its subcontractor obligations as follows. When SSSI needed a part, a buyer on site at the Navy Air Station began the acquisition process. Recall that, according to the defendants, the buyer was nominally employed by SSSI but acted as an agent of Derco. To fulfill the parts request, the buyer researched potential sources for the part (*i.e.*, searched for a third-party vendor) and obtained a price quote from the vendor. (Def. PFOF ¶ 25.) The buyer then entered the vendor's quoted price into Derco's IFS software, which automatically created (1) a purchase order that Derco would later transmit to the vendor and (2) a "customer order" that Derco would later use to bill SSSI for the part. (Def. PFOF ¶¶ 24, 26, 28.) When the buyer entered the vendor's quoted price into IFS, the software automatically added Derco's 32% markup to the vendor's price and entered that price (*i.e.*, the quoted price

---

[2] In their brief, the defendants state that this understanding was "[b]ased on prior experience and discussions about the IWA." (ECF No. 170 at p. 9 of 36.)

x 1.32) on the customer order line in IFS. (Def. PFOF ¶ 28.) According to the defendants, the resulting price on the customer order line was Derco's "fixed sales price to SSSI" for the part. (*Id.*) However, as far as the record reveals, Derco did not transmit this price information to SSSI and have SSSI agree to the price before Derco ordered the part from the vendor.

Once the vendor received Derco's purchase order, the vendor shipped the part to SSSI at the appropriate Navy Air Station and sent an invoice to Derco at its headquarters in Milwaukee, Wisconsin. (Def. PFOF ¶ 32; Pl. PFOF ¶ 21.) After personnel at the air station accepted the part, the purchase-order entry in IFS was updated to reflect that the part was received. (Def. PFOF ¶ 32.) At that point, IFS automatically marked the corresponding customer order line as "delivered." (Def. PFOF ¶ 33.) About once or twice a month, Derco's billing personnel would run a query in IFS for customer order lines marked "delivered" and prepare invoices to SSSI for the delivered parts. (Def. PFOF ¶ 40.) Derco would then send invoices to SSSI in which each part was priced at the purchase-order price plus Derco's 32% markup. (Def. PFOF ¶¶ 44–45.) After SSSI paid Derco's invoices, SSSI submitted a voucher to the government for reimbursement. Through a separate process, Derco's accounting department paid the vendor's invoice. (Def. PFOF ¶ 46.)

The parties agree that, "[o]ftentimes," the price on the vendor's invoice did not match the price on Derco's purchase order. (Def. PFOF ¶ 47 and Pl. Resp.) Derco referred to these differences between the purchase order and vendor invoice as "purchase price variances," or "PPVs". (*Id.* ¶ 48.) According to the defendants, the quoted price on the purchase order could change by the time the vendor issued the

invoice "due to parts availability, raw material costs, and/or scope of work modification."
(Def. PFOF ¶ 49.) The defendants also point out that Hawker Beechcraft, one of
Derco's main suppliers, expressly stated in its terms and conditions that "prices are
subject to change without notice" and that "all orders are subject to [the supplier's] price
in effect at time of shipment." (Def. PFOF ¶ 50.) According to Derco's controller, over
the life of the subcontract relationship between SSSI and Derco, which involved roughly
145,000 parts sales, the vendor's invoice price to Derco varied from the purchase-order
price roughly 29,000 times, or in about 20% of all parts sales. (Def. PFOF ¶ 51.)
Conversely, this means that the invoice price was identical to the purchase-order price
in approximately 80% of all sales.

　　　The parties vehemently dispute how Derco calculated its prices to SSSI for
purchases in which the purchase-order price differed from the invoice price. The
defendants contend that Derco generally set its prices to SSSI based on the purchase-
order price, which they describe as Derco's "estimated costs," even when the invoice
price was different than the purchase-order price. (Def. PFOF ¶¶ 29.) However, Derco
eventually adopted a policy of investigating transactions in which IFS reflected that the
final invoice price varied from the initial purchase-order price by more than $25.[3] (Def.
PFOF ¶ 55.) In those circumstances, Derco's accounts payable department worked with
the buyers at the air stations to try and identify the reason for the price differences. (*Id.*)
According to the defendants, "in limited, fact-specific circumstances," the investigation
would result in Derco's "adjust[ing] its net billings to SSSI when appropriate." (*Id.*) The
defendants identify several reasons that might have resulted in an adjustment to a

_____

[3] The parties agree that Derco never adjusted its price to SSSI based on a purchase-
price variance of less than $25. (Def. PFOF ¶ 60 & Pl. Resp.)

particular price to SSSI. First, they state that "[t]he rare adjustments that did occur were intended 'to ensure that the invoices to SSSI did not contain significant price errors and to correct true errors in the pricing, such as typographical errors or misquotes.'" (Def. PFOF ¶ 57.) Second, they state that adjustments were made in situations in which a part was either unexpectedly covered by a warranty (and thus a refund of the purchase price was due) or unexpectedly not covered by a warranty (in which case Derco would charge SSSI for a new part). (Def. PFOF ¶ 58.) Finally, the defendants state that price adjustments occurred when Derco billed SSSI for a repair to a part but the supplier, after receiving and inspecting the part, deemed the part "beyond economical repair." (Def. PFOF ¶ 59.) In those instances, Derco would refund SSSI the amount it paid for the anticipated repair. (*Id.*) The defendants contend that they have identified 333 parts transactions involving a purchase-price variance of more than $25 that were not adjusted, including 162 transactions in which Derco lost money on its sales to SSSI. (Def. PFOF ¶¶ 61–65.) The defendants contend that these transactions prove that Derco was not adding its 32% markup to the invoice prices. Rather, Derco insists that its markup was consistently added to the price listed on Derco's purchase orders and that any changes made at the time of invoicing were for legitimate reasons, not to ensure that Derco always recovered its actual costs plus 32%.

The government, in contrast, contends that Derco routinely adjusted its billings to SSSI to account for purchase-price variances over $25. According to the government, "[i]f a PPV reflected an increase in Derco's costs of greater than $25 and Derco determined that the invoice was correct, Derco adjusted its incurred costs for the part in its general ledger to reflect the amount of the variance, added a 32% markup to the

PPV, and then invoiced SSSI for the additional amount." (Pl. PFOF ¶ 30.) Likewise, "[i]f a PPV reflected a decrease in Derco's costs by more than $25 and Derco determined the invoice was correct, it adjusted its incurred costs and then credited SSSI for the variance, plus 32% of that amount." (*Id.*) The government thus contends that Derco added its markup to the vendor's invoice price rather than to the vendor's quoted price as listed on Derco's purchase order.

SSSI and Derco operated under the arrangement described above for about five years. As SSSI's contract with the Navy drew to a close, the Navy conducted an open competition for a follow-on contract. (Pl. PFOF ¶ 38.) The Navy initially awarded the contact to a bidder other than SSSI, but this award was subject to a successful bid protest, which required the Navy to conduct a second competition for the follow-on contract. (*Id.*) On March 30, 2011, the Navy awarded SSSI a second contract, which the parties refer to as the "Bridge Contract," to ensure that maintenance services continued during the re-bidding process. (Def. PFOF ¶ 79–80.) While performing under the Bridge Contract, SSSI continued to use Derco for logistics support, and SSSI and Derco continued their subcontractor relationship under the IWA. (Pl. PFOF ¶ 42.) However, for the first time, Derco developed a firm-fixed-price list for 514 high-use parts, which it then provided to SSSI. (Pl. PFOF ¶ 43 & Def. Resp.) For parts not included on the price list, Derco continued its practice of developing prices on a purchase-by-purchase basis by applying a 32% markup to its vendor's quoted price. (Def. Resp. to Pl. PFOF ¶ 43.)

At some point, the Defense Contract Management Agency ("DCMA") raised questions about Derco's pricing. (Pl. PFOF ¶ 44 & Def. Resp.) In response to the DCMA's concerns, SSSI and Derco agreed to end the practice of allowing Derco to add

a markup to its vendors' quoted prices. Beginning on July 1, 2012, SSSI and Derco agreed that Derco would provide parts to SSSI at cost and then charge a flat monthly fee for its services. (Pl. PFOF ¶¶ 44–45 & Def. Resp.)

In its current motion, the government seeks summary judgment on the issue of whether the agreement between SSSI and Derco for Derco to sell parts to SSSI at a 32% markup amounted to a prohibited cost-plus-a-percentage-of-cost system of contracting. The government does not, however, contend that the sale of parts pursuant to Derco's list of 514 firm-fixed prices was illegal. Nor does the government contend that SSSI and Derco's later agreement to sell parts at cost plus a flat monthly fee was illegal.[4]

The defendants have filed their own motion for summary judgment, but not on the ground that the government lacks sufficient evidence to get to trial on its claim that the arrangement between SSSI and Derco involved cost-plus-a-percentage-of-cost contracting. Instead, the defendants contend that, based on a position the United States took in *UMC Electronics Co. v. United States*, 43 Fed. Cl. 776 (1999), it is now judicially estopped from claiming that the pricing agreement between SSSI and Derco amounted to a cost-plus-a-percentage-of-cost system of contracting.

I consider the parties' cross-motions for summary judgment below.

---

[4] In addition to the parts transactions I have already discussed, Derco made several sales of "high dollar items" to the Navy through SSSI that were initiated in response to specific Navy requests for proposals that resulted in predetermined fixed-price contracts. (*See* Def. PFOF ¶¶ 35–39.) It is not clear from the government's briefs whether it contends that these sales were made on a cost-plus-a-percentage-of-cost basis. In any event, as I will discuss below, those sales clearly were not made on such a basis.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

### A.      Government's Motion for Summary Judgment

The parties dispute how to characterize the form of the pricing arrangement between SSSI and Derco. The defendants contend that the pricing arrangement amounted to a contract to sell at firm-fixed prices. The government, as we know, contends that the pricing arrangement was an agreement to sell parts at Derco's costs plus a percentage of those costs. Thus, before addressing the parties' arguments, I will provide some general background on the types of contracts that are typically used in government contracting.

Government contracts are grouped into two broad categories: fixed-price contracts and cost-reimbursement contracts. *See* 48 C.F.R. § 16.101(b). Fixed-price contracts provide for a firm price or, in appropriate cases, an adjustable price. *Id.* § 16.201(a). There are several types of fixed-price contracts, *see id.* §§ 16.202–16.207, including, as is relevant here, firm-fixed-price contracts, *id.* § 16.202. A firm-fixed-price contract provides for a price that is not subject to adjustment on the basis of the contractor's cost experience in performing the contract. *Id.* § 16.202-1. This means that, at the time of contracting, the parties have agreed to a specific price for the goods or

services that will not change based on the contractor's performance costs. *See* 2 Walter Wilson, *Government Contracts: Law, Administration and Procedure* § 19.20[1], LexisNexis (database updated 2021) (a firm-fixed price contract "represents an agreement by the contractor to furnish to the government the supplies or services called for at a specified price"). Under a firm-fixed price contract, "the contractor has the greatest incentive to produce economically, for its profit will depend on the difference between its costs of production and the selling price to the government." *Id.*

The other broad contract type is the cost-reimbursement contract. In a cost-reimbursement contract, the government does not contract for the performance of a specified amount of work for a predetermined price but instead agrees to pay the contractor's reasonable costs of performance. *See* 48 C.F.R. § 16.301-1; John Cibinic, Jr., et al., *Cost-Reimbursement Contracting* 1 (4th ed. 2014). As with fixed-fee contracts, there are several types of cost-reimbursement contracts. However, for present purposes, I need not provide a general overview of the permissible forms of cost-reimbursement contracts because neither the government nor the defendants contend that the subcontractor arrangement between SSSI and Derco took the form of a permissible cost-reimbursement contract. Instead, as discussed, the defendants claim that they agreed to firm-fixed prices, and the government contends that the defendants agreed to a cost-plus-a-percentage-of-cost system of contracting, which is always illegal.

I have already provided an overview of cost-plus-a-percentage-of-cost contracts in the background section, above. As I explained there, a cost-plus-a-percentage-of-cost system of contracting arises when a buyer commits itself to buying goods or

services from a supplier without negotiating a specific price for the goods or services at the time of contracting and instead agrees to pay the supplier the costs the supplier incurs in performing the contract plus a profit calculated as a percentage of those costs. *See Muschany*, 324 U.S. at 61–62. "The evil of such contracts is that the profit of the other party to the contract increases in proportion to that other party's costs expended in the performance." *Id.* at 61.

The federal procurement statutes and regulations prohibit government contractors and subcontractors from using the "cost-plus-a-percentage-of-cost system of contracting." 10 U.S.C. § 2306(a); 48 C.F.R. § 16.102(c); 48 C.F.R. § 52.244-2. But beyond this simple statement that such contracting is prohibited, the statutes and regulations provide no guidance. Thus, no statute or regulation rigorously defines the elements of cost-plus-a-percentage-of-cost contracting. In *Urban Data Systems, Inc. v. United States*, 699 F.2d 1147, 1150 (Fed. Cir. 1983), however, the Federal Circuit accepted the "general criteria" developed by Comptroller General for determining whether a contract is a cost-plus-a-percentage-of-cost contract. There are four such criteria: (1) payment is on a predetermined percentage rate; (2) the predetermined percentage rate is applied to actual performance costs; (3) the contractor's entitlement is uncertain at the time of contracting; and (4) the contractor's entitlement increases commensurately with increased performance costs. *Id.* (citing 55 Comp. Gen. 554, 562 (1975)). Ultimately, however, "any contractual arrangement where the contractor is assured of greater profits by incurring additional costs will be held illegal." Cibinic, et al., *supra*, at 42.

The defendants claim that Derco and SSSI entered into a firm-fixed-price contract. But the evidence is to the contrary. As the defendants admit, at the start of the subcontractor relationship, Derco was unable to calculate firm-fixed prices because it did not have sufficient information about the parts that SSSI would need. (Def. Resp. to Pl. PFOF ¶ 14.) So, instead of agreeing to a firm-fixed-price list at the time they negotiated the subcontract, SSSI and Derco agreed that "Derco would be developing its fixed prices to SSSI by applying a markup, consisting of its estimated indirect costs and a reasonable profit, to its vendor's quoted price" on a "purchase-by-purchase basis." (Def. PFOF ¶¶ 16, 19.) The defendants claim that this process of applying a markup to vendor prices "established a fixed price to SSSI." (Def. PFOF ¶ 19.) However, although in a literal sense adding a markup to a quote can produce something that might be called a "fixed price," it does not follow that Derco and SSSI entered into a firm-fixed-price *contract* within the meaning of federal acquisition law. That is so because Derco and SSSI did not negotiate the fixed price *at the time of contracting*. *See* 48 C.F.R. § 16.202-1 (specifying that a firm-fixed-price contract "provides for a price"). What Derco and SSSI agreed to at the time of contracting was a *method* for calculating *future* prices—adding 32% to the vendors' quoted prices at the times Derco received them— not firm-fixed prices. Indeed, even a cost-plus-a-percentage-of-cost contract will result in a fixed price once the contractor incurs its performance costs and tacks its predetermined percentage rate onto those costs, but obviously a cost-plus-a-percentage-of-cost contract is not a firm-fixed-price contract.

The defendants claim that "the 'time of contracting' [was] not when the parties negotiated the IWA; it was when they agreed on a fixed price for each transaction."

(ECF No. 170 at pp. 31–32 of 36.) But the defendants do not support this argument by showing that the elements of contract formation—offer, acceptance, and consideration—were met on a purchase-by-purchase basis. Instead, their own proposed finding of fact states that, at the outset of SSSI and Derco's subcontractor relationship, SSSI and Derco "understood" (*i.e.*, agreed) that Derco would apply a markup to whatever the vendor's quoted price for the part happened to be at the time SSSI needed the part. (Def. PFOF ¶ 16.) Similarly, in their response to the government's requests for admission, the defendants wrote that "Derco and SSSI agreed that Derco would establish a fixed price to SSSI on an individual purchase-by-purchase basis by applying a markup consisting of Derco's estimated material overhead rate, general and administrative ("G&A") rate, and profit, to Derco's vendor's quoted price (i.e., its estimated costs)." (Resp. to RFA Nos. 1–4, ECF No. 158-4.) Thus, by the defendants' own admissions, SSSI and Derco agreed to pricing terms—a method for calculating future prices—at the beginning of the subcontractor relationship.

Moreover, no evidence shows that each individual sale of parts resulted in a freestanding contract between SSSI and Derco. As discussed in the background section, the buyers who selected the parts were agents of Derco rather than SSSI. No evidence shows that, after the buyer selected a part and IFS calculated a specific price, Derco contacted SSSI and offered to enter into a contract for the sale of that part at that price, which SSSI then had an opportunity to accept or reject before Derco placed the order. The defendants claim that Derco and SSSI agreed on a fixed price for each transaction "when Derco issued an individual purchase order and IFS generated a fixed price to SSSI." (ECF No. 170 at 32 of 36.) But no evidence shows that SSSI actually

agreed to the price generated by IFS *before* Derco ordered the part and had it delivered. The defendants' evidence shows only that Derco *calculated* its price using IFS at the time it prepared the purchase order issued to Derco's vendor. (*See* Def. PFOF ¶ 29 and evidence cited there.) The defendants do not submit evidence that an agent of SSSI saw the calculated price and had an opportunity to accept or reject it before Derco completed the transaction and sent SSSI an invoice.[5] As far as the record reveals, the first time SSSI learned of the price for a part was when it received Derco's invoice, which did not occur until after the part had already been delivered to SSSI.

Ultimately, what the undisputed evidence shows is that SSSI subcontracted with Derco for a service—"logistics support"—that consisted of Derco's supplying personnel (the buyers) and software (IFS) capable of satisfying SSSI's need for spare parts. (Def. PFOF ¶ 17.) SSSI agreed to pay Derco for this service by allowing Derco to add a 32% markup to the parts it would obtain using the buyers and the software. Thus, SSSI and Derco had one contract: SSSI's agreement to use Derco for logistics support and to compensate it for its services by paying a 32% markup on parts. This contract might not have been entirely contained within the terms of the IWA, but it existed nonetheless, as shown by the defendants' proposed findings of fact and responses to requests for admission. And because the contract did not provide for a predetermined, fixed price for Derco's services, it was not a firm-fixed-price contract.

Although SSSI's contract with Derco was not a firm-fixed-price contract, it does not follow that the contract resulted in a cost-plus-a-percentage-of-cost system of

---

[5] To the contrary, a Derco witness agreed at his deposition that there was "no realtime order-by-order communication of the customer order information from Derco to SSSI as individual parts transactions [were] occurring." (Dep. of Peter Winkler at 188:24–189:10; ECF No. 173-19.)

contracting, for, as discussed, the firm-fixed-price contract is not the only legitimate type of government contract. But here, the contract actually resulted in a cost-plus-a-percentage-of-cost system. The reason is simple: SSSI agreed to use Derco for logistics support and compensate it by paying a 32% markup on the then-undetermined vendor prices for the parts that Derco would order during the life of the subcontract. This gave Derco an incentive to choose the vendor that quoted the highest price, since Derco's entitlement was determined by a percentage of that price. Thus, the "evil" that the prohibition of cost-plus-a-percentage-of-cost contracting was meant to thwart was present in the SSSI-Derco arrangement. *Muschany*, 324 U.S. at 61.[6]

The government briefs the question of whether the contract was a prohibited cost-plus-a-percentage-of-cost contract using the four criteria identified in *Urban Data Systems*, 699 F.2d at 1150, and so I will address those criteria as well. I think my analysis so far shows that three of the four criteria are met. The first criterion is that "payment is on a predetermined percentage rate." *Id.* Here, that criterion is satisfied because it is undisputed that SSSI and Derco agreed in advance that SSSI would pay Derco a 32% markup on parts. (Def. PFOF ¶¶ 16, 19.[7]) The third criterion is that "the contractor's entitlement is uncertain at the time of contracting." *Urban Data Sys.*, 699 F.2d at 1150. Here, as explained, SSSI and Derco did not agree to predetermined prices at the time SSSI subcontracted with Derco for logistics support, and thus this

---

[6] Derco has submitted declarations from the buyers at the air stations in which they swear that they never tried to inflate Derco's costs by selecting the most expensive parts. (*See, e.g.*, Decl. of Terry Ellis ¶ 32; ECF No. 173-7.) But the prohibition on cost-plus-a-percentage-of-cost contracting applies even when the contractor does not act on its incentive to drive up the government's costs, so the buyers' actual motivations are not relevant to the issues raised by the present motions.

[7] Although the government denies these proposed findings, it does not deny that SSSI and Derco agreed to apply a 32% markup.

criterion is satisfied. The fourth criterion is that "the contractor's entitlement increases commensurately with increased performance costs." *Id.* As I have explained, Derco's entitlement would increase if, during performance of the subcontract, it selected the vendors that quoted the highest prices, and thus this criterion is satisfied.

The defendants contend, however, that the second criterion is not satisfied because Derco did not apply its 32% markup to its "actual performance costs." *Urban Data Sys.*, 699 F.2d at 1150. Here, the defendants draw a distinction between the price that a vendor quoted to Derco at the time that Derco placed an order for the part and the price that the vendor included on its invoice at the time of billing. The defendants describe the former as Derco's "estimated cost" (ECF No. 170 at 23 of 36) and the latter as its "actual performance cost" (*id.* at 11 of 36). According to the defendants, so long as Derco applied its 32% markup to the purchase-order price rather than the vendor's invoice price, there was no cost-plus-a-percentage-of-cost contracting.

The response to this argument is that adding a markup to the vendor's quoted price presents the same "evil" as adding a markup to the vendor's invoice price: because the price for the part was not agreed to at the time of contracting and, instead, SSSI agreed to pay a markup to Derco based on a percentage of the vendor-quoted prices Derco received during contract performance, Derco had an incentive to drive up its costs (and thus SSSI's costs and ultimately the government's costs) by choosing the vendor that quoted the highest price. For example, if Vendor A quoted $100 and Vendor B quoted $150, Derco had an inventive to choose Vendor B because Derco could then bill SSSI (and ultimately the government) $198 rather than $132, and its expected profit would be $48 rather than $32.

The defendants note that Derco's vendors' quoted prices were not binding, and that therefore Derco bore the risk that its actual costs, as reflected on the vendor invoices, would be higher than the vendor quoted prices to which it added its 32% markup. But, even if a price change occurred between ordering and invoicing, Derco's entitlement—its price to SSSI—would always be the greatest when Derco selected the vendor that quoted the highest price. For example, in the prior example, if Vendor B raised its price to $155 between the time of ordering and delivery, Derco's entitlement would still be greater if it ordered from Vendor B rather than Vendor A, as Derco would bill SSSI $198 rather than $132 and earn a profit of $43 rather than $32.

Moreover, the evidence shows that the risk that Derco's vendors would significantly increase their prices between the time of ordering and invoicing was so small as to be virtually nonexistent. According to the defendants' own evidence, over the life of the subcontract, the actual invoice price differed from the vendor's quoted price only 20% of the time, which means that, in 80% of all parts sales, the invoice price was exactly the same as the quoted price. (Def. PFOF ¶ 51.) Further, of the approximately 29,000 instances in which the quoted price and the invoiced price varied, approximately 17,800 of them varied by only one, two, or three cents. (Pl. PFOF ¶ 63.) Thus, only about 8% of sales[8] could have resulted in more than a miniscule difference between the quoted price and the invoice price. Further, the defendants have been able to identify only 333 parts sales in which the difference between the purchase-order price

---

[8] If 29,000 sales amounted to 20% of the total sales over the life of the contract, then there were approximately 145,000 total sales (29,000 x 5). Subtracting 17,800 from 29,000 gives 11,200, which is the number of sales in which the invoice price varied from the quoted price by more than three cents. 11,200 divided by 145,000 is 0.077, which when multiplied by 100 to yield a percentage is 7.7%, which I rounded up to 8% in the text.

and the invoice price was more than $25 and Derco did not adjust the price to SSSI after invoicing to fix a mistake or related issue in the purchase-order price. (Def. PFOF ¶ 61.) These 333 sales amount to about two-tenths of one percent of the total sales over the life of the contract.[9] All of this shows that, when the products being sold are spare parts, the vendor's price at the time of invoicing is not likely to vary significantly from the price that it quoted at the time of ordering. So the contractor can be assured that, by consistently ordering from vendors who quote the highest prices, it will maximize its own percentage-based profits.

The defendants cite the Supreme Court's decision in *Muschany* for the proposition that a cost-plus-a-percentage-of-cost violation does not occur just because a contractor's estimated costs (which, according to Derco, were its purchase-order prices) and its actual costs (which, according to Derco, were its invoice prices) are identical. (ECF No. 170 at p. 27 of 36.) But *Muschany* does not support the defendants' position. In that case, the contract alleged to be illegal was a contract between landowners and the government to purchase land for an ordnance plant. 324 U.S. at 51. Prior to entering into any contract for the sale of the land, the government engaged an agent to procure options from various property owners for the purchase of suitable land. The government agreed with the agent that his fee would be a 5% commission to be paid by the sellers of the land the government ultimately decided to purchase. *Id.* at 51–52. The selling landowners knew in advance of contracting with the government that the agent's fee would be deducted from the sales price, and the Court found that the landowners therefore increased their asking price to the government by 5% to account

---

[9] As explained in the prior footnote, Derco made approximately 145,000 parts sales to SSSI over the life of the contract. 333 divided by 145,000 is 0.0023, or 0.23%.

for the agent's fee. *Id.* at 56. The government then accepted the landowners' offer to sell their land at the resulting fixed price. *Id.* at 53. The government later tried to repudiate its contract with the landowners by claiming it violated the prohibition on cost-plus-a-percentage-of-cost contracting, since the agent's fee of 5% was added to the cost of the land. *Id.* at 54. But the Supreme Court rejected this argument on the ground that the sales price to the government was fixed at the time the government and the landowners entered into the contract for the sale of the land and the price was not "subject to change by future action of the [landowners]." *Id.* at 63. In other words, at the time of contracting, the government knew the exact price to be paid for the land, and no part of the sales price was based on an "estimate" of the landowners' or the agent's future costs. In contrast, in the present case, neither SSSI nor the government knew the price of parts at the time SSSI and Derco contracted for Derco's services and SSSI agreed to pay Derco a 32% markup on future vendor-quoted prices. Because Derco's price to SSSI and the government would be determined by Derco's post-contracting actions in selecting vendors for each parts transaction, *Muschany* does not support the defendants' argument.

Another way of explaining this is that Derco obtained the vendor-quoted prices while it was *performing* the subcontract, not while it was preparing a *proposal* for the subcontract. As I have explained, SSSI and Derco agreed to the logistics subcontract in Summer 2006 and at that time determined that Derco would receive compensation in the form of a 32% markup on vendor-quoted prices. Derco did not at that time obtain quotes from its vendors, add 32%, and provide SSSI with a list of specific prices to agree to for the life of the subcontractor relationship, which would have resulted in a

legal firm-fixed-price contract. Rather, the vendor-quoted prices were unknown at the time of contracting. Further, because Derco received the quotes at roughly the same time that it ordered the parts, the quotes were highly unlikely to change significantly before the vendor shipped them. This is not a case in which the contractor, for example, submitted a proposal to build a new kind of aircraft and based its prices on estimates for raw materials that would not be acquired until months or years after the proposal was prepared, at which time actual prices could vary significantly from the estimates. So, in this case, the vendor quotes were nearly identical to—and therefore a proxy for—actual performance costs, even though those quotes were technically subject to change. Indeed, the defendants' evidence shows that, for the year 2008, Derco's adding 32% to its vendor-quoted prices resulted in its billing SSSI 99.58% of the amount it would have billed had it added 32% to its vendor-invoiced prices, which it claims were its actual performance costs. (Zemek Decl. ¶ 13, ECF No. 173-48.[10]) For these reasons, the vendor-quoted prices cannot meaningfully be viewed as "estimated costs," as the defendants contend.[11]

---

[10] Zemek's declaration states that, in 2008, Derco's cost of sales was $29,015,934.45. Adding 32% to this cost gives $38,301,033.47. The amount that Derco actually billed to SSSI in 2008 was $38,138,867.18, which is 99.58% of Derco's actual cost of sales plus 32%.

[11] To support their argument that the vendor quotes were estimates that Derco used to create fixed prices, the defendants cite an article stating "[w]here estimated costs are involved there is no likelihood of the contractor gaining financial advantage by deliberately increasing the cost of doing the job. The reason is plain. The amount of the entitlement is set at the time of the award, based on the estimate." ECF No. 170 at p. 32 of 36 n. 37 (citing Frank Reda, *Anatomy of Cost-Plus-Percentage-of-Cost*, 10 AF JAG L. Rev. Sept-Oct 1968, at 41). But the defendants seem to overlook the important part of this statement, which is that estimates are used to lock in a price "at the time of the award," *i.e.*, at the time of contracting. As I have explained, for the SSSI-Derco relationship, the time of contracting was Summer 2006, when SSSI agreed to pay Derco

Now, I realize that the second criterion from *Urban Data Systems* states that the predetermined rate must be applied to "actual performance costs" and that, from an accounting perspective, it is reasonable to describe the vendors' invoice prices, rather than Derco's purchase-order prices, as Derco's actual performance costs. But the term "actual performance costs" does not appear in the statutes or regulations forbidding cost-plus-a-percentage-of-cost contracting. Rather, the statutes and regulations state, without further elaboration, that "[t]he cost-plus-a-percentage-of-cost system of contracting may not be used." 10 U.S.C. § 2306(a); 48 C.F.R. § 16.102(c).[12] The term "actual performance costs" was introduced into the cost-plus-a-percentage-of-cost context by a judicial opinion that incorporated an opinion of the Comptroller General. Neither the Federal Circuit nor the Comptroller General defined the term. Further, courts must avoid treating language in judicial opinions as statutory text and must instead understand such language in light of the opinions' holdings. *See Vinning-El v. Evans*, 657 F.3d 591, 595 (7th Cir. 2011) ("[J]udicial opinions are not statutes . . . . It is always important to understand opinions in light of their holdings and not take ambiguous statements for all they might be worth."). I do not see anything in *Urban Data Systems* or the opinion of the Comptroller General suggesting that a contractor could avoid the prohibition on cost-plus-a-percentage-of-cost contracting by applying its predetermined percentage rate to the price that a vendor quotes at the time of ordering rather than to

an undetermined price based on its future vendor quotes and a 32% markup. Derco did not use estimates to lock in prices at that time.

[12] The defendants cite other federal acquisition regulations dealing with the concept of costs (*see* ECF No. 170 at pp. 14–15 of 36), but none of them purports to interpret the statute prohibiting cost-plus-a-percentage-of-cost contracting. Instead, these regulations set rules for recovering costs from the government under *legal* cost-reimbursement contracts. Such rules are not relevant to defining the elements of an *illegal* form of contracting.

the price that the vendor ultimately charges at the time of shipping when, as in this case, adding the percentage rate to either price gives the contractor an incentive to drive up the government's costs after the government has already committed to buying from the contractor at the agreed markup. Thus, whether or not the vendor-quoted prices are "actual performance costs" from a strict accounting perspective, I conclude that, under the facts of this case, adding a predetermined percentage rate to those prices resulted in a "cost-plus-a-percentage-of-cost system of contracting" within the meaning of 10 U.S.C. § 2306(a) and the associated regulations.

Before moving on, I think it is helpful to contrast the parts sales discussed above with certain "high dollar" parts sales that SSSI and Derco made to the Navy through a separate process. (*See* Def. PFOF ¶¶ 35–39.) In these high-dollar sales, the procurement process began with the Navy's issuing a request for a proposal from SSSI. In response, a buyer at one of the air stations, acting on behalf of Derco, obtained a quote from a vendor for the part the Navy needed. After selecting a vendor, Derco added its 32% markup to the vendor's quoted price and sent this new price to SSSI, at which time SSSI added its own permitted indirect rate to Derco's price and submitted the resulting proposed firm-fixed price to the Navy. After receiving the proposal, the Navy could either accept or reject it. Once the Navy accepted the proposal, a firm-fixed-price contract was formed. Derco then sent a purchase order to the vendor and eventually billed SSSI for the part at the vendor's quoted price plus 32%, in accordance with its earlier agreement with SSSI and the Navy.

The above process for obtaining high-dollar parts resulted in freestanding, legal, firm-fixed-price contracts. That is so because, in each transaction, Derco estimated its

costs prior to the time either SSSI or the Navy committed to purchasing the parts and then used that estimate to calculate a specific price that both SSSI and the Navy accepted before Derco ordered the part, and the contract did not permit Derco to modify the price during performance to account for its actual cost experience. Under this process, Derco had no opportunity to increase its entitlement by increasing the government's costs after the time of contracting. In contrast, the parts sales made pursuant to SSSI and Derco's "understanding" that Derco could always add 32% to its future vendor price quotes was an illegal cost-plus-a-percentage-of-cost arrangement. That understanding was made at the time the IWA was signed in 2006. At that time, SSSI committed itself to purchasing parts at undetermined prices and agreed that those prices would later be determined by Derco's adding a predetermined percentage rate to vendor quotes that Derco had not received prior to the time of contracting with SSSI. For these sales, Derco did not prepare proposals that included fixed prices and have either SSSI or the Navy accept or reject them on a purchase-by-purchase basis, and thus separate contracts were not formed each time Derco ordered a part. Under this arrangement, Derco had an incentive to inflate its fee by always selecting the vendor who quoted the highest prices, knowing that its selection was not subject to preapproval by either the Navy or SSSI.

The defendants note that it would not have been "cost effective" to have Derco's prices separately preapproved for "low-dollar items," as was the case with the high-dollar parts. (ECF No. 170 at p. 27–28 of 36, n.27.) I do not doubt that that is true. But the impracticality of having SSSI preapprove Derco's prices for individual low-dollar parts transactions only highlights the reality that, for low-dollar parts, SSSI and Derco

entered into a single contract governing all such parts sales rather than nearly 150,000 freestanding contracts for the sale of individual parts at fixed prices. Notably, the illegal cost-plus-a-percentage-of-cost arrangement to which SSSI and Derco agreed was not the only alternative to negotiating tens of thousands of individual contracts. For example, they could have, at the outset of their subcontract, entered into the legal cost-plus-flat-monthly-fee arrangement that they eventually entered into after the DCMA questioned Derco's markup.

For the above reasons, I conclude the government is entitled to summary judgment on the issue of whether SSSI and Derco entered into a cost-plus-a-percentage-of-cost system of contracting. As noted in the background section, the government argues that the system of contracting should also be deemed illegal because Derco routinely adjusted its prices based on vendor invoices to ensure that it always recovered its actual costs plus 32%. Because I have concluded that SSSI and Derco's understanding was illegal even if Derco always added its markup to the vendor-quoted price rather than the invoice price, I do not need to discuss this argument. But, if I had to reach the issue, I would not enter summary judgment for the government. Although the government's evidence shows that Derco sometimes made price adjustments after invoicing, the evidence does not compel a reasonable trier of fact to conclude that Derco always made such adjustments or that the adjustments it did make resulted in a cost-plus-a-percentage-of-cost system of contracting. The evidence shows that some of the adjustments were made to correct errors in the price quote, such as instances in which the decimal point was in the wrong place, causing the price to be off by an order of magnitude (Zemek Dep. at 90:21–91:12), and that other adjustments

Case 2:11-cv-00560-LA   Filed 11/29/21   Page 26 of 36   Document 190

were made because of unexpected warranty coverage or noncoverage (Def. PFOF ¶¶ 58–59). These price changes were designed to correct mistakes or otherwise bring the contract price in line with the price Derco meant to charge at the time of ordering the part, rather than to ensure that Derco always recovered its invoiced costs plus 32%. Or at least a reasonable trier of fact could so find, and therefore the government is not entitled to summary judgment on this basis.[13] But the government is entitled to summary judgment because the undisputed facts show that SSSI and Derco entered into a subcontract for logistics support at undetermined prices that allowed Derco to add a predetermined markup to the vendor quotes that Derco solicited during performance.

## B.    Defendants' Motion for Summary Judgment Based on Judicial Estoppel

In their own motion for partial summary judgment, the defendants contend that judicial estoppel prevents the government from arguing that Derco's contract with SSSI resulted in a cost-plus-a-percentage-of-cost system of contracting. Judicial estoppel is used to prevent a litigant from advancing and succeeding on a legal argument in one proceeding and then advancing a contradictory legal argument in a successive proceeding. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Several factors typically inform the decision whether to apply the doctrine in a particular case. *Id.* at 750. First, a party's later position must be "clearly inconsistent" with its earlier position. *Id.* Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent

---

[13] I also reject the government's argument that the way Derco recorded its parts sales to SSSI for accounting purposes is relevant to determining whether a cost-plus-a-percentage-of-cost system of contracting existed. (ECF No. 161 at pp. 20–22.) Whether such a system existed is determined by the terms of SSSI and Derco's agreement, not by how Derco recorded the various costs and revenues associated with that agreement in its accounting records.

position in a later proceeding would create "the perception that either the first or the second court was misled." *Id.* A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 751.

In the present case, the defendants argue that the government is judicially estopped by the position it advanced and succeeded upon in *UMC Electronics Co. v. United States*, 43 Fed. Cl. 776 (1999), from now advancing the position that purchase-order prices reflect "costs" for purposes of identifying a cost-plus-a-percentage-of-cost system of contacting. But this argument clearly fails because, as I will explain, *UMC Electronics* was not a case involving an alleged cost-plus-a-percentage-of-cost system of contracting or any similar legal claim, and therefore the position taken by the government in that case was not "clearly inconsistent" with the position it has taken here. *New Hampshire*, 532 U.S. at 750.

The *UMC* case arose out of a government contractor's request for an equitable adjustment under a fixed-price contract to produce floodlights for the U.S. Air Force. 43 Fed. Cl. at 777–78, 780. Equitable adjustments are a form of corrective measure that the government undertakes to make a contractor whole when the government modifies a contract and thereby increases the contractor's cost of performance. *See LB&B Assocs. Inc. v. United States*, 91 Fed. Cl. 142, 154 (2010). In *UMC*, the contractor believed that it had suffered increased performance costs due to government-caused delay. 43 Fed. Cl. at 780. The contractor thus filed a "certified claim for equitable adjustment" with the government. *Id.* The issue in *UMC* was whether the contractor, in its claim, misrepresented the amount of additional costs it had actually incurred in

performing the contract as of the time the claim was submitted. This issue was important to a number of claims raised in the case, including the government's claim against UMC under the False Claims Act. *Id.* at 820–21. The Court of Federal Claims held a trial on this issue, and the published opinion cited by the defendants here contains the court's findings of fact and conclusions of law.

The relevant facts that the court found after trial were as follows. In its certified claim for an equitable adjustment,[14] UMC represented that the government's delay had caused it to incur "increased material costs" and that the delay would also cause it to incur increased costs during the remaining production period. *Id.* at 783. However, by the time UMC made these representations, it had already produced nearly all the floodlights called for by the contract and thus had already incurred nearly all the material costs. *Id.* When UMC submitted its claim, it possessed "all but one invoice" for the materials that it needed or would need to complete the contract. *Id.*

In response to UMC's claim, the government contracting officer asked UMC to provide him with "detailed cost and pricing data as outlined in [the applicable Federal Acquisition Regulation ("FAR")]." *Id.* at 783–84. UMC responded to the officer by providing him with, among other things, "purchase orders supporting the material pricing." *Id.* at 784. In a letter to the contracting officer regarding these materials, UMC represented that "UMC's claim consists of actual costs incurred which are fully documented in its books and records, and have been represented as accurate and complete in the certification accompanying its claim submission." *Id.* The letter

---

[14] The contractor submitted several versions of its claim for an equitable adjustment. The claim that ultimately led to UMC's liability was sent on June 11, 1992. *See UMC*, 43 Fed. Cl. at 782–83.

concluded by emphasizing that UMC had met "all of the cost criteria contained in FAR 31." *Id.* at 785. At trial, the author of UMC's letter testified that "UMC was indeed representing to the contracting officer that the supporting cost or pricing data submitted complied with the applicable definition of 'actual costs' in FAR Part 31." *Id.* Under that definition, "actual costs" meant "amounts determined on the basis of costs incurred, as distinguished from forecasted costs." *Id.* (citing 48 C.F.R. § 31.001).

At trial, the government established that UMC derived its calculation of "actual costs incurred" "from purchase orders with vendors and suppliers." *Id.* at 785. These costs included "amounts that had never been invoiced and amounts for materials that had never even been received." *Id.* UMC conceded that the amounts it described as "actual costs" were "not representative of amounts actually paid [to] vendors or reflected on invoices." *Id.* And at trial, the government presented evidence that "UMC included in its claim $195,984.00 in material costs that had never been paid to its vendors and for which UMC had never received invoices." *Id.* Further, the court found it significant that, although UMC's purchase-order liability might have been an estimate of its eventual actual costs, UMC's representations to the government did not "contain an explanation that some of the claimed increased material costs [were] estimates of amounts vendors might eventually invoice to UMC." *Id.* at 786.

Based on the evidence at trial, the court found that, "[i]n contradiction to its repeated and unequivocal representations to the contracting officer, UMC's June 11, 1992 claim was not based on its actual costs incurred, as that term is defined by the FAR, by UMC, and by the government: the invoiced costs found in the material costs account of its general ledger." *Id.* at 798. Instead, "UMC included the total amount of the

purchase orders with its vendors and represented those amounts as 'actual costs incurred' to the government." *Id.* The court explained that "UMC included in its material costs claim, the total amount of the purchase orders, irrespective of whether UMC had received the materials or a valid invoice." *Id.* "In fact," the court found, "UMC included in its June 11, 1992 claim amounts that had never been invoiced and amounts for materials that had never even been received." *Id.* Finally, the court noted that "[n]owhere in its June 11, 1992 claim submission did UMC explain that its increased material costs portion of the claim was based on purchase orders, rather than actual costs." *Id.*

In the course of its findings, the court addressed UMC's argument that case law supported the proposition that "purchase order obligations are appropriate support for equitable adjustment claims." *Id.* at 801. Here, the court stated that the United States had not argued that "invoices are the only measure of costs for an equitable adjustment claim or that purchase orders are never appropriate." *Id.* Instead, the court noted, the government had actually argued "that actual costs should be the starting point for any inquiry and the court should look to the best evidence available, on a case by case basis, in order to determine such actual costs." *Id.* The court then accepted the government's argument, finding that, "in the instant case," "'actual costs' are 'invoice costs,' under the concept of best evidence for determining actual costs as defined in the FAR and relevant case law." *Id.*

When the court turned specifically to the government's fraud claim, it began by noting that "UMC's false and misleading statements were all designed to hide the simple fact that UMC has claimed in submissions to the contracting officer . . . over

$233,500.00 in material costs (including burden) that its vendors never invoiced and UMC never paid." *Id.* at 809. The court found that "UMC arrived at its calculation of material costs presented in its June 11, 1992 claim by using purchase order prices rather than the actual invoices received from its suppliers." *Id.* However, the court noted, "'[a]ctual costs' are defined in the FAR as 'amounts determined on the basis of costs incurred, as distinguished from forecasted costs.'" *Id.* at 810 (quoting 448 C.F.R. § 31.001). Further, at trial, UMC's main witness "admitted that UMC's material costs claim submitted to the contracting officer [was] based in part on forecasted costs." *Id.* The court then made the following statement, on which the defendants here heavily rely to support their judicial-estoppel argument:

> Given this acknowledgment and the FAR definition of "actual costs," a reasonable person would, and this court does, conclude that actual costs means based on vendor invoices received from UMC's suppliers, or other form of proof of delivery and payment, but not on the earlier issued purchase orders, which might not have been fully or even partially filled, or accurately reflect material price because of escalations and decreases in price, or rate indices.

*Id.* at 810. Later in its opinion, the court stated as follows:

> By the time UMC submitted its June 11, 1992 claim, it had substantially completed performance on the contract and had received over 99% of the invoices on the materials it purchased. Therefore, UMC's claim [for an equitable adjustment] should have been based primarily and overwhelmingly on the invoice costs, rather than on purchase order prices. More significantly, any deviation from the use of invoice costs, particularly future estimates, should have been disclosed and clearly identified in accordance with the requirement of the Contract Disputes Act certification and the FAR.

*Id.* at 812–13. Ultimately, the court found that UMC had defrauded the government by representing that it had actually incurred $195,984.00 in costs that it had not actually

incurred because vendors had not invoiced UMC for the costs and likely never would invoice it for those costs. *Id.* at 820.

In the present case, the defendants contend that the government's position in *UMC* results in judicial estoppel because the government's prior position that UMC's purchase-order prices were not its "actual costs" conflicts with its current position that Derco's purchase-order prices were its actual costs. But in light of the significant differences between *UMC* and the present case, it is clear that the government has not taken inconsistent positions. *UMC* did not involve an allegation by the government that a contract amounted to an illegal cost-plus-a-percentage-of-cost system of contracting. Instead, as I have discussed, the government sought to prove that, while seeking an equitable adjustment under a fixed-price contract, UMC falsely represented the amount of costs it had already incurred in performing the contract. Because the issues in *UMC* were nothing like the issues here, the government may prevail in both cases without creating "the perception that either the first or the second court was misled." *New Hampshire*, 532 U.S. at 750.

The defendants believe that *UMC* results in judicial estoppel because the government there drew a distinction between purchase-order prices and invoice prices that appears to conflict with the position it has taken on purchase orders and invoices in the present case. In *UMC*, the government argued that invoice prices, not purchase-order prices, reflect "actual costs," while in the present case the government takes the position that purchase-order prices can reflect actual costs. But this superficial similarity between the two cases vanishes once the legal significance of the government's arguments in each case is taken into consideration. In *UMC*, the government was trying

to convince the court that the contractor had made statements that tricked the government into thinking that the contractor had already incurred costs that, in fact, it had not yet incurred and likely never would incur. As part of this argument, the government noted that the contractor's claim for an equitable adjustment was governed by a federal acquisition regulation that defined the term "actual costs" as "amounts determined on the basis of costs incurred, as distinguished from forecasted costs." *UMC*, 43 Fed. Cl. at 785 & 810 (citing 48 C.F.R. § 31.001). Despite knowing that the applicable regulation defined "actual costs" to exclude forecasted costs, the contractor included its forecasted costs, as reflected in its purchase orders, in its claim for actual costs. *Id.* at 810. The court concluded that, in this context, the purchase orders represented "forecasted costs" rather than costs incurred because the purchase orders did not accurately reflect the prices that the suppliers charged for materials that UMC had already received by the time it submitted its claim for an equitable adjustment. *Id.*

In the present case, the legal context in which the distinction between purchase orders and invoices arises is different. Here, the government does not claim that any defendant misrepresented that Derco had actually incurred costs that it had not incurred by submitting a claim for reimbursement based on purchase-order prices rather than invoice prices. Instead, the government argues that SSSI and Derco entered into a prohibited cost-plus-a-percentage-of-cost system of contracting that involved Derco's adding a predetermined markup to its future purchase-order prices. Thus, the government's argument here does not turn on what a reasonable person would understand a representation about "actual costs" to mean. Instead, it turns on whether, under the facts of this case, agreeing to a predetermined markup on future purchase-

order prices resulted in an illegal contract. And whether such an agreement resulted in an illegal contract turns not on the meaning of any federal acquisition regulation defining "actual costs" for purposes of an equitable adjustment claim, but on whether the agreement gives the contractor an incentive "to inflate his future costs to increase his profits since the Government is already bound to pay any future undetermined 'costs.'" *Muschany*, 324 U.S. at 62–63. A purchase order issued after the time of contracting with the government can reflect a "future cost" for this purpose even if such a purchase order would not reflect the contractor's "actual cost" of materials for purposes of an equitable adjustment claim that the contractor submits to the government after it has already received an invoice for those same materials.[15]

In short, there is nothing untoward about the government's prevailing in both this case and *UMC*. The government's proving that SSSI and Derco entered into a prohibited cost-plus-a-percentage-of-cost contract when they agreed to allow Derco to add 32% to its future purchase-order prices would not imply that the Court of Federal Claims was misled by the government's argument that UMC's purchase-order prices did not reflect its actual costs incurred for purposes of an equitable adjustment claim. Accordingly, the defendants' motion for partial summary judgment based on judicial estoppel will be denied.

---

[15] Moreover, in *UMC*, the government did not argue that a purchase order could never serve as the basis for a claim about actual costs for purposes of an equitable adjustment claim. *See* 43 Fed. Cl. at 801 ("The United States, however, has not stated that invoices are the only measure of costs for an equitable adjustment claim or that purchase orders are never appropriate. Instead, the government argues, and the case law supports, that actual costs should be the starting point for any inquiry and the court should look to the best evidence available, on a case by case basis, in order to determine such actual costs."). Thus, even if the legal issues in *UMC* and the present case were the same, I doubt that judicial estoppel would apply.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the government's motion for partial summary judgment is **GRANTED**. For purposes of this case, the government has established that SSSI and Derco violated the prohibition on the use of the system of cost-plus-a-percentage-of-cost contracting as set forth in 10 U.S.C. § 2306(a), 48 C.F.R. § 16.102(c) and 48 C.F.R § 52.244-2, with respect to the parts and materials sold by Derco to SSSI from the period of June 30, 2006 through July 1, 2012, except insofar as sales were made pursuant to Derco's list of 514 firm-fixed prices or through the Navy's procurement process for certain high-dollar parts.

**IT IS FURTHER ORDERED** that the defendants' motion for partial summary judgment is **DENIED**.

Dated at Milwaukee, Wisconsin, this 29th day of November, 2021.

s/Lynn Adelman
LYNN ADELMAN
District Judge