# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA, ex rel.**
**MARY J. PATZER and PETER CIMMA,**
            **Plaintiffs,**

    **v.**                                    **Case No. 11-C-0560**

**SIKORSKY AIRCRAFT CORPORATION,**
**SIKORSKY SUPPORT SERVICES, INC., and**
**DERCO AEROSPACE, INC.,**
            **Defendants.**

---

## DECISION AND ORDER

In the present case, the United States alleges that defendants Sikorsky Aircraft Corporation, Sikorsky Support Services, Inc. ("SSSI"), and Derco Aerospace, Inc. ("Derco") violated the False Claims Act, 31 U.S.C. §§ 3729–3733, by perpetrating a scheme in which SSSI and Derco agreed to an illegal cost-plus-a-percentage-of-cost system of government contracting and took steps to hide the illegal nature of their agreement from the government. The government and the defendants have filed motions to compel that relate to documents allegedly protected by the attorney-client privilege. (ECF Nos. 181 & 185.) I consider those motions in this order.[1]

---

[1] The government's motion to compel exceeds the page limit for discovery motions that I set in the case-management order. The government therefore requests leave to file a lengthier brief. The defendants responded to the motion by filing a brief that meets the page limit for discovery motions, but they state that they intend to file a lengthier brief if I accept the government's lengthier brief. I will accept the government's lengthier brief. However, I will decide the motion without waiting for the defendants to file their own lengthier brief. The defendants' short brief and their longer meet-and-confer letter to the government's attorneys regarding the issues raised by the government's motion (ECF No. 181-24) adequately present the defendants' position.

# I. BACKGROUND

The government's claims arise out of a contract between SSSI and the United States Navy in which SSSI agreed to maintain trainer aircraft at Naval air stations in Texas and Florida. SSSI, in turn, entered into a subcontract with Derco under which Derco agreed to procure spare parts for the aircraft as needed by SSSI. SSSI agreed to compensate Derco for its services by allowing Derco to add a 32% markup to the cost of the parts it sold to SSSI. After paying Derco for parts, SSSI submitted requests for reimbursement to the Navy.

The government alleges that the agreement between SSSI and Derco to allow Derco to add a 32% markup to the cost of parts sold to SSSI resulted in a cost-plus-a-percentage-of-cost system of contracting, in violation of 10 U.S.C. § 2306(a). In a recent decision on the parties' motions for partial summary judgment, I agreed with the government on this point and found that the subcontract violated § 2306(a). *See United States v. Sikorsky Aircraft Corporation*, __ F. Supp. 3d __, 2021 WL 5563954 (E.D. Wis. 2021). The government now seeks to prove that the defendants knew that the agreement between SSSI and Derco was illegal and took steps to conceal the illegal aspects of their agreement from the government, which resulted in violations of the False Claims Act. The government also brings claims for breach of contract and unjust enrichment.

Several of the defendants' defenses are relevant to the present motions to compel. First, the defendants contend that the Navy was aware of Derco's 32% markup and therefore could not have been deceived. Second, the defendants assert an affirmative defense entitled "Waiver and Ratification" that is based on the Navy's

knowledge of the markup. (ECF Nos. 134 & 135, First Affirmative Defense.) In this affirmative defense, the defendants allege that the Navy, with full knowledge that Derco was marking up parts by 32%, continued to allow the markup and even extended its contractual relationship with SSSI and Derco, and thereby either waived its claim that the markup was unlawful or ratified the defendants' conduct. Third, the defendants assert an affirmative defense entitled "Laches" that is likewise based on the Navy's alleged knowledge of the markup. (ECF Nos. 134 & 135, Sixth Affirmative Defense.) In this affirmative defense, the defendants allege that the government failed to bring this suit promptly after learning about Derco's markup. According to the defendants, the government waited eight years to bring suit, during which time the defendants "rel[ied] in good faith on the Government's consent to the pricing methodology" by continuing to use that methodology. (*Id.* ¶ 5.) The defendants also allege that they were prejudiced by the government's delay because a crucial witness died during the period of delay. (*Id.*)

To support their defenses, the defendants wish to use as evidence a page of typewritten notes created by Noelle Reimers, who was the responsible Navy procurement officer for the contract. The notes consist of six bullet points, each of which states a question relating to an aspect of the Navy's contract with SSSI. One question asks, "Are you aware of the 32% mark-up of parts by Derco, for parts purchased from vendors, which was charged to [SSSI] . . . ?" (ECF No. 186-2.) Underneath this question, Reimers wrote, "Markups are transparent to us." (*Id.*) According to the defendants, this answer shows that the Navy was aware of Derco's 32% markup.

The government produced Reimer's notes as part of its responses to the defendants' written discovery requests. When they deposed her, the defendants asked

Reimers a series of questions about the notes. During a break at the deposition, the government's lawyers checked the metadata associated with the electronic version of the notes and learned that Reimers had saved the notes under the filename "Todd September 2012." In September 2012, DCIS Special Agent John Todd worked under the direction of two government lawyers as part of the government's investigation into the facts underlying this litigation. Based on the filename, the government's lawyers concluded that Reimers likely made the notes to facilitate her communications with government attorneys, and that therefore the document is protected by the attorney-client privilege. The government thus exercised its right to "claw back" the document under the court's order under Federal Rule of Evidence 502(d). In their motion to compel, the defendants argue that the notes are not protected by the attorney-client privilege and that therefore they should be allowed to use the notes to support their defenses.

The government's motion to compel likewise involves the attorney-client privilege. The motion raises several issues. First, the government contends that the defendants waived the privilege as to certain documents by asserting affirmative defenses alleging good-faith reliance on the government's conduct. According to the government, the defendants, by asserting those defenses, placed the advice they received from counsel at issue in this litigation, which resulted in a waiver of the privilege.

Second, the government contends that certain of the defendants' witnesses testified, either through declarations or at their depositions, about their understanding of the legality of Derco's 32% markup. The government contends that, by offering this

testimony, the defendants have waived the privilege with respect to attorney-client communications concerning the legality of the markup.

Third, the government contends that the court should review *in camera* certain documents identified on the defendants' privilege logs to determine whether the crime-fraud exception to the attorney-client privilege applies. Here, the government alleges that the crime-fraud exception potentially applies to two sets of attorney-client communications: (1) those involving a revision to the SSSI-Derco subcontract that, according to the government, concealed Derco's 32% markup; and (2) those involving a presentation the defendants made to government auditors regarding Derco's markup.

Finally, the government contends that the court should review *in camera* documents identified on the privilege logs as involving legal advice from Attorney Thomas Kister. The government contends that Kister has denied giving legal advice on the topics reflected on the privilege logs, and that therefore it is probable that the withheld documents are not protected by the attorney-client privilege.

## II. DISCUSSION

### A.    Defendants' Motion to Compel Withdrawal of Privilege Claim

In their motion to compel, the defendants ask me to find that Reimers' notes are not protected by the attorney-client privilege. The privilege extends to confidential communications between client and attorney that are made to obtain legal assistance. *United States v. Leonard-Allen*, 739 F.3d 948, 952 (7th Cir. 2013). Its purpose is to encourage clients to make full disclosure to their attorneys, and its scope is informed by this purpose. *Id.* at 952–53. Because the privilege may operate in derogation of the search for truth, courts construe the privilege to apply only where necessary to achieve

its purpose. *Id.* at 953. The Seventh Circuit has said that the privilege covers "only those communications which reflect the lawyer's thinking [or] are made for the purpose of eliciting the lawyer's professional advice or other legal assistance." *Id.* (quoting *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir.2007)).

Here, the defendants contend that Reimers' notes are not privileged for several reasons. First, the defendants contend that the government has produced insufficient evidence to show that Reimers created the notes for the purpose of obtaining legal advice. The defendants note that, at her deposition, Reimers could not recall having prepared the notes or having used them to facilitate communications with the government's attorneys. However, the government has produced strong circumstantial evidence showing that Reimers in fact prepared the notes for this purpose. The government has submitted, for the court's *in camera* review, an email from Special Agent Todd to Reimers, dated September 14, 2012. (ECF No. 189-1.) Todd sent copies of the email to the government lawyers involved in this litigation. In the email, Todd thanks Reimers for agreeing to meet telephonically with him and the government's lawyers on September 17, 2012. (The government's counsel confirms that this teleconference actually occurred. (Gale Decl. ¶ 6.)) In his email, Todd lists several questions that he and the attorneys wanted to discuss with Reimers during the teleconference. Those questions are reproduced verbatim in Reimers' notes. Under each question, Reimers lists what appears to be either an answer to the question or Reimers' own question seeking clarification of what Todd and the lawyers wished to know. The notes themselves bear the title "Sept 2012" and, as noted, the filename under which Reimers saved the notes was "Todd September 2012." This evidence

makes clear that Reimers prepared the notes in anticipation of her meeting with Todd and the government's lawyers, and therefore I find that Reimers made the notes for the purpose of facilitating her communications with the government's lawyers about the government's legal position in this case.[2]

The defendants next contend that Reimers' notes are not protected by the attorney-client privilege because no evidence shows that Reimers transmitted the notes to Todd or the government's attorneys. The defendants argue that, unless the notes themselves were transmitted, they do not qualify as a "communication" for purposes of the attorney-client privilege. However, courts recognize that when a client prepares notes that he or she uses to facilitate communications with an attorney, the notes themselves are protected by the privilege, even if the client did not transmit the notes to the attorney. *See Mazur v. Wal-Mart Stores, Inc.*, No. 5:05–cv–85, 2006 WL 7344548, at *2–3 (E.D. Mich. April 19, 2006); *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002); *Alexander v. F.B.I.*, 186 F.R.D. 154, 161 D.D.C. 1999). Indeed, as one court has noted, the purpose of the attorney-client privilege would be undermined if courts refused to extend the privilege "to notes a client would make to prepare for a meeting with her lawyer—notes which could serve as an agenda or set of reminders about things to ask or tell counsel." *ChevronTexaco*, 241 F. Supp. 2d at 1077. In the present case, Reimers' notes clearly served as an agenda or a set of

---

[2] Although Special Agent Todd is not an attorney, I find that he was acting as an agent of the government's attorneys for purposes of conducting the factual investigation into the government's claims. (Gale Decl. ¶ 3.) Thus, the fact that a non-attorney was part of the email exchange and the teleconference does not prevent the attorney-client privilege from attaching. *See Jenkins v. Bartlett*, 487 F.3d 482, 491 (7th Cir. 2007) (presence of third party does not destroy the "in confidence" element of the attorney-client privilege when the third party is present to assist the attorney in rendering legal services).

reminders about things to ask or tell Todd and the government's attorneys at the teleconference on September 17, 2012, and therefore they fall within the scope of the attorney-client privilege.

Finally, the defendants contend that there is no evidence that Reimers expected the notes to remain confidential. In support of this argument, the defendants note that Reimers did not mark the document "attorney client privileged" or "confidential." However, there is no requirement that, for the privilege to attach, a client must affix these labels to a document. What matters is that the client expected the communication to be made in confidence, and here there is no evidence that Reimers shared the document with any non-privileged third party. Rather, as noted, the evidence shows that Reimers used the notes in her meeting with the government's lawyers and the lawyers' agent. Thus, the "in confidence" element of the privilege is satisfied.

Accordingly, I find that the attorney-client privilege applies to Reimers' notes and that the government properly clawed them back. I note, however, that this conclusion does not mean that Reimers' opinion that Derco's markup was "transparent" is privileged. The fact that Reimers communicated this opinion to the government's attorneys does not make the opinion itself privileged. *See* 1 Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, Part III.3.E1.A.A. (6th ed. Lexis 2017) ("The privilege protects only the contents of the communication itself from compelled disclosure. It does not immunize from disclosure the facts communicated, if those facts can be learned from some source other than the privileged communication itself."). Accordingly, if Reimers testified at her deposition that she thought the markup was transparent, then that testimony is admissible. But the defendants may not use

Reimers' notes, which are privileged, or any testimony based on those notes, as evidence that Reimers thought the markup was transparent.[3]

## B. Government's Motion to Compel

The government's motion to compel raises multiple issues concerning the attorney-client privilege, which I address in turn.

### 1. At-Issue Waiver Based on Assertion of Affirmative Defenses

The government first contends that the defendants have waived the attorney-client privilege with respect to certain documents by placing the advice they received from counsel at issue in this litigation. *See Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175 n.1 (7th Cir. 1995). To waive the privilege by placing an attorney's advice at issue, a party must do more than deny the opposing party's allegations. *See Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir. 1987). Instead, the holder of the privilege "must inject a new factual or legal issue into the case," which often occurs through the assertion of an affirmative defense. *Id.* Moreover, "[a]dvice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner." *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994). Rather, "[t]he advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Id.*

---

[3] Having found that Reimers' notes are privileged, I will grant the parties' respective motions to restrict from public view their filings associated with the defendants' motion to compel withdrawal of the privilege. Although the parties have not provided redacted versions of their filings for public viewing, *see* Gen. L.R. 79(d)(2) (E.D. Wis. 2010), I find that the redactions would have been so pervasive as to render the public documents meaningless, and that therefore redacted versions need not be filed.

In the present case, the government contends that the defendants placed their attorneys' advice at issue by asserting the affirmative defenses of waiver and ratification and laches. In these affirmative defenses, the defendants allege that the government was aware of the pricing arrangement between SSSI and Derco almost from the beginning of the subcontractor relationship but did not object to it. Therefore, the defendants allege, the government either waived its right to challenge the arrangement (waiver and ratification) or waited too long to bring suit (laches). Neither of these defenses inherently places the advice that the defendants received from counsel at issue. However, the government contends that because the defendants allege in support of their laches defense that the government's delay in filing suit "caus[ed] [them] to rely in good faith on the Government's consent to the pricing methodology," they have placed the advice they received from counsel at issue.

The government's position depends on cases indicating that, when the defendant places its own good faith at issue, it implicitly places the advice it received from counsel at issue. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994); *United States v. Bilzerian*, 926 F.2d 1285, 1292–93 (2d Cir. 1991). However, in such cases, "good faith" was understood to mean an assertion by the defendant that it thought its conduct was legal. *See Cox*, 17 F.3d at 1419 (describing defendant's affirmative assertion "that it believed that its [conduct] was legal" as an affirmative assertion of "good faith" that injected defendant's "knowledge of the law" into the case); *Bilzerian*, 926 F.2d at 1292–93 (describing defendant's "good faith defense" as involving "testimony that he thought his actions were legal," which "would have put his knowledge of the law and the basis for his understanding of what the law required in issue"). I do

not interpret these cases to mean that a defendant places the advice of counsel at issue whenever it raises "good faith" as part of a defense. Rather, at-issue waiver will occur only when the defendant claims that it had a good-faith belief that its conduct was legal.

In the present case, I do not understand the defendants' allegation of good faith in support of their laches affirmative defense to be a claim that the government's conduct caused the defendants to believe that their conduct was legal. The defense of laches bars an action when the plaintiff's delay in filing the claim (1) is unreasonable and inexcusable, and (2) materially prejudices the defendant. *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003). The defense "serves to protect defendants from prejudice caused by stale evidence, prolonged uncertainty about legal rights and status, and unlimited exposure to liability damages." *Id.* The defendants' allegation of good-faith reliance arises as an aspect of the prejudice element. The defendants essentially allege that had the government objected to the pricing arrangement between SSSI and Derco sooner, the defendants could have limited their liability by abandoning that arrangement rather than continuing to operate under it for several years. This allegation does not place the advice of counsel at issue because the defendants are not placing their understanding of the law at issue. Instead, they are claiming that the government's failure to object to the arrangement sooner prejudiced them by causing them to think that the government approved of the arrangement and would allow them to continue using it. The allegation is no different than asserting that a plaintiff's delay in bringing a claim for breach of contract caused the defendant to think that that the plaintiff did not regard the defendant's conduct as a breach, which would not place the advice of the

defendant's counsel at issue. Accordingly, I conclude that the defendants' assertion of their waiver and laches affirmative defenses did not waive the attorney-client privilege.

### 2. Waiver Based on Evidence Disclosed in Discovery

The government next contends that the defendants waived the attorney-client privilege by disclosing certain evidence during discovery. First, the government contends that the defendants waived the privilege by providing the government with a declaration from Derco's former in-house counsel, Thomas Kister. (ECF No. 181-7.) In this declaration, Kister states that he has no legal expertise in the area of government contracting and thus would not have provided legal advice to Derco employees on that topic. Kister also states that a Derco employee raised concerns to him about the subcontract between SSSI and Derco possibly being an impermissible cost-plus-a-percentage-of-cost agreement. Kister states that he does not recall what steps he took in response to the employee's concern, but that his general practice would have been to refer the matter to an attorney who had the relevant expertise.

The government contends that, for two reasons, the defendants' having disclosed Kister's declaration resulted in waiver of the attorney-client privilege. First, they contend that the defendants are using Kister's declaration to show that they made a good-faith effort to comply with the law. However, it is clear that this was not the defendants' purpose in offering the declaration. The gist of Kister's declaration is that he had no expertise in government contracting and therefore he would not have given the defendants any advice in this area. Instead, the most he would have done is refer Derco employees to attorneys with the appropriate expertise. He does not state that he in fact referred the employees to other attorneys or imply that those attorneys advised the

employees that Derco's conduct was legal. Thus, none of the matters asserted in Kister's declaration would support a claim that the defendants had a good-faith belief in the legality of their conduct, and so disclosing the declaration did not result in at-issue waiver.

The government's second claim of waiver with respect to Kister's declaration is based on partial-disclosure waiver. Under this form of waiver, when a client makes a partial disclosure, the client implicitly waives the privilege as to other communications on the same topic. *Lorenz*, 815 F.2d at 1098–99. Here, the government seems to contend that Kister partially disclosed a privileged communication in his declaration by stating that a Derco employee asked him for legal advice about whether the SSSI-Derco subcontract involved a cost-plus-a-percentage-of-cost agreement. However, this part of the declaration merely states the topic under discussion between attorney and client, which does not waive the privilege as to the particulars of the communication. *See* 1 Epstein, *supra*, at § IV.U. Thus, disclosing Kister's declaration did not result in partial-disclosure waiver.

The government also contends that the defendants waived the privilege by submitting declarations and deposition testimony by three employees who claim that the SSSI-Derco subcontract did not involve cost-plus-a-percentage-of-cost contracting. First, the government contends that the defendants waived the privilege by submitting a declaration from Robert Schulman. Schulman is an attorney who was employed by SSSI as a contracts manager during the relevant time. In his declaration, Schulman states that he was the SSSI employee responsible for negotiating the subcontracts associated with SSSI's contract with the Navy, including its subcontract with Derco.

Schulman describes various events that occurred during the negotiation of the subcontract, including discussions he had with "Derco personnel" about the cost-plus-a-percentage-of-cost prohibition. (Schulman Decl. ¶ 8.) Schulman states that he told Derco personnel that "applying a markup to the vendor's quoted price was an acceptable method for developing a firm-fixed price." (*Id.*) According to the government, this statement resulted in at-issue waiver for certain communications. I disagree. The defendants have not offered Schulman's testimony for the purpose of proving that either he or anyone else had a good-faith belief that their actions were legal. Although Schulman states that it was his opinion that adding a markup to a vendor's quoted price was an acceptable way to develop a fixed price, the defendants have not argued that Schulman's having held this belief absolves them from liability. Instead, their purpose in offering Schulman's declaration was to support their factual argument that Derco created its prices by adding a markup to vendors' quoted prices rather than to vendors' actual prices. (*See* Br. in Opp. to Gov't Mot. for Summ. J. at 3–4; Def. Prop. Finding of Fact ("PFOF") ¶ 16.) This factual argument does not implicate any legal advice that Schulman or any other employee may have received, and therefore it did not result in at-issue waiver.

Next, the government contends that a declaration by Peter Winkler and his deposition testimony resulted in at-issue waiver. During negotiation of the SSSI-Derco subcontract, Winkler was Derco's controller and supervised the Derco employees responsible for administering the subcontract. (Winkler Decl. ¶¶ 2, 5.) Winkler describes various events that occurred during the negotiation and implementation of the subcontract. Like Schulman, Winkler states that Derco established its prices to SSSI by

adding a markup to vendors' quoted prices. Winkler adds that, in his experience, "applying a markup [to a purchase-order price] is a generally established process for establishing a firm-fixed price." (Winkler Decl. ¶ 9.) At his deposition, in response to the government's questions, Winkler testified that he remembered that some Derco employees consulted with "the Sikorsky government compliance team" about whether the subcontract was "appropriate." (Winkler Dep. at 59:21–60:2.) Again, I conclude that these disclosures did not result in at-issue waiver because the defendants have not used them to argue that the defendants had a good-faith belief in the legality of their actions. Instead, the defendants have used Winkler's declaration to support their factual argument that Derco created its prices by adding a markup to vendors' quoted prices rather than their actual prices. (*See, e.g.*, Def. PFOF ¶ 19.) Further, Winkler's answering truthfully the government's questions at a deposition could not result in at-issue waiver because the defendants had no control over the government's questioning. If the defendants were to use that testimony to support a claim that they thought their actions were legal, then perhaps at-issue waiver could occur. But, as noted, so far in this case, the defendants have not claimed that they are not liable because their employees believed that their conduct was legal.

Finally, the government contends that the defendants waived the privilege by submitting a declaration from Dawn Katucki. According to her declaration, Katucki worked in Sikorsky Aircraft Corporation's government accounting department during the performance of the SSSI-Derco subcontract. At some point, she questioned whether the subcontract involved cost-plus-a-percentage-of-cost contracting, and she states that she was never able to reach a conclusion as to the legality of the subcontract during her

employment at Sikorsky. However, she states that if the subcontract involved adding a markup to vendors' quoted costs rather than actual costs, then she would not "have any concerns that it was an illegal [cost-plus-a-percentage-of-cost] agreement." (Katucki Decl. ¶ 8.) The government argues that the defendants have offered Katucki's declaration "to vouch for their supposed good-faith understanding of the law." (ECF No. 181-1 at 19 of 29.) However, the government cites no part of the record that supports this argument, such as a brief filed by the defendants or their response to a contention interrogatory. Further, from the face of the declaration, it appears that the defendants have offered it to refute the government's contention that the subcontract involved cost-plus-a-percentage-of-cost contracting, not to establish that the defendants' employees believed that their conduct was legal. Indeed, the declaration establishes that Katucki *questioned* the legality of the subcontract during her employment at Sikorsky and that she was not then aware of the facts that have caused her to now believe that the subcontract was legal. Because Katucki lacked the necessary state of mind at the relevant time, I do not see any way in which the defendants could use her declaration to support a good-faith defense. Accordingly, Katucki's declaration does not result in at-issue waiver.

### 3.     Crime-Fraud Exception

The government next contends that the crime-fraud exception to the attorney-client privilege potentially applies to certain communications on the defendants' privilege logs, and that therefore I should review those communications *in camera* to determine whether the exception applies. The crime-fraud exception places communications made in furtherance of a crime or fraud outside the attorney-client privilege. *United States v.*

*BDO Seidman, LLP*, 492 F.3d 806, 818 (7th Cir. 2007). "To establish the crime-fraud exception, and thus defeat the privilege, the government must present *prima facie* evidence that gives color to the charge by showing some foundation in fact." *United States v. Boender*, 649 F.3d 650, 655 (7th Cir. 2011) (internal quotation marks omitted). The production of such evidence allows the district court to require the defendant to come forward with an explanation for the evidence offered against the privilege. *Id.* The district court then has discretion to either accept or reject the proffered explanation. *Id.* at 655–56.

In the present case, the government's motion concerns the type of evidence that a court may use to determine whether the crime-fraud exception applies. More specifically, the government's motion concerns whether *in camera* review of the allegedly privileged communications is warranted. The Supreme Court has held that "[b]efore engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (internal quotation marks and citation omitted). If the opponent of the privilege makes that showing, then "the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Id.*

The government contends that the crime-fraud exception potentially applies to two sets of privileged communications. I will separately consider whether *in camera* review of each set is warranted.

### a. Emails discussing revisions to the subcontract

First, the government contends that eight documents that appear to relate to consultations with attorneys in connection with a revision to the SSSI-Derco subcontract should be reviewed *in camera*. The government contends that there is evidence to support a reasonable belief that this revision was "designed to keep Derco's true pricing methodology out of view of the government" and was "in furtherance of a scheme to engage in illegal [cost-plus-a-percentage-of-cost] contracting." (ECF No. 181-1 at 21 of 29.)

The government's evidence shows that, on August 30, 2006, SSSI and Derco executed the subcontract at issue in this case, which was entitled "Inter-Entity Work Authorization" (the "IWA"). The version the parties initially executed contained a term providing that "[e]ach firm fixed price invoice shall specify the items billed and include the Derco agreed to markup of thirty-two percent added to vendor cost." (ECF No. 181-16, § 6.3.) The government contends that this contract term would have resulted in a cost-plus-a-percentage-of-cost system of contracting. But two hours after this version of the IWA was circulated, Schulman (who, as discussed above, negotiated the contract on behalf of SSSI) wrote an email stating "SSSI has not agreed to a 'mark-up' of 32%." (ECF No. 181-17 at 1 of 75.) Schulman attached to his email a revised version of the IWA that deleted the reference to the 32% markup. The revised IWA included the following term instead: "Each firm-fixed price invoice shall specify the items billed." (*Id.* at 3 of 75, § 6.3.) This version of the IWA was executed on August 30, 2006. (ECF No. 171, ¶ 13.)

On September 1, 2006, a Derco employee, Phillip Bail, emailed Attorney Thomas Kister and others a list of issues to be discussed with SSSI. (ECF No. 181-18.) One of the issues to be discussed was "how should Derco determine its selling price so as not to violate the restriction against [cost-plus-a-percentage-of-cost] type contracts." (*Id.* at 1 of 3.) Bail attached to the email a memo in which he described his own thoughts about whether the subcontract was a cost-plus-a-percentage-of-cost arrangement. (*Id.* at 3 of 3.) This email indicates that Bail (and likely others at Derco) were struggling with the concept of cost-plus-a-percentage-of-cost contracting. On September 5, 2006, a Derco employee emailed a second employee and told him that, at an upcoming meeting with SSSI, a "fundamental issue" would be "Derco price determination and how it is explained." (ECF No. 181-19 at 1 of 3.) On September 26, 2006, a Derco employee emailed Schulman a set of discussion points for a meeting between Derco and SSSI that was scheduled for October 4, 2006. (ECF No. 181-20.) Two of the matters listed for discussion were: (1) "if [the] IWA is not [firm-fixed price] what is it considered," and (2) "[d]oes [the IWA] create a cost plus percentage of cost situation?" (*Id.* at 2 of 3.)

The government contends that, in light of the above evidence, it is reasonable to believe that several entries on the defendants' privilege logs are communications in which Derco or SSSI employees consulted company attorneys for the purpose of obtaining advice about how to defraud the government by concealing what they knew to be a cost-plus-a-percentage-of-cost system of contracting, which advice resulted in their modifying the IWA to delete reference to a 32% markup. I disagree. The government's evidence shows that, at the time of the revision, SSSI and Derco employees were confused about the prohibition on cost-plus-a-percentage-of-cost contracting. To the

extent they sought legal advice on this issue, it was likely to determine whether they were committing a cost-plus-a-percentage-of-cost violation rather than to obtain advice about how to continue committing what they knew to be a violation without detection. Although the IWA was revised to delete reference to a 32% markup added to "vendor cost," this was not inherently nefarious, as the parties might have been trying to cure a potential cost-plus-a-percentage-of-cost violation. In any event, the defendants' privilege logs do not show that any of the relevant employees sought legal advice at the time the revision was contemplated. The defendants' evidence shows that Schulman proposed the revision only two hours after the initial IWA was executed on August 30, 2006, and none of the entries on the privilege logs reflects that any attorney-client communications occurred on that day. Although Schulman communicated with an attorney on August 2, 2006, there is no reason to think that this communication related to the revision that he would later propose on August 30, 2006. The only entry on the privilege logs that relates to a revision to the IWA is for a communication that occurred on September 15, 2006. (ECF No. 181-4, entry 9.) But by that date, the revision deleting reference to the 32% markup had already occurred, and the privilege log describes the communication as involving a "potential" revision. (*Id.*) So it is likely that this communication involved something other than the past revision that resulted in deletion of the reference to the markup.

In short, I do not see a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the communications involving revisions to the IWA might reveal evidence to establish that the crime-fraud exception applies.

### b. Emails regarding presentation to the government

The remaining set of communications that the government believes might be subject to the crime-fraud exception concerns a PowerPoint presentation that SSSI prepared for the Defense Contract Audit Agency ("DCAA") in 2012. According to the government, one of the PowerPoint slides falsely depicts the elements of Derco's 32% markup. The government contends that this "false buildup" was meant to "camouflage the existence or magnitude of the Defendants' illegal [cost-plus-a-percentage-of-cost] arrangement." (ECF No. 181-1 at 26 of 29.) The government further notes that the defendants' privilege logs identify several communications with attorneys concerning the meeting with DCAA, and that therefore it is possible that attorneys assisted SSSI in perpetrating a fraud.

There are several problems with the government's presentation of this argument. First, the government does not adequately support its assertion that the PowerPoint presentation contains a false statement. The government argues in its brief that Derco's CFO, Amy Skaar, admitted at her deposition that some statement in the presentation was false. But the government only submits excerpts from the deposition, and those excerpts do not provide enough context to enable me to understand what Skaar was testifying about. In a portion of her deposition, Skaar seems to deny that the presentation contained false information. (Skaar Dep. at 156:1–156:3.) Later, she agrees with the government that something was not true "[f]rom a specific mathematical step calculation, how it ran through our system." (Skaar Dep. at 176:6–176:8.) But the excerpts do not contain anything from which I can determine what Skaar was admitting

was inaccurate. Thus, I cannot find that the PowerPoint presentation contained a false statement.

A second problem is that the government has not adequately explained how the false information on the PowerPoint slide could have been used to conceal the existence or magnitude of the cost-plus-a-percentage-of-cost violation. The slide contains an example showing that Derco added $32 to the cost of a $100 part. It seems to me that this reveals exactly what the government now claims was a cost-plus-a-percentage-of-cost violation. And although I realize that the government takes issue with some of the additional information on this slide—including a statement about the elements of Derco's 32% markup—the government does not explain how this additional information could have tricked the government into thinking that SSSI and Derco were not engaged in cost-plus-a-percentage-of-cost contracting.

Finally, the government does not explain how the information on the slide could have concealed the "magnitude" of the cost-plus-a-percentage-of-cost arrangement. In any event, such arrangements are illegal no matter their magnitude, *see* 10 U.S.C. § 2306(a), and it seems highly unlikely that SSSI employees would have sought legal advice about how to trick the government into thinking that their contract was only a little bit illegal.

For these reasons, I will not review *in camera* the attorney-client communications pertaining to the DCAA meeting.

### 4. Necessity of *In Camera* Review of Kister Documents

Finally, the government contends that I should review *in camera* five communications on one of the defendants' privilege logs. In connection with these

entries on the privilege log, the defendants state that Attorney Kister gave legal advice on topics in the area of government contracting. The log describes the communications as involving "legal interpretation of FAR [Federal Acquisition Regulation] provision," "legal advice regarding applicability of flowdown requirements," "legal advice pertaining to draft exceptions letters to IWA," "legal advice regarding contractual relationship with SSSI," and "legal advice regarding applicability of FAR clause." The government notes that Kister, in his recent declaration, claims to have no expertise in the area of government contracting and that he would not have provided legal advice in this area. The government contends that, in light of Kister's declaration, there is reason to believe that the documents on the privilege log do not actually contain legal advice and therefore are not protected by the attorney-client privilege.

The government cites no legal authority suggesting that a court may review communications *in camera* to determine whether the lawyers who prepared a privilege log inaccurately described the contents of supposedly privileged communications. In any event, Kister's declaration does not give rise to a reasonable inference that the privilege log is inaccurate. Kister prepared his declaration 14 years after the time of the communications at issue, and thus the fact that he does not now remember providing legal advice does not imply that he did not give it. Further, although Kister denies having expertise in government contracting and claims that he would have referred questions on this topic to other attorneys, it is not implausible to think that he responded to some questions from Derco employees with what could be regarded as legal advice. Finally, to deem *in camera* review warranted, I would have to presume that there is a reasonable chance that the defendants' current litigation attorneys are lying, since they

are the ones who prepared the privilege logs and described the communications as involving legal advice from Kister. Because I have no reason to doubt the integrity of these attorneys, I find it more likely that Kister simply does not remember providing limited legal advice in the area of government contracting 14 years ago.

Accordingly, I will not review the communications involving Kister's legal advice *in camera*.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the government's motion for permission not to use the court's expedited non-dispositive motion procedure is **GRANTED**.

**IT IS FURTHER ORDERED** that the government's motion to compel is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion to compel the government to withdraw its designation of Reimers' notes as privileged is **DENIED**.

**FINALLY, IT IS ORDERED** that the parties' motions to restrict from public view their filings regarding Reimers' notes (ECF Nos. 184 & 187) are **GRANTED**.

Dated at Milwaukee, Wisconsin, this 13th day of December, 2021

s/Lynn Adelman
LYNN ADELMAN
District Judge