UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA, ex rel.
MARY J. PATZER and PETER CIMMA,**
      **Plaintiffs,**

v.                                            Case No. 11-C-0560

**SIKORSKY AIRCRAFT CORPORATION,
SIKORSKY SUPPORT SERVICES, INC., and
DERCO AEROSPACE, INC.,**
      **Defendants.**

---

## DECISION AND ORDER

Mary Patzer commenced a *qui tam* action under the False Claims Act ("FCA") against Sikorsky Aircraft Corporation ("SAC") and two of its subsidiaries, Sikorsky Support Services, Inc. ("SSSI") and Derco Aerospace, Inc. ("Derco"). Patzer is a former employee of Derco. In addition to her *qui tam* allegations, Patzer alleges that Derco violated the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h)(1), by terminating her employment because she tried to prevent Derco from defrauding the government. Before me now is Derco's motion for summary judgment on the retaliation claim.

### I. BACKGROUND

Derco specializes in distributing aircraft parts and materials and providing related services. At the time of the events giving rise to this suit, Derco was a subsidiary of SAC. Between 2006 and 2013, Derco was SSSI's parts-and-materials subcontractor for SSSI's prime contract with the United States Navy, under which SSSI was responsible for maintaining the Navy's T-34, T-44, and T-6 trainer aircraft at several Navy airfields (the "T-34/44 Program").

Patzer began working for Derco in 2002 as a Financial Analyst. In 2010, Patzer was Derco's Assistant Controller of U.S. Government Accounting and Sarbanes Oxley Compliance. In that position, Patzer's responsibilities included operational oversight of the accounts payable department, Sarbanes-Oxley compliance, and United States Government contract accounting. Her duties with respect to government accounting included calculation of annual forward pricing rates, developing and maintaining approved disclosure statements, and being the accounting point of contact for defense-contract review audits by the Defense Contract Management Agency ("DCMA") and the Defense Contract Audit Agency ("DCAA"). Patzer's duties also included investigating and reporting potential fraud related to accounting rules and regulations and financial reporting. In 2010, Patzer worked directly under Derco's Controller, Amy Skaar, and her second-level supervisor was Derco's Chief Financial Officer, Peter Winkler.

In early August 2010, another Derco employee, Chris Piper, stopped by Patzer's office to ask her a question about Derco's subcontract with SSSI for the T-34/44 Program. Piper asked whether Derco was making a profit on the sales of parts and materials to SSSI. Patzer, who was familiar with Derco's earnings under the subcontract because of her accounting role, told Piper that Derco was profiting. Piper told her that the terms of the subcontract stated that Derco would be selling parts and materials to SSSI at cost and that any profit or fee to Derco was unallowed. Piper was referring to the fact that the subcontract described Derco's work as not involving "commercial" items or services within the meaning of the Federal Acquisition Regulation ("FAR").[1] (ECF No. 241-85 at 5 of 43.) Under FAR 31.205-26(e), any transfers of materials or services

---

[1] In this opinion, citations to "FAR" are to the Federal Acquisition Regulation, which is codified as Chapter 1 of Title 48 of the Code of Federal Regulations.

between corporate affiliates must be at cost unless, among other things, the work is commercial, in which case the transfer may be "at price" (*i.e.*, a price that includes a profit). Because Derco and SSSI were affiliates, Derco could not sell parts and materials to SSSI at price unless Derco's work was commercial.

After talking with Piper, Patzer became concerned that one of Derco's accounting documents contained false information. Specifically, Patzer was aware that Derco's 2008 Cost Accounting Standards Disclosure Statement ("CAS Disclosure Statement") stated that transfers to its affiliates would be at cost unless the parts or services were commercial. Patzer was particularly worried about this issue because the DCAA was in the process of auditing the Disclosure Statement, and Patzer was assisting the auditor. To investigate her concerns, Patzer reviewed the subcontract between SSSI and Derco and discovered that, as Piper had told her, the subcontract stated that Derco's work was non-commercial.

After investigating, Patzer attempted to contact Derco's CFO Peter Winkler, who was Patzer's second-level supervisor and had signed the Disclosure Statement on behalf of Derco. However, Winkler did not respond to Patzer, and she became increasingly concerned. At one point, she left a large handwritten note on Winkler's desk in which she begged him contact her about an urgent matter involving the ongoing audit.

On August 13, 2010, after her failed attempts to contact Winkler, Patzer emailed Dawn Katucki, an employee of SAC who oversaw government accounting. Although Katucki was not in Patzer's chain of command and was not a Derco employee, Patzer believed that she could consult Katucki on government-accounting issues. In her email,

3

Case 2:11-cv-00560-LA   Filed 10/17/23   Page 3 of 18   Document 311

Patzer identified the issue concerning the Disclosure Statement, stated that the DCAA auditor was not aware of the issue, and told Katucki that she did not want to make false statements to the auditor. Patzer and Katucki then talked by telephone, and Patzer sent Katucki a copy of the subcontract. According to Patzer, Katucki agreed that there seemed to be an issue of concern.

In response to Patzer's concerns, Katucki participated in a phone call with Peter Winkler and others. After the call, Winkler told Patzer that the non-commercial designation in the subcontract was a mistake and that he would have it changed to state that Derco's contract with SSSI was a commercial contract. Winkler also told Patzer that he would send her a copy of the revised subcontract. However, Patzer never received a revised subcontract, and as far as the record reveals, none was created.

During September 2010, Patzer continued to voice her concerns to Katucki, but by late September those concerns had not been addressed to her satisfaction. On September 30, 2010, at 11:00 a.m., Patzer sent Katucki a final email, which stated as follows:

> Hi Dawn,
>
> I really need to hear from you because I'm ready to close out the audit of our accounting system and disclosure statement with the DCAA auditor.
>
> As you know our disclosure statement says we sell to affiliate companies at cost unless the product/service is deemed commercial. That is not the case for the T34/44 as we are selling at profit and the [subcontract] clearly states it is not commercial.
>
> I will not make false statements to the auditor. I need your help.

(Decl. of Mary J. Patzer, Ex. 8.) At 11:36 a.m., Katucki emailed Winkler and Skaar about "revisit[ing]" the issues Patzer had raised and included the text of Patzer's 11:00 a.m. email. (ECF No. 288-2.) Later that day, Derco fired Patzer. At 8:00 that evening, Katucki

4

emailed Patzer in response to her 11:00 a.m. email and told her she would talk to one of her coworkers and get back to her. (Patzer Decl. Ex. 8.) Katucki thus seemed unaware of Patzer's termination.

According to Derco, Patzer's termination was part of a company-wide reduction in force ("RIF"). It is undisputed that, in Summer 2010, Derco began planning the RIF as part of a series of cost-control measures directed by SAC. As of August 23, 2010, Derco had planned to eliminate only 10 positions as part of the RIF. (ECF No. 241-175.) However, by the end of September, the number of eliminated positions increased to 15. Derco notified all 15 employees of their terminations on September 30, 2010.

According to Derco, it began the process of evaluating employees in preparation for the RIF months before the terminations occurred. The evaluation process involved scoring employees on five factors that related to their employment: "Interpersonal Skills," "Achieves Results," "Criticality of Skills," "Qualifications," and "Business Orientation." (ECF No. 288-5 at 10.) Derco's Controller, Amy Skaar, was Patzer's direct supervisor and was primarily responsible for evaluating Patzer and the other employees in Derco's Finance department. However, Skaar testified that she consulted with Winkler about her rankings. (Skaar Dep. at 268:2–268:7, 274:9–274:14, 277:7–277:15.) Of the seventeen Finance employees ranked by Skaar and Winkler, Patzer ranked twelfth, meaning that five employees were ranked lower than her. (ECF No. 288-4.) Patzer was the only employee from the Finance department who was terminated.

At the time of the RIF, Derco's parent company, SAC, maintained written guidelines, known as the "Employee Assessment Guidelines," that were to be "used to help management make layoff selections." (ECF No. 288-5 at 3.) Derco was supposed

5
Case 2:11-cv-00560-LA   Filed 10/17/23   Page 5 of 18   Document 311

to follow the guidelines when selecting employees for the 2010 RIF. (Skaar Dep. at 276:20–277:6.) Under the guidelines, layoff selections were to be made by starting with the lowest ranked employee on the evaluation list and progressing up the list if needed. (ECF No. 288-5 at 6.) However, the guidelines provided that situations may arise in which higher-ranked employees are laid off and lower-ranked employees are retained, such as when the lower-ranked employee has skills that are important to the company that the higher-ranked employee lacks. When selecting employees out of sequence, the guidelines required "the business necessity of the selection" to be "set forth in a memorandum approved by the decisional unit head" and sent to the human-resources department. (*Id.*) The guidelines provided that "[i]n no case will an out-of-sequence selection be permitted without documentation." (*Id.*) In Patzer's case, however, she was selected out of sequence, and Derco did not prepare a memorandum.

In response to Patzer's retaliation allegations, Derco advanced a facially legitimate reason for selecting her for the RIF. According to Skaar, Patzer was selected for termination because she scored low on the assessment criteria and because Derco no longer required Patzer's expertise in government contracting, as it was moving away from government work. (Skaar Dep. at 278:4–278:24.) Patzer's low score on the assessment related primarily to her interpersonal skills. For several years prior to her termination, Patzer's supervisors had noted on her performance reviews that she had a reputation for being a difficult coworker. In her 2007 performance review, Patzer's supervisor at the time, John Sepulveda, wrote that she "has a tendency to come across in an abrasive manner." (ECF No. 241-171 at 7 of 9.) In her 2008 review, Skaar wrote that Patzer's "communication style results in a negative perception." (ECF No. 241-172

6

at 6 of 7.) In the same review, Winkler concurred with Skaar's assessment and wrote that "[t]he message [Patzer] communicates is sometimes not received because of the tone (directness) she takes." (*Id.*) Winkler added that, "[w]hile there was some improvement in this area in 2008, it should continue to be a focus for Mary in 2009." (*Id.*) In Patzer's 2009 review, Skaar wrote: "As noted in prior years Mary is very steadfast in her opinions and beliefs which at times might offend others that [sic] can cause a break down in teamwork." (ECF No. 241-173 at 7 of 8.) That same year, after Patzer's review was submitted to Human Resources, the vice president of that department questioned Skaar and Winkler's overall high rating of Patzer's performance, noting that "while Mary is technically strong, she also stirs up problems that don't really need to exist and for someone at her level, that's a problem." (ECF No. 241-174.) Patzer's interpersonal issues were also described during the deposition of one of her coworkers, Amber Zemek. Zemek testified that Patzer "was terrible to work with," would often yell at other coworkers, and on at least one occasion caused another employee to cry. (Zemek Dep. at 222:11–222:13, 223:25–224:1, 225:12–225:13.)

Derco's other stated reason for terminating Patzer was that her area of expertise—U.S. government accounting—was no longer required because Derco was moving away from government work. While she was employed at Derco, Patzer spent slightly less than one-half of her time on government accounting. Patzer points out that, at the time of her termination, Derco was still working with the Navy on the T-34/44 Program and that it was preparing a bid to continue as SSSI's subcontractor if the Navy selected SSSI to continue as the prime contractor. Further, as of 2012—two years after her termination—Derco still had an employee responsible for developing business with

7

the U.S. Government. Patzer also notes that, in her 2009 performance review, Skaar wrote that Patzer's knowledge of government accounting rules had become "more important" in light of the departure of another employee with such knowledge that year. (ECF No. 241-173 at 3 of 8.)

At the time of her termination, the issue regarding the Disclosure Statement had not been resolved to Patzer's satisfaction. Because she was no longer able to investigate or raise concerns as an employee, she reported her concerns to the ombudsman at SAC's parent company, United Technologies Corporation. She also made a call to the U.S. Government's fraud-reporting hotline.

Patzer commenced this suit on June 10, 2011. In her *qui tam* allegations, Patzer alleged that Derco's transferring material to its affiliate SSSI under the Navy contract at price was fraudulent because the items were noncommercial and should have been transferred at cost. Over the next several years, the government investigated Patzer's allegations. In 2014, the government intervened and filed its own complaint against SAC, SSSI, and Derco in which it alleged, among other things, that the subcontract between SSSI and Derco involved an illegal cost-plus-a-percentage-of-cost arrangement. The government did not allege claims based on Patzer's concerns over the commerciality of Derco's work.

Nearly two years after Patzer was terminated, the DCAA completed an audit of SSSI's 2007 incurred cost submissions to the Navy. One of the issues explored by the DCAA during that audit was whether Derco's work was commercial, such that SSSI could seek reimbursement for the parts and materials it purchased from Derco at a price that included profit. Although the DCAA initially concluded that Derco's work was not

commercial, it later issued a report in which it opined that, in light of additional information supplied by SSSI, Derco's work was commercial. (*See* ECF No. 241-78 at 3–4 of 4.) Later, Derco audited SSSI's 2008 incurred cost submissions and discovered that the subcontract between SSSI and Derco "flowed down a term from SSSI's prime contract with the Navy that prohibited profit or fee on the parts and material." (Decl. of Michael Richardson ¶ 8.) DCAA thus concluded that any costs associated with Derco's profit were unallowable as inconsistent with the terms of the contract, and that the issue of whether Derco's work was commercial was moot. (*Id.*) However, before DCAA could finalize its conclusions, the Department of Justice asked it to put its audit on hold while DOJ investigated Patzer's *qui tam* allegations. The audit was never completed.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

To prevail on a claim under § 3730(h)(1), a plaintiff must prove that she was engaged in protected conduct and was fired "because of" that conduct. *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016). In moving for summary judgment, Derco contends that Patzer did not engage in protected conduct and that, even if she did, the person who made the decision to fire her was unaware of that conduct and had a legitimate reason for the termination.

### A. Protected Conduct

Section 3730(h)(1) protects two categories of conduct, one of which was added by the 2009 amendments to the FCA. *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847–48 (7th Cir. 2012). Prior to 2009, the statute prevented employers from terminating employment for conduct that was "in furtherance of an action under this section." *Id.* (quoting § 3730(h)(1)). The Seventh Circuit had interpreted that statutory language to mean that the employee must have engaged in conduct that put the employer on notice of the "distinct possibility" of a *qui tam* action. *Id.*; *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002). With the 2009 amendments, Congress added the second category of protected conduct, which protects employees "from being fired for undertaking 'other efforts to stop' violations of the Act, such as reporting suspected misconduct to internal supervisors." *Halasa*, 690 F.3d at 847–48.

Under either category, for an employee's conduct to be protected, she must have a reasonable belief that her employer is committing fraud against the government. *Uhlig*, 839 F.3d at 635. The FCA does not "protect an employee who just imagines fraud without proof." *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 481 (7th Cir. 2004). However, an employee does not have to be certain that fraud is being committed. "Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Id.*

Derco contends that Patzer cannot prove that she had a reasonable belief that Derco was committing fraud. Patzer believed that Derco was committing fraud by representing on its CAS Disclosure Statement that it complied with the FAR provision

prohibiting profits on transfers of noncommercial items between affiliates while simultaneously adding a profit to its transfers of noncommercial materials to its affiliate SSSI. Derco contends that this belief was unreasonable because Patzer made no effort to determine whether the parts and services Derco provided to SSSI were actually commercial under the FAR. However, it is undisputed that Patzer knew that the contract between SSSI and Derco stated that Derco's work was non-commercial. Patzer could have reasonably accepted the contract's description at face value without performing her own analysis of whether the work was commercial. Moreover, when Patzer raised the commerciality issue with Winkler, he ignored her until she escalated the issue to Katucki. After Katucki became involved, Winkler told Patzer that the non-commercial designation in the contract was a mistake, that he would have it corrected, and that he would provide Patzer with the amended contract. But the contract was never amended, and Patzer never received a copy. Thus, Patzer could have reasonably believed that Winkler was giving her the runaround, and that the non-commercial designation was not a mistake. For these reasons, Patzer had a reasonable belief that Derco was defrauding the government by charging profit for non-commercial work.

Derco next contends that Patzer was a "fraud alert" employee who needed to satisfy a heightened notice requirement to receive protection from the FCA's anti-retaliation provision. This argument stems from cases decided prior to the 2009 amendment to § 3730(h)(1), when an employee was required to put her employer on notice of a "distinct possibility" that a *qui tam* action might be filed against it. *See Brandon*, 277 F.3d at 944–45. Under those cases, when an employee's ordinary job duties involve investigating potential fraud and compliance issues, he must do more

than simply raise concerns about potential violations, because raising such concerns "would not necessarily put [the employer] on notice that he was planning to take a far more aggressive step and bring a *qui tam* action against [the employer] or report [its] conduct to the government." *Id.* at 945. In the present case, Patzer is arguably a fraud-alert employee because her job duties included investigating and reporting potential fraud related to accounting rules and financial reporting.

Now that the 2009 amendments have added a second category of protected conduct—undertaking "other efforts to stop" violations of the FCA, such as reporting suspected misconduct to internal supervisors, *Halasa*, 690 F.3d at 847–48—it is not clear that a fraud-alert employee must meet a heightened notice requirement to receive protection. Under the second category, an employee's conduct is protected so long as the employer was aware that the employee was attempting to stop a violation of the FCA; the employer does not need to be on notice that the employee was prepared to take the extra step of filing a *qui tam* action. Thus, even a person whose job duties include preventing violations of the FCA should be entitled to the Act's protections. Indeed, allowing an employer to retaliate against an employee whose job it is to prevent fraud would run directly contrary to the purpose of the 2009 amendments. *See* Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 5:28 (Westlaw, August 2023).

In any event, even if the heightened standard for fraud-alert employees applies to Patzer, she has met it. Patzer did not merely raise a routine compliance issue in the ordinary course of her job duties. She complained about what she thought was a form of ongoing fraud, and she went to great lengths to have that issue addressed by her

employer. Significantly, after Winkler ignored Patzer's initial requests to discuss the issue, Patzer contacted Katucki, who was employed by SAC rather than Derco and was outside Patzer's chain of command. Patzer repeatedly told Katucki in emails that she was concerned about making false statements to the government auditor, and Katucki forwarded at least one of those emails to Winkler and Skaar. (ECF No. 288-2.) These are the kinds of acts that satisfy the heightened requirement imposed on fraud-alert employees. *See, e.g., United States ex rel. Ascolese v. Shoemaker Constr. Co.*, 55 F.4th 188, 195 (3d Cir. 2022) (identifying "acting outside [one's] normal job responsibilities" and "notifying a party outside the usual chain of command" as acts that satisfy the heightened notice requirement).

Accordingly, a jury could reasonably find that Patzer engaged in conduct protected by § 3730(h)(1).

## B. Termination "Because of" Protected Conduct

Derco next contends that Patzer cannot prove that Derco fired her because of her protected conduct. Here, Derco makes two arguments. First, it contends that no evidence allows a jury to reasonably find that the supervisor who made the decision to terminate Patzer was aware of her complaints about the commerciality issue. Second, Derco contends that it has advanced a legitimate reason for the termination, and that Patzer cannot show that the reason is a pretext for retaliation.

### 1. Awareness of Protected Conduct

According to Derco, the supervisor who made the decision to include Patzer in the RIF was her immediate supervisor, Amy Skaar. Derco further contends that Skaar did not learn about Patzer's commerciality concerns until after she made the decision to

terminate her. Patzer disputes both facts. She contends that Peter Winkler—who learned of Patzer's concerns at least several weeks prior to the RIF—was involved in the decision to include her in the RIF, and that Skaar was aware of her protected conduct prior to her termination.

At her deposition, Skaar testified that she was the one who made the decision to select Patzer for the RIF. (Skaar Dep. at 273:19–273:22.) However, Skaar also testified that Winkler was involved in the decision, in that she consulted with him when she rated the Finance employees and produced their numerical scores. (*Id.* at 268:2–268:7, 274:9–274:14, 277:7–277:15.) Further, Skaar testified that Winkler "had some input" into the selection of Patzer for termination, although she could not recall what that was. (*Id*. at 283:2–283:6.) Based on this evidence, a jury could reasonably conclude that Winkler, who indisputably knew about Patzer's protected conduct, influenced Skaar's decision.

Moreover, even if Skaar made the decision on her own, a jury could reasonably conclude that she was aware of Patzer's protected conduct prior to her termination. Skaar testified that Winkler never discussed Patzer's concerns with her and that she did not learn of those concerns until she received Katucki's email on the morning of September 30, 2010, which forwarded Patzer's final email about the commerciality issue. (Skaar Dep. at 265:10–265:18.) However, Katucki's email begins by stating that she wanted to "revisit" Patzer's concerns, which implies that she had discussed it with both Winkler and Skaar on a prior occasion. (ECF No. 288-2.) Further, it is not clear why Katucki would have included Skaar on the email if she was not already aware of the issue. Skaar testified that she believed Katucki included her on the email because

Patzer had been terminated. (Skaar Dep. at 59:5–59:8.) However, Katucki also sent an email to Patzer at her company email address at 8:10 p.m. that same day, in which she said that she would contact Patzer about her concerns. (ECF No. 288-3.) Katucki would not have sent such an email if she knew Patzer had been fired. From this, the jury could infer that Katucki did not know that Patzer had been terminated when, earlier in the day, she sent the email to Winkler and Skaar. Based on this circumstantial evidence, a jury could reasonably infer that Skaar was aware of Patzer's concerns at the time she made the decision to include her in the RIF.

### 2. Legitimate Reason/Pretext

The remaining issue is whether Patzer has enough evidence to show that the legitimate reason Derco has offered for her termination is pretextual. Again, Derco contends that it terminated Patzer as part of a reduction in force because of her poor interpersonal skills and because it no longer required her expertise in government accounting.

Patzer does not dispute that Derco carried out a company-wide RIF on September 30, 2010. Moreover, although Patzer defends her own job performance, the evidence in the record corroborates Derco's claim that Patzer was a difficult coworker. In each of the three years prior to her termination, Patzer's supervisors flagged Patzer's lack of interpersonal skills in her performance reviews. Each performance review was completed long before Patzer complained about the commerciality issue, so the jury could not infer that the reviews were tainted by Derco's desire to retaliate. Further, the vice president of Derco's HR department challenged Winkler and Skaar's high rating of Patzer during her 2009 performance review, noting that while Patzer was technically

15

Case 2:11-cv-00560-LA   Filed 10/17/23   Page 15 of 18   Document 311

competent, she created unnecessary problems. Again, this comment was made before Patzer raised the commerciality issue. Finally, Patzer's former coworker, Amber Zemek, testified that Patzer was "terrible to work with," frequently yelled at coworkers, and made a coworker cry.

However, Patzer's poor interpersonal skills explain only why she scored poorly (12th out of 17) on Skaar and Winkler's assessment. It does not explain why Skaar and Winkler picked Patzer to be the only Finance employee included in the RIF, rather than one of the five employees who scored lower than her. To explain this out-of-sequence selection, Derco points to Skaar's testimony that Derco was shifting away from government business and had less of a need for Patzer's expertise in government accounting. But there is evidence in the record that would allow the jury to disbelieve this explanation. First, in Patzer's 2009 performance review, Skaar wrote that Patzer's knowledge of government accounting rules had become "more important" in light of the departure of another employee with such knowledge earlier that year. (ECF No. 241-173 at 3 of 8.) Skaar does not explain what changed in the ensuing nine months to make Patzer's knowledge expendable. Indeed, Derco continued to perform government work after Patzer's departure, as evidenced by an employee holding the title of "USG Business Development" in 2012. (ECF No. 241-97 at 5 of 5.)

Second, Winkler and Skaar selected Patzer for inclusion in the RIF out of sequence without following the procedures required by SAC's employee assessment guidelines. Those guidelines provided that "[w]henever employees are selected for layoff out of sequence, the business necessity of the selection must be set forth in a memorandum approved by the decisional unit head . . . and provided to the HR Client

Manager." (ECF No. 288-5 at 6.) In Patzer's case, no such memorandum was created. In employment discrimination cases, courts have reasoned that "[a]n employer's unusual deviation from standard procedures can serve as circumstantial evidence of discrimination." *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017); *see also Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) ("Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative [sic] and probative circumstantial evidence of discriminatory intent.").

Derco notes that the guidelines state that they are not binding and that SAC may change them at any time without notice. (ECF No. 288-5 at 2.) However, no evidence suggests that SAC had changed them prior to the 2010 RIF, and they explicitly state that they apply to layoffs. (*Id.* at 3.) Further, the guidelines indicate that the memorandum requirement for out-of-sequence layoffs is mandatory: they provide that "[i]n no case will an out-of-sequence selection be permitted without documentation." (*Id.* at 6.) The Seventh Circuit has emphasized that when "the express language of the corporate policy" indicates that it applies to an employment decision, the jury may reasonably infer pretext from the employer's failure to follow it. *Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424, 427 (7th Cir. 1992). Thus, Derco's unexplained failure to document its reasons for selecting Patzer for the RIF out of sequence is evidence of pretext.

Based on the above circumstantial evidence, a reasonable jury could find that Derco selected Patzer for inclusion in the RIF because of her protected conduct.

17

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment on Patzer's retaliation claim (ECF No. 238) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 17th day of October, 2023.

<u>/s/ Lynn Adelman</u>
LYNN ADELMAN
District Judge