# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA, ex rel.**
**MARY J. PATZER and PETER CIMMA,**
        **Plaintiffs,**

    **v.**                               **Case No. 11-C-0560**

**SIKORSKY AIRCRAFT CORPORATION,**
**SIKORSKY SUPPORT SERVICES, INC., and**
**DERCO AEROSPACE, INC.,**
        **Defendants.**

---

## DECISION AND ORDER

In this action, which began as a *qui tam* action brought by relator Mary Patzer, the United States alleges claims against Sikorsky Aircraft Corporation ("SAC") and two of its subsidiaries, Sikorsky Support Services, Inc. ("SSSI") and Derco Aerospace, Inc. ("Derco"), under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, and the common law. The government's claims arise out of a series of contracts that the Navy awarded to SSSI. Under the contracts, SSSI agreed to maintain the Navy's T-34, T-44, and T-6 trainer aircraft. The contracts provided that, in addition to paying SSSI a fee for its services, the Navy would reimburse SSSI for the cost of the parts and materials that it purchased to complete the maintenance services. To obtain the parts and materials, SSSI entered into a subcontract with Derco under which Derco agreed to procure the necessary parts and materials and sell them to SSSI at a price. Derco also agreed to provide on-site support personnel at the Navy airfields who would be responsible for ordering parts and managing the parts inventory, among other things.

The government contends that the subcontract between SSSI and Derco produced two unlawful arrangements. First, the government contends that SSSI agreed to compensate Derco on a cost-plus-a-percentage-of-cost ("CPPC") basis, which is illegal in government contracting. The government contends that the existence of this arrangement caused SSSI to breach its contract with the Navy. The government also contends that, when SSSI submitted claims for reimbursement of the amounts it paid to Derco for parts under this CPPC arrangement without disclosing that arrangement, it violated the False Claims Act by submitting a false or fraudulent claim for payment to the government.

The second alleged unlawful arrangement involved SSSI and Derco's use of an accounting device known as an inter-entity chargeback. Under the parties' subcontract, Derco was responsible for the labor costs associated with on-site logistics support. However, it turned out to be more convenient for SSSI to hire and pay the workers. Because SSSI satisfied Derco's financial obligation to pay the labor costs, the parties used the chargeback to shift the obligation back to Derco. The government contends that the chargeback had the effect of granting SSSI a refund of a portion of the purchase price of the parts it purchased from Derco, and that SSSI was required by the contract and the Federal Acquisition Regulation ("FAR")[1] to pass this rebate on to the government. Because it did not do so, the government contends that SSSI is now liable to it in the amount of the chargebacks.

In a prior order, I entered summary judgment for the government on the issue of whether the arrangement between SSSI and Derco involved CPPC contracting. *See*

---

[1] In this opinion, citations to "FAR" are to the Federal Acquisition Regulation, which is codified as Chapter 1 of Title 48 of the Code of Federal Regulations.

*United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, 571 F. Supp. 3d 979 (E.D. Wis. 2021). Before me now are three motions for summary judgment filed by defendants and the United States that address various issues remaining in the case.[2]

## I. BACKGROUND

A.     **Factual Background**

1.     **The Navy's Solicitation**

In November 2005, the Navy issued Solicitation No. 00019-05-R-0046, which requested proposals to provide maintenance and logistics services for the T-34, T- 44, and T-6 aircraft used in pilot training programs at airfields in Corpus Christi, Texas, Whiting Field, Florida, and several satellite sites (the "T-34/44 Program"). The solicitation identified the specific services and materials to be provided to the government as separate contract line items ("CLINs"). As is relevant here, the solicitation provided that the CLINs associated with maintenance and on-site services were to be provided on a fixed-price and labor-hour basis, and that the CLINs association with parts and materials were to be provided on a cost-reimbursable basis. (Solicitation, Offer & Award [hereinafter "Solicitation"] § C-2, ECF No. 241-64.)

The solicitation included terms relating to the cost-reimbursable parts and materials. These terms are central to this case, and I reproduce them almost entirely in full, with the most important clauses emphasized:

f. T-34/T-44 Parts/Material and ACI Spares Transportation, CLIN's X023, X026, X045 and X048. These CLINs are COST REIMBURSABLE. Direct material necessary to accomplish the requirements of Attachment (1), Sections 2, 3, 4, 6, 7, 8, 12, 13, and 18 shall be obtained from the Government property inventory. Material not available from the

---

[2] Defendants filed a fourth motion for summary judgment that addresses the relator's retaliation claim. I address that motion in a separate order.

Government property inventory shall be provided in accordance with Section 13 of the PWS and will be reimbursed under these CLINs. **The Government will reimburse the Contractor for the allowable actual cost of purchase and replenishment of direct parts and material, vendor repair services, and attendant shipping costs that are necessary for the performance of the work requirements of this contract**, up to the funding ceiling, except for parts and material and shipping included in the fixed price of another CLIN. The Contractor shall acquire materials at the most advantageous prices available with due regard to securing prompt delivery of satisfactory materials and take all case and trade discounts, rebates, allowances, credits, commissions, and other benefits. For parts and materials issued from the prime Contractor's inventory, the actual cost shall be that charged to the Contractor's most-favored customer. **For parts and material or services procured from a vendor, the actual cost shall be the actual catalog/market price from the vendor. Fee/profit is UNALLOWABLE on the actual price of parts, material, services, and shipping costs.** The Contractor shall be allowed its actual shipping costs. Unless other clauses in this contract limit the amount of burden allowed on cost-reimbursable items, the Contractor shall be allowed its normal material burdens in accordance with FAR 52.216-7, "Allowable Cost and Payment," and actual shipping costs. . . . <u>Note</u>: **Any subcontract labor associated with fixed price or labor hour CLINs shall be included in those CLINs and not the cost reimbursable CLINs.**

(Solicitation Section B-5f (emphasis added).)

The solicitation also contained a term prohibiting the contractor from entering into a subcontract in which the subcontractor would be paid on a cost-plus-a-percentage-of-cost basis. *See* Solicitation at 56, ECF No. 241-64 at 57 of 151 ("No subcontract or modification thereof placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis . . . ."). This prohibition was in line with federal procurement statutes and regulations, which forbid "[t]he cost-plus-a-percentage-of-cost system of contracting." 10 U.S.C. § 2306(a); FAR 16.102(c). In general, a cost-plus-a-percentage-of-cost system of contracting arises when a buyer commits itself to buying goods or services from a supplier without negotiating a fixed price for the goods or services at the time of contracting and instead agrees to pay the supplier the costs it incurs in

performing the contract plus a profit calculated as a percentage of those costs. *See Muschany v. United States*, 324 U.S. 49, 61–62 (1945). The reason Congress prohibited this type of arrangement is that it gives the supplier an incentive to drive up the government's costs: because the supplier's profit is determined by a percentage of its future costs, the supplier has an incentive "to pay liberally for reimbursable items because higher costs mean[] a higher fee to him." *Id.* at 62.

### 2. SSSI's Response to Solicitation

SSSI—an aircraft maintenance company wholly owned by SAC—prepared a proposal in response to the Navy's solicitation. As part of its proposal, SSSI planned to use Derco—another SAC subsidiary—as a subcontractor responsible for procuring the parts and materials that SSSI would need to perform the maintenance work and for staffing the on-site logistics support positions at the airfields.

Because of the size of the proposal, SSSI had to obtain approval from SAC's Proposal Review Committee ("PRC") before submitting it to the Navy. On January 5, 2006, the PRC reviewed SSSI's proposal. The focus of the review was on a "cost sheet" that reflected the estimated costs and profits associated with the proposal, along with other metrics. The cost sheet contained a row of data related to "material" that showed an estimated "margin" of 22% and a "profit" of $11,283,896. The SAC executives on the committee signed the cost sheet, which granted SSSI permission to submit the proposal to the Navy.

On January 17, 2006, SSSI submitted its proposal. The proposal contemplated using Derco as a subcontractor responsible for "Material Management and Logistics Support." (SSSI Proposal, ECF No. 241-66 at 6 of 33.) In a section of the proposal

dealing with pricing, SSSI proposed that Derco would provide a logistics manager and buyer/purchasing agent to work on-site at each airfield. The proposal indicated that Derco would staff those positions at no additional cost to the government. Instead, the government would pay SSSI a fixed price for on-site labor under a fixed-price CLIN. (Def. Prop. Findings of Fact ["PFOF"] ¶¶ 24, 39; see also *id.* ¶ 112 (SSSI tells Navy that Derco's "management of, and financial responsibility for, on-site logistics personnel" are provided "at no direct charge to the Contract.")

David Adler, SSSI's senior vice president, wrote a cover letter for the proposal that provided in relevant part as follows:

> SSSI will provide total management and oversight for the program in addition to performing the large majority of the functional elements. For other efforts, SSSI has selected four principal subcontractors: Derco Aerospace, Inc, for logistics support; Stevens Aviation, Inc. for ACI and engineering; Standard Aero Limited, for Pratt & Whitney-authorized overhaul services on PT6A turbine engines; and Piedmont Aviation Component Services, for propeller overhaul and repair services. Each was chosen through a careful process modeled after the Navy's prime contractor selection process. Corporate entities were considered but where the best value solution came from another company, the outside contractor was chosen. . . .

(ECF No. 241-70 at 3 of 30.) The cover letter stated that Adler was authorized to sign the proposal, and that SSSI contracts manager Rob Schulman and SSSI business manager George Springsteen were authorized to negotiate on behalf of SSSI.

On June 1, 2006, the Navy formally accepted SSSI's proposal, and Contract No. N00019-06-D-0017 became binding between SSSI and the Navy. I will refer to this contract as the Prime Contract. As executed, the Prime Contract incorporated the solicitation's terms regarding cost-reimbursable parts and materials (Section B-5f, ECF No. 260-1 at 513–14), and contained the required clause prohibiting CPPC

subcontracting (*id.* at 562).[3] The Navy would later renew this contract four times, with the result that it would remain binding between the Navy and SSSI until March 31, 2011.

As proposed, SSSI intended to use Derco as its subcontractor for parts and materials. To oversimply slightly, this meant that SSSI personnel would maintain the aircraft, and that SSSI would rely on Derco to order and supply the parts needed to perform the maintenance work. SSSI and Derco understood that, under Section B-5f of the contract, when Derco provided parts and materials to SSSI, it was acting as SSSI's "vendor." (Def. PFOF ¶ 35.) Thus, Derco was allowed to charge SSSI its catalog or market prices for the parts and materials provided. *See* Prime Contract § B-5f ("For parts and material or services procured from a vendor, the actual cost shall be the actual catalog/market price from the vendor."). The Navy's contract with SSSI provided that SSSI was entitled to have the government reimburse it for the actual cost of parts and materials from vendors. Once SSSI paid Derco, SSSI was to submit a voucher for its "claimed allowable cost[s]." (Prime Contract at 551 (incorporating FAR 52.216-7)). As part of its request for reimbursement, SSSI was permitted to add its own General and Administrative ("G&A") rate to the cost of the parts. (United States' Statement of Prop. Mat'l Facts ("USA SMF") ¶ 13.)

### 3. Negotiation of SSSI-Derco Subcontract

After the Navy awarded the contract to SSSI, executives at SSSI and Derco began negotiating the subcontract that would control Derco's sales of parts to SSSI and other matters relating to its role in the T-34/44 Program. As of June 2006, Derco did not have a list of the parts and materials needed to maintain the aircraft. Because Derco did

---

[3] The clause prohibiting CPPC subcontracting was inserted in the contract pursuant to FAR 52.244-2.

not know what parts it would need to procure, it was unable to develop a catalog or price list that contained the prices that Derco intended to charge SSSI for parts during performance of the subcontract.

Around June 2006, Philip Bail, a Derco employee responsible for overseeing Derco's compliance with government contracting rules, learned that, instead of developing a price list, Derco was proposing a fee structure under which Derco would apply a 32% markup to the cost of whatever parts it ended up acquiring while performing the subcontract. (Decl. of Philip Bail ¶ 5.) Bail understood that, under Derco's proposal, if Derco's cost for a part was $100, Derco would charge SSSI $132 for that part. If one month later Derco paid $200 for the same part, Derco would charge SSSI $264. (*Id.*) Upon learning that this was Derco's intent, Bail became concerned that the arrangement would violate the prohibition on CPPC contracts. (*Id.* ¶ 6.) In June 2006, he began expressing those concerns to the Derco executives responsible for negotiating the subcontract. That month, he provided a PowerPoint presentation concerning CPPC contracting to William Ochsner (Derco's CEO, who also held positions at SSSI and SAC), James Aspell, Tom Kister (Derco's in-house counsel), Peter Winkler (Derco's then-Controller and later CFO), and others. (*Id.* ¶ 7.) During this meeting, Bail explained what CPPC is and how it was impermissible in federal contracting. He also pointed out that, "if Derco adds 32% to its vendor costs, which were not known for the parts for the T-34 program, Derco was likely violating the CPPC prohibition." (*Id.*) Bail recalls that Ochsner told him that he would discuss his concerns with others at SSSI. (*Id.*)

Also in June 2006, Aspell asked Bail to review a draft of the subcontract between SSSI and Derco that had been prepared by Robert Schulman, SSSI's contracts manager. (Bail Decl. ¶ 9.) According to Bail, the draft stated that Derco would charge firm-fixed prices, and it included an attachment that was intended as a price list. However, the attachment stated only "TBD" and did not list any prices. (*Id.*) At around the same time, during a meeting of Derco executives, it was determined that Derco would be unable to develop firm-fixed prices for parts, and that therefore the contract would be structured as cost-reimbursable. (*Id.*) Bail was asked to revise a draft agreement to reflect that it was cost-reimbursable. (*Id.*) He distributed such a draft agreement on July 28, 2006 to several Derco executives. (*Id.* ¶ 10.)

In August 2006, Bail raised a separate issue, which was that Derco was proposing to designate the contract as "non-commercial." The designations "commercial" and "non-commercial" had implications under the FAR that affected how Derco could price its parts and services to a corporate affiliate. In short, if Derco's services were commercial, meaning that Derco provided the same services to non-affiliates in the market, Derco could sell its products at a price that included a profit. If Derco's parts and services were non-commercial, then Derco had to transfer them at cost. *See* FAR 31.205-26(e). Bail and others at Derco believed that the contract was commercial because Derco provided similar services to private companies.

On August 3, 2006, Bail sent an email to SSSI's Schulman that included an attachment that suggested changes to the draft subcontract, which by this time was called an "Inter-Entity Work Authorization," or "IWA." (Bail Decl. Ex. C.) In the attachment, Bail recommended designating the contract as a commercial-item

subcontract. He also noted that SSSI and Derco would need to further discuss the contract's pricing terms. Bail states in his declaration that further discussion about pricing was needed because Derco was not willing to commit to firm-fixed prices in light of Derco's lack of knowledge of what its vendors' prices would be. (Bail Decl. ¶ 11.) On August 7, 2006, Bail sent an email to Attorney Kister and Doug Haskins, Derco's director of U.S. programs, in which Bail proposed a solution to the CPPC problem. Bail proposed eliminating the 32% markup altogether and instead charging SSSI a monthly firm-fixed price for Derco's parts and services. (*Id.* ¶ 12 & Ex. D.)

Despite Bail's concerns about the potential CPPC violation, SSSI and Derco continued to assume that Derco would charge SSSI by adding a 32% markup to the cost of each part procured during contract performance. On September 1, 2006, Bail sent an email to Aspell and other Derco executives in which he continued to question whether adding a markup to the cost of parts would result in CPPC contracting. (Bail Decl. ¶ 14 & Ex. F.) Bail also performed research on CPPC contracting and distributed the articles and cases he found to Aspell and other Derco executives. (*Id.* ¶ 15 & Ex. G.)

On September 26, 2006, Bail sent a memo to SSSI's Schulman that Bail had drafted under Aspell's name. (Bail Decl. ¶ 16 & Ex. H.) The memo identified discussion points for a meeting between SSSI and Derco about the IWA. One discussion point was the difference between fixed-price contracting and CPPC contracting. The memo identified the definition of a firm-fixed-price contract as one that "provides for a price that is not subjected to any adjustment resulting from the contractor's cost experience during performance." (Bail Decl. Ex. H at 2.) It also noted that, in a firm-fixed-price contract, "fair and reasonable prices are established at the outset." (*Id.*) The memo also defined a

CPPC contract as one in which "any part of the contractor's compensation is stated as a percentage of actual costs incurred, so that compensation increases as costs increase." (*Id.*) The memo included the elements of a four-part test for identifying CPPC contracts that the Federal Circuit used in *Urban Data Systems, Inc. v. United States*, 699 F.2d 1147 (Fed. Cir. 1983). According to Bail, when Derco executives discussed his memo, they commented that "if the Navy would simply approve the invoices submitted by SSSI without supporting documentation from Derco showing that Derco added 32% to its vendor cost, then the Navy would not necessarily be able to detect a CPPC violation." (Bail Decl. ¶ 16.)

At his deposition, Bail testified that, by August 2006, he was "getting a very strong impression that [he] better quiet down about CPPC." (Bail Dep. at 81.) Therefore, to "save [his] job," he started to soften his warnings. (*Id.*) A former Derco executive, Markus Heinrich, submitted a declaration in which he states that he was part of a conversation with William Ochsner in which Bail's concerns about Derco's markup were raised. According to Heinrich, Ochsner told him to "serve Bail a cup of shut the fuck up." (Heinrich Decl. ¶ 6.) Ochsner also said that he knew that the markup was "noncompliant" but that, "if the Navy could not figure it out or identify the problem," then the markup was allowable. (*Id.*) Ochsner also told Heinrich that he believed the Navy was "too stupid to figure it (the markup scheme) out." (*Id.*)

At the end of August 2006, SSSI and Derco signed the IWA. An initial version of the IWA described how Derco would invoice SSSI for parts and stated that "[e]ach firm fixed price invoice shall specify the items billed and include the Derco agreed to markup of thirty-two percent added to the vendor cost." (ECF No. 241-85 at 40 of 43.) However,

after SSSI's Schulman reviewed this version, he wrote an email to Derco's Aspell in which he said that "SSSI has not agreed to a 'mark-up' of 32%." (ECF 241-88 at 2 of 4.) A short time later, SSSI executed a version of the IWA that omitted reference to a 32% markup and instead provided that "[e]ach firm fixed price invoice shall specify the items billed." (ECF No. 284-12 at 3 of 75.) According to Schulman, he requested that the reference to the 32% markup be deleted because it reflected a potential CPPC violation. (Decl. of Robert Schulman ¶ 7.) Schulman states in his declaration that he believed Derco would be selling materials to SSSI at firm-fixed prices. (*Id*.) However, the IWA did not contain a price list, and Derco did not have a separate catalog or price list that contained fixed prices for the parts and materials that Derco would provide to SSSI under the IWA. Indeed, in an email to Derco executives dated August 7, 2006, Schulman acknowledged that the IWA did not contain firm-fixed prices. (ECF No. 241-86 ("I am unable to identify the FFP . . . .")).

### 4.    Performance of the SSSI-Derco Subcontract

From August 2006 to March 2011, SSSI and Derco operated under the IWA. Derco did not warehouse parts for SSSI or provide SSSI with parts from its own inventory. Instead, when SSSI needed a part, Derco's on-site personnel at an airfield identified a vendor and issued a purchase order to the vendor for the part. The vendor then shipped the part directly to the airfield. Derco calculated its price to SSSI for the part by taking the cost of the part as reflected on Derco's purchase order at the time of ordering and adding a 32% markup. After Derco invoiced SSSI for the parts and SSSI paid the invoice, SSSI submitted a voucher to the government for reimbursement of the amount paid to Derco plus an additional percentage that reflected SSSI's G&A rate.

SSSI attached Derco's invoices to the vouchers, but the invoices were not itemized and did not show that Derco was adding a percentage markup to its vendors' cost. The government paid the vouchers.

In my prior opinion on the parties' cross-motions for summary judgment, I determined that this arrangement between SSSI and Derco amounted to CPPC contracting because Derco added a predetermined markup to its performance costs. *Patzer*, 571 F. Supp. 3d at 986–95. As Derco's costs increased, so did its profits. Indeed, the government has pointed to several instances in which Derco's profit on a part increased simply because Derco's vendor's cost increased. For example, in 2008, Derco purchased tube assays from a vendor for $577.50 per unit; Derco, in turn, charged SSSI $762.30 per unit (*i.e.*, Derco's vendor's price plus 32%). In 2010, however, Derco purchased that same part at a vendor price of $1,984.78 per unit, and Derco, in turn, charged SSSI $2,619.91 per unit (again, Derco's new vendor price plus 32%). (USA Stmt. Of Add'l Facts ["USA SAF"] ¶¶ 110–11.) Derco's profit on the exact same part thus increased by $1,887.61 simply because its vendor's price increased. The government's proposed findings of fact contain additional examples along these lines. (*Id.* ¶¶ 112–15.)

Another relevant aspect of SSSI and Derco's performance under the subcontract involved how the parties allocated the cost of labor associated with the on-site logistics services that SSSI agreed to provide to the Navy under fixed-price CLINs. SSSI and Derco agreed that Derco would be financially responsible for paying the salaries and benefits of the on-site logistics personnel at the airfields. To fill these positions, the parties wanted to hire the legacy logistics managers and buyers who had performed the

same work at the airfields for the prior contractor, a company known as L-3. The parties originally intended to have Derco employ the on-site personnel, but payroll, union, and benefits issues made it impractical for Derco to hire them directly. (Def. PFOF ¶ 45.) For this reason, SSSI hired six logistics employees to fulfill roles that were assigned to Derco, but Derco trained them, supervised them, and provided the necessary technological infrastructure for them. (*Id.* ¶ 46.)

Because SSSI was paying the salaries and benefits of employees performing work for which Derco was financially responsible, SSSI and Derco agreed that SSSI would transfer those labor costs back to Derco through an accounting device known as an inter-entity chargeback. Such a chargeback is a means for one division or subsidiary of a company to procure labor, services, or material from another division or subsidiary through mirrored journal entries on their general ledgers. In the present case, the chargebacks essentially involved Derco's issuing SSSI "store credit" in the amount of the labor costs associated with the on-site logistics services. This store credit, in turn, was applied to reduce SSSI's obligation to pay Derco for labor, services, and material that SSSI purchased from Derco. Because SSSI purchased the parts and materials at issue in the present case from Derco, the government takes the position that the chargebacks had the effect of reducing the total amount that SSSI paid Derco for those parts and materials. In other words, the government views the chargebacks as a refund of part of the purchase price for the parts and materials.

In 2006, only six SSSI positions were identified as involving Derco work and subject to the chargebacks. However, in 2008, the parties agreed that 24 employees

14

were performing work that was assigned to Derco under the subcontract and increased the chargebacks to cover the labor costs associated with all 24 positions.

### 5. CNATRA's Knowledge of Derco's Markup

A theme running through many of defendants' arguments is that the government was aware that Derco was selling parts to SSSI by adding a 32% markup to its vendor's prices. One of the agencies that was supposedly aware of the markup was the Chief of Naval Air Training ("CNATRA"), the agency that trained Navy pilots in the T-34, T-44, and T-6 aircraft. Defendants point to evidence showing that CNATRA's industrial property specialists at the airfields learned during performance of the contract that Derco was routinely adding a 32% markup to the cost of parts. The CNATRA specialists learned about the markup through discussions with Derco's on-site logistics managers about various matters. (Def. PFOF ¶¶ 103–06.) For example, because SSSI had to obtain approval from CNATRA for certain non-routine maintenance work, SSSI submitted estimates for the proposed work to CNATRA officials. When one CNATRA official noticed that the cost of a repair seemed high, a Derco logistics manager told her that "a 32% mark-up was being applied to some part acquisitions." (Decl. of James Werden ¶ 46.) Through conversations such as these, CNATRA officials generally became aware that CNATRA applied a 32% markup to the parts it acquired. Moreover, one CNATRA specialist compared several Derco purchase orders and invoices and deduced that Derco was adding a 32% markup to the purchase order price to arrive at the invoiced price. (Decl. of Catherine Powers ¶ 4.) However, these CNATRA specialists were not responsible for auditing SSSI's or Derco's prices for compliance with government contracting rules, were not familiar with the prohibition on CPPC

contracting, and had no authority to approve or disapprove the government's payments to SSSI. (*Id.* ¶¶ 4, 6.)

### 6. NAVAIR and the Pax River Presentation

The Naval Air Systems Command ("NAVAIR") was the agency that awarded the prime contract to SSSI and managed the T-34/T-44 Program. (Def. PFOF ¶ 100.) By the end of August 2006, NAVAIR had noticed that, since SSSI took over maintenance functions for the Program from the prior contractor, the cost of parts had substantially increased. NAVAIR contacted officials within the Defense Contract Management Agency ("DCMA"), which was responsible for administering SSSI's contract with the Navy, and asked them to request that the Defense Contract Audit Agency ("DCAA") audit SSSI's prices. (ECF No. 241-98.) The NAVAIR officials specifically noted that SSSI was seeking reimbursement from the government for the cost of a part plus a markup, and they questioned whether the markup was appropriate. (*Id.*) In response to NAVAIR's request, DCMA asked DCAA to audit the "difference in cost." (*Id.*)

At about the same time, other NAVAIR officials asked SSSI to explain the price increase. In response, SSSI executives George Springsteen and Robert Schulman provided a presentation—which defendants refer to as the "Pax River Presentation"—to NAVAIR contracting officer Craig Simpson and others at NAVAIR. During this presentation, which occurred on January 23, 2007, SSSI stated that a primary reason for the price increase was that Hawker Beechcraft, which supplied many of the parts needed for the aircraft, was unwilling to extend a discount to Derco that it had extended to SSSI's predecessor, which was affiliated with Hawker Beechcraft. (Def. PFOF ¶ 110.)

As part of the presentation, Schulman and Springsteen showed NAVAIR a series of PowerPoint slides. (ECF No. 241-102.) One such slide depicted a spreadsheet containing data about the cost of seven specific parts. (*Id.* at 6 of 17.) The apparent purpose of this slide was to convince the government that the increase in the cost of parts from the prior contractor was due to factors beyond SSSI's or Derco's control. But defendants contend that the slide also had the effect of disclosing Derco's 32% markup to NAVAIR. This is so, they contend, because two of the eleven columns on the spreadsheet revealed the "Derco Cost" for each part and the "Actual Price" charged to SSSI for the part, respectively. For four of the seven parts on the spreadsheet, SSSI's actual price was 32% greater than Derco's cost. But the spreadsheet did not explicitly state that Derco added a 32% markup to each part—a viewer of the slide would have to divide the amount in each "Actual Price" column by the amount in each "Derco Cost" column to determine that the Derco markup on the four parts at issue was 32%. Still, evidence in the record indicates that some in the government inferred from the presentation that "Derco was adding a 32% fee over and above the cost of some parts." (4/18/2007 email from NAVAIR's Krista Gatton, ECF No. 241-133.)

After the Pax River Presentation, NAVAIR's Craig Simpson emailed David Lamb of the DCMA. (ECF No. 241-103.) Simpson told Lamb that he wanted to "maintain one [government] voice to SSSI," and that NAVAIR intended to pursue the costs matter further, if necessary. (*Id.*) Simpson asked that DCMA ask DCAA to "suspend" its audit until NAVAIR had a chance to further review the presentation materials. (*Id.*) In response, Lamb emailed DCAA and asked it to cancel the audit.

In July 2007, NAVAIR's Krista Gatton emailed DCMA's David Lamb and asked him to request that DCAA restart its parts audit. (ECF No. 284-48.) Gatton pointed to SSSI's recent requests for reimbursement for parts that were nearly 39% higher than the price charged to Derco by the manufacturer. Gatton wanted DCAA to find out "what each of the companies are charging us for and the amount," and whether the charges were allowable. (*Id.*) In Lamb's response email, he seemed disinclined to restart the audit. He stated that "[w]hat DERCO pays its vendor is not our concern provided SSSI pays DERCO 'the most advantageous prices available with due regard to securing prompt delivery of satisfactory materials' (See clause B-5f. page 513 of the contract)." (ECF No. 284-50.) In a separate email, Lamb told Gatton that "[w]e don't have the authority to access DERCO's cost information. In reality DERCO's markup is none of our business provided SSSI is adhering to the contract." (ECF No. 241-144.)

### 7.    DCMA Inquiries to SSSI About Derco Prices and Robert Schulman's 2009 Email

In August 2009, DCMA's David Lamb was contacted by others within DCMA who alleged that Derco was adding a 32% markup to the cost of parts. (Decl. of David Lamb ¶ 7.) To investigate this allegation, Lamb emailed his contacts at SSSI about Derco's prices. (*Id.* Ex. 2.) Using one of SSSI's vouchers as an example, Lamb noted that SSSI had reported that Derco billed SSSI for $88,599.01 in parts. Lamb expressed his understanding that Derco was SSSI's parts supplier, but that Derco was not the manufacturer of the parts. Lamb asked SSSI what Derco's prices consisted of: were they the prices that Derco paid for the parts or were they what Derco paid plus some markup?

Two SSSI employees responded to Lamb's email and stated that they did not know how Derco set its prices. One employee told Lamb that his question was best answered by DCAA. Lamb then emailed his question to DCAA. In response, DCAA auditor Ellen Calafiore told Lamb that someone was under the impression that "the work between Derco and SSSI was [firm-fixed price]." (ECF No. 241-146.) Calafiore then said: "It is not (but I think you know that)." (*Id*.)

After the two SSSI employees told Lamb that they did not know the answer to his question, one of the employees forwarded Lamb's email to SSSI's Robert Schulman. In response, Schulman emailed all the SSSI employees in the email chain and instructed them not to reply to Lamb until the group discussed his question. (ECF No. 284-22.) The next day, August 5, 2009, Schulman sent the following email to Lamb in response to his inquiry:

> Derco is a Government directed subcontractor that sells material to [SSSI] at FFP [*i.e.*, firm fixed prices]. . . . How Derco builds up the FFP is a question for the DCAA office assigned to Derco.

(ECF No. 241-145.)

After receiving Schulman's response, Lamb emailed the following to others at DCMA:

> According to Rob Schulman Derco "sells" parts to SSSI at a "firm-fixed price" and SSSI adds a G&A of 3.2% to the price and bill[s] the Government. Presumably Derco is just like any other supplier. He doesn't know the markup and if it is really just a purchase, as opposed to an interdivisional transfer, he (or us) had no reason to know and no authority to ask.
>
> Some people who identified themselves as DCMA Quality called earlier this week claiming that Derco was adding a mark-up of 32% but didn't provide the source of their information. That 32% figure sounds suspiciously like the 3.2% G&A. In other words these quality people may not have their facts straight and may be getting into areas they know nothing about. I told these people that I knew nothing of a 32% markup.

(Lamb Decl. Ex. 1.) In an apparent reference to Calafiore's earlier email stating that the work between Derco and SSSI was not firm-fixed price, Lamb added: "However, the Derco saga has taken a strange turn this week as DCAA questions whether or not Derco's subcontract is FFP." (*Id.*)

### 8. Sikorsky Government Accounting Manager Flags Potential CPPC Issue

In August 2010, SAC's manager of government accounting, Dawn Katucki, had a conference call with SSSI's then-CFO, David Hennig, and Derco's then-CFO, Peter Winkler, about Derco's charges to SSSI for the parts. (USA SAF ¶ 28.) After the call, Katucki wrote an email to Hennig and Winkler stating:

> One thing I thought of after our call was that if the arrangement with Derco was truly commercial and fixed price, then the prices being billed should have been negotiated in the [IWA] and there should be no pricing activity going on right now. If that is the case, then it really might be a cost-plus-percentage of cost situation.

(ECF No. 241-95.)

### 9. DCAA Audits of SSSI's 2007 and 2008 Incurred Cost Submissions

At some point, DCAA began auditing SSSI's incurred costs for the year 2007. Due to a backlog at DCAA, the audit was delayed by several years, and it seems that it did not begin in earnest until approximately 2012. (Decl. of Michael Richardson ¶¶ 2–3.) During the audit, DCAA focused on SSSI's payments to Derco for parts and materials. DCAA knew that SSSI and Derco were affiliated entities. As noted, under FAR 31.205-26(e), affiliated entities may not add a profit to materials transferred between them unless, among other things, the items transferred are "commercial." For commercial materials, the transfer may be "at price," which can include profit. DCAA focused its

audit on whether the parts were commercial, such that Derco could transfer them to SSSI at a price. (Richardson Decl. ¶ 6.)

Initially, SSSI failed to provide sufficient information to substantiate that Derco's work was commercial. Accordingly, DCAA issued a provisional finding that Derco's work was not commercial and therefore could be transferred only at cost. (Richardson Decl. ¶ 7.) In response, SSSI provided additional information to substantiate its claim that Derco performed commercial work. Based on this new information, in July 2012 DCAA issued an audit report concerning SSSI's 2007 incurred costs that provisionally accepted Derco's charges to SSSI, subject to further testing in the audit of SSSI's 2008 incurred cost submission. (*Id.*)

Later, during the audit of SSSI's 2008 incurred costs, DCAA learned that the IWA between SSSI and Derco "flowed down" a term from SSSI's prime contract with the Navy that prohibited profit or fee on parts and material. (Richardson Decl. ¶ 8.) DCAA thus determined that Derco's profit was inconsistent with the terms of the IWA and unallowable. Based on this determination, DCAA informed SSSI that it intended to issue a supplemental audit report for 2007 that disallowed Derco's profit. Before DCAA could take further action, however, the U.S. Department of Justice—which by that time was investigating the relator's allegations in this suit—informed DCAA that it was investigating matters related to DCAA's audit and asked DCAA to refrain from issuing a revised audit report or otherwise acting in connection with the SSSI contract. DCAA complied with DOJ's request and never completed its audit of SSSI's 2008 incurred costs or decided whether to issue a supplemental audit report concerning SSSI's 2007 costs.

As part of its incurred-cost audits of SSSI, a DCAA official emailed Derco to ask it what kind of contract it had with SSSI: cost-plus fixed fee, time and materials, firm-fixed price, or other contract type. (Decl. of Marc Ramminger ¶ 5 & Ex. 1.) In response, Derco's CFO, Amy Skaar, told DCAA that Derco's contract with SSSI was firm-fixed price. (*Id*.) Based on this representation, DCAA determined that it did not have authority to audit Derco's prices to SSSI for parts and materials. (Ramminger Decl. ¶ 7.)

### 10.    Bridge Contract

In early 2011, the Navy conducted an open competition for a follow-on contract for the T-34/44 Program. Although SSSI submitted a bid, the Navy initially awarded the contract to another bidder. But a successful protest overturned the award, and the Navy was required to reopen the bidding process. Because the contract could not have been re-bid before SSSI's existing contract expired at the end of March 2011, the Navy awarded an extension of the contract to SSSI.  Because this contract was intended to bridge the gap between the March 31, 2011 expiration date of the contract and the start date of a future, re-competed contract, this later contract was referred to as the "Bridge Contract" by NAVAIR, SSSI, and Derco. The Bridge Contract was in effect from April 1, 2011 to January 31, 2013.

Like the prior contract between SSSI and the Navy, the Bridge Contract provided that parts and materials were cost-reimbursable and that SSSI was not allowed to add a fee or profit when seeking reimbursement for the cost of parts. More specifically, the Bridge Contract provided:

> g. T-34/44/6 parts and Material CLIN's 1023, 1045, 1083 are cost reimbursable with no fee. Allowable indirect costs including any subcontractor mark-ups/burdens (for example, outsourcing the procurement service associated with processing the orders for direct

parts, repair parts, and/or materials), are included in the Government estimated ceiling provided. Contractor mark-ups are limited to one subcontractor tier only.

(ECF 260-2 at 5 of 163.) The contract also incorporated the clause prohibiting CPPC subcontracting. (*Id.* at 142 of 163.)

In anticipation of the Bridge Contract, SSSI asked Derco to provide it with a proposal for continuing to supply the parts SSSI would need to perform the maintenance work. In response to this request, Chris Piper, Derco's Director of USG Business Development—who was not involved in the negotiation of the IWA in 2006— asked SSSI's Tom Gallo and Rob Schulman about how Derco's pricing should be structured. Gallo and Schulman told Piper that Derco should provide SSSI with a firm-fixed price list for parts expected to be purchased under the Bridge Contract. (ECF No. 284-23 at 2–5.) Piper then replied to Gallo and Schulman by stating that, as far as he could tell, "Derco has accomplished no significant work to negotiate fix prices for T-34/44 parts." (*Id.* at 2.) Piper added that, for this reason, Derco "will not be submitting a FFP parts listing for the bridge contract by Feb 15." (*Id.*) In response, Gallo sent the following email to Piper (and cc'd Schulman and others): "Now I'm confused—How did you all operate under the present contract starting 5 years ago for supplying parts on the T-34/44 program?" (*Id.* at 1.) At this point, Schulman sent a separate email to Gallo directing him to "stop the emails on this" and proposing to talk with Piper by phone. (*Id.*)

Ultimately, Derco gave SSSI a price list for 514 parts but otherwise continued its practice of adding a 32% markup to the costs of parts as reflected on Derco's purchase orders to its vendors. (Def. PFOF ¶ 163.) However, from July 1, 2012 through the end of the Bridge Contract, Derco, prompted in part by government inquiries, changed its

practices and sold parts to SSSI at cost plus a flat monthly fee for its logistics services. (USA SAF ¶ 30.)

### 11. Derco Pricing Discussions for Bidding on Follow-On Contract

After the successful bid protest required the Navy to restart its competition for the follow-on contract, Derco personnel discussed potential pricing structures for SSSI's new response to the Navy's solicitation. Derco's Chris Piper sent an email to a group of Derco colleagues that attached a list of "pricing options" and requested feedback. (ECF No. 241-97.) He asked his colleagues to take note of paragraph 2 on the attachment. That paragraph proposed selling parts to SSSI "at price based upon margin as a % of procurement cost (vendor prices)." (*Id.* at 4 of 5.) Underneath this proposal, a large box contained the following warning: "DANGER WILL ROBBINS! This type of pricing is taboo with the USG." (*Id.*) The box then quoted the FAR's prohibition on CPPC contracting.

## B.     Procedural Background

Relator Mary Patzer commenced this action in June 2011 by filing a complaint that was kept under seal while the government investigated its allegations. While the Patzer complaint was still under seal, a second relator, Peter Cimma, commenced a similar *qui tam* action. After investigating the Patzer and Cimma complaints, the government elected to intervene in the suits and filed its own complaints. In November 2017, I consolidated the two cases.

In prior proceedings, I dismissed claims that the government had brought under the Anti-Kickback Act, 41 U.S.C. §§ 8701–07, and dismissed Realtor Cimma's complaint under the FCA's "first to file" rule, 31 U.S.C. § 3730(b)(5). (ECF No. 96.) As

noted, I also found, in a prior summary-judgment decision, that the subcontract between SSSI and Derco involved CPPC contracting. *Patzer*, 571 F. Supp. 3d at 994–95. And during a pretrial conference, the government agreed to abandon certain of the claims it had alleged in its complaints. (ECF No. 231 at 3.)

The following claims remain: (1) the government's claims under the FCA against SAC, SSSI, and Derco based on the illegal CPPC subcontracting; (2) the government's claims against SSSI and Derco based on the chargeback arrangement; (3) the government's breach-of-contract claim against SSSI based on CPPC subcontracting and the chargeback arrangement; and (4) the government's unjust-enrichment claim against Derco based on CPPC subcontracting.

Defendants have filed a motion for summary judgment on all FCA claims based on CPPC contracting. They have filed a second motion for summary judgment on all chargeback-based claims, and a third motion on the element of the government's damages for all claims. The government cross-moves for summary judgment on certain claims and issues: its breach of contract claim against SSSI, the measure of its damages, the issue of whether SSSI's vouchers were false claims, and the materiality of the false claims.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable

juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

**B.     False Claims Act**

As is relevant here, a company violates the False Claims Act if it (1) presents or causes to be presented a false or fraudulent claim for payment to the United States, (2) uses a false record or statement to conceal or decrease an obligation to pay money to the United States; or (3) knowingly conceals an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(A), (B) & (G); *United States v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732, 739 (7th Cir. 2021).[4] A successful claim requires proof both that the defendant made a statement to receive money from the government and that he made that statement knowing it was false. *Molina*, 17 F.4th at 739–40. Further, a defendant is liable only if the false statement was material to the government's decision to pay. *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 75 F.4th 778, 783 (7th Cir. 2023).

**C.     Motions for Summary Judgment on FCA Claims Based on CPPC Contracting**

**1.     Vouchers as False Claims**

One of the government's theories of FCA liability is that every time SSSI submitted a voucher to the Navy claiming reimbursement for parts and materials purchased from Derco on a CPPC basis, it presented a false claim for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A). The government and

---

[4] This suit applies to conduct that began in 2006 and ended in 2013. In 2009, the FCA was amended in certain respects. Because no party contends that the pre-2009 version is relevant to any claim or issue, I will cite to and apply the 2009 version.

defendants move for summary judgment on the issue of whether the vouchers satisfy the FCA's falsity element.

The parties address this issue under the theory of "implied false certifications." According to this theory, "when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement . . . the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 180 (2016). In *Escobar*, the Supreme Court held that, "at least in certain circumstances," the implied false certification theory can be a basis for liability. *Id.* at 181. Those circumstances encompass two elements: (1) the claim does not merely request payment, but also makes specific representations about the goods or services provided; and (2) the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths. *Id.* at 190.

The government contends that SSSI's vouchers satisfy the two elements identified in *Escobar*, while defendants contend that they do not. The government's theory is that the vouchers were rendered misleading by SSSI's failure to disclose that the parts were procured through an illegal CPPC system of contracting. However, there was no "specific representation" about Derco's goods that was rendered misleading by SSSI's failure to disclose the illegal CPPC arrangement. The only specific representations about the goods that appeared in the vouchers concerned the type of parts provided, whether they were for T-34 or T-44 aircraft, and the amount that SSSI

27

paid for them. Those representations were entirely true. Although SSSI did not disclose the CPPC arrangement, this lack of disclosure did not render SSSI's representations about the parts provided or the amount paid misleading half-truths. Indeed, the CPPC arrangement did not even concern the goods themselves; it concerned the way the goods were procured.

The government likens the vouchers to the implied false certifications at issue in *Escobar*. In *Escobar*, the defendant sought payment for therapy services without disclosing that the therapists did not hold the licenses or qualifications necessary to provide the reported services under state law. 579 U.S. at 189–90. The defendant, by using payment codes that corresponded to specific therapy services, specifically represented that it had provided the type of therapy that corresponded to each code. But because the therapist was not licensed or qualified to provide that therapy, it was misleading to fail to disclose this fact. Notably, the misleading omission related to the services provided rather than how the defendant procured those services. That is, if the therapists were unlicensed, then the defendant did not provide the services for which it claimed reimbursement, since a reasonable person would expect a therapist to hold the licenses and other qualifications required by state law. In the present case, however, SSSI's omission of the CPPC arrangement did not render its specific representations that Derco had supplied the listed goods at the stated prices misleading half-truths. SSSI may have failed to disclose a violation of federal procurement law, but it did not say anything false or misleading about the goods or services Derco provided.[5]

_____

[5] The government also likens this case to *U.S. ex rel. Prose v. Molina Healthcare of Ill.*, 17 F.4th 732 (7th Cir. 2021). However, like in *Escobar*, the false certification in *Molina* concerned the goods or services provided rather than the way the goods or services were procured: by using a specific reimbursement code, the defendant implied that it

Although the vouchers do not satisfy *Escobar*'s two elements, it does not follow that they are not implied false certifications. That is so because *Escobar* does not hold that the implied false certification theory is limited to the kind of half-truths at issue in that case. The Court expressly reserved the question of "whether all claims for payment implicitly represent that the billing party is legally entitled to payment." 579 U.S. at 188. It then held that the theory can be a basis for liability "at least" when the two elements are met. *Id.* at 190. The use of this language implies that the theory might be a basis for liability in other circumstances. *See U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1031 n.4 (D.C. Cir. 2017); *United States ex rel. Simpson v. Bayer Corp.*, 376 F. Supp. 3d 392, 407 (D.N.J. 2019).

The Seventh Circuit has recognized that the implied false certification theory applies in at least one circumstance that does not satisfy *Escobar*'s elements: when a defendant presents bills to Medicare and Medicaid for medical services but conceals the fact that the services were provided to patients who came to the defendant's facility only because of referrals that violated the Stark Amendment to the Medicare Act and the Anti-Kickback Act. *United States v. Rogan*, 517 F.3d 449, 451–52 (7th Cir. 2008). Although *Rogan* did not use the term "implied false certification," the Seventh Circuit subsequently construed *Rogan* as involving the theory. Specifically, in *U.S. ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, the Seventh Circuit cited *Rogan* in a footnote identifying cases that had applied the theory. 764 F.3d 699, 711 n.13 (7th Cir.

---

had provided the specific services associated with that code. Because the defendant did not disclose its failure to provide those services, its request for reimbursement was false.

2014). The court observed that, in *Rogan*, "the defendant did not explicitly certify that he was refraining from accepting illegal referrals." *Id.*

SSSI's vouchers are analogous to the claims for payment presented to the government in *Rogan*. In both cases, the defendant presented claims for payment for goods or services actually provided that did not contain misleading half-truths, but failed to disclose that the transactions that resulted in the claims for payment were illegally structured.[6] In *Rogan*, the services were facilitated by illegal referrals, while in the present case the goods were provided under an illegal CPPC subcontract. In *Rogan*, it would have violated federal law for the claims-processing officer to pay the claim with knowledge that illegal referrals were involved. 517 F.3d at 452 ("the Stark Amendment forbids payment of any claim that arises from medical services rendered to a patient who had been referred improperly"). In the present case, it would have violated federal law for the Navy to pay SSSI's vouchers with knowledge that SSSI had paid for them under a CPPC subcontract. 10 U.S.C. § 2306(a); 48 C.F.R. § 16.102(c); *see also* Lamb Decl. ¶ 5 (contracting officer states that federal law prohibited him from approving claims based on CPPC subcontracts); Simpson Decl. ¶ 3 (same).

The principle underlying *Rogan*, and which applies to SSSI's vouchers, can be more generally stated: when a defendant presents a claim for payment to a government agency, he is impliedly certifying that the goods or services were not procured in a way

---

[6] Besides illegal kickbacks, *Rogan* involved a fraud in which the defendant billed the government for services it never provided. 517 F.3d at 452. However, the kickbacks rendered even the claims for services actually provided fraudulent. *See id.* ("apart from the fact that the Stark Amendment forbids federal reimbursement for services that stem from compensated referrals, many of the bills were padded"). In comparing SSSI's vouchers to the claims in *Rogan*, I am referring only to claims for services actually provided to patients referred illegally.

that would make it illegal for the agency to pay the claim. For liability to attach, the claim does not have to contain a misleading half-truth, since the mere presentment of the claim implies that the agency may pay it without breaking the law. Thus, if the defendant presents the claim without disclosing facts that, if known to the agency, would legally preclude it from paying the claim, it has presented a false or fraudulent claim under § 3729(a)(1)(A).[7]

As noted, the government was legally precluded from paying for goods procured under a CPPC subcontract. SSSI submitted vouchers to the government requesting payment for such goods without disclosing that they were procured on a CPPC basis. Accordingly, the vouchers were false, and the government is entitled to summary judgment on the issue of whether the vouchers meet the FCA's falsity element. Defendants' cross-motion for summary judgment on this issue will be denied.

## 2. Materiality of CPPC Violation as to Vouchers

The parties cross-move for summary judgment on the issue of whether SSSI's failure to disclose, in connection with the submission of its vouchers, the CPPC nature of its subcontract with Derco was material. To be actionable under the FCA, a misrepresentation must be material to the government's payment decision. *Escobar*, 579 U.S. at 192. In this context, materiality means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.*

---

[7] Besides illegal referrals and goods procured through CPPC contracting, one can envision other claims that would be impliedly false under this standard. For instance, federal laws might prohibit federal agencies from paying for goods that were manufactured using child labor, or that were procured from countries subject to economic sanctions. If a contractor submitted a claim for payment to the agency without disclosing that the goods were procured from these unlawful sources—thereby tricking the agency into paying a claim that it was legally precluded from paying—then the contractor would be subject to liability under the FCA.

at 192–93 (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)). It "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 193 (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)). This is an objective standard. *U.S. ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 563 (7th Cir. 2015).

Here, materiality is closely intertwined with the falsity of the vouchers in the first place. Presenting each voucher to the Navy was impliedly false because any reasonable recipient of the vouchers would assume that the government could legally pay the claim if the statements made in the vouchers (*i.e.*, that SSSI purchased certain parts for certain navy aircraft at the specified prices) were true. The undisclosed CPPC violation lurking beneath the vouchers, had it been disclosed, would have barred the Navy from paying the claims. Thus, SSSI had a duty to disclose the CPPC nature of its subcontract with Derco prior to submitting a voucher.

One reason why SSSI had a duty to disclose the CPPC nature of its subcontract was that it was extremely relevant to the Navy's payment decision. Again, had the Navy known that SSSI was requesting reimbursement for parts purchased on a CPPC basis, a reasonable and diligent claims-processing officer who was familiar with the law would have refused to pay the claims. In *Rogan*, the Seventh Circuit recognized that omitting facts that make reimbursement illegal satisfies the FCA's materiality standard. Citing the *Neder* formulation of materiality that the Supreme Court later applied in *Escobar*, the court held that omitting facts about the illegal nature of the referrals was material "because the Stark Amendment forbids payment of any claim that arises from medical services rendered to a patient who had been referred improperly." *Rogan*, 517 F.3d at

452. The same result applies here. Omitting facts about the CPPC nature of SSSI's subcontract with Derco was material because federal statutes and regulations forbid payment of any claim that arises from a CPPC system of contracting.

Defendants contend that the Supreme Court rejected *Rogan*'s approach to materiality in *Escobar*. They point to *Escobar*'s holding that "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." 579 U.S. at 194. However, by "condition of payment," the *Escobar* Court was referring to conditions that, if unsatisfied, would give the government the *option* to refuse payment. This is made clear by the example the Court used: a contract in which the United States contracts for health services and adds a requirement that contractors buy American-made staplers. *Id.* at 195–96. In the example, the Court assumed that the government could "routinely pay claims despite knowing that foreign staplers were used." *Id.* at 196. If the government routinely paid claims with such knowledge, the Court concluded, the failure to disclose the use of foreign staplers would not necessarily be material.

The present case and *Rogan* do not involve mere "conditions of payment," as the Court understood that phrase in *Escobar*. Instead, they involve complete prohibitions on payment. In *Rogan*, a payment officer would have broken the law had he paid the claims knowing that they were generated by illegal referrals. 517 F.3d at 452. In the present case, a payment officer would have broken the law had he paid SSSI's vouchers knowing that they were based on CPPC subcontracting. In either case, a payment officer with knowledge of the omitted information would not have had the

option to pay the claims. Nothing in *Escobar* implies that an omission of facts that would make the government's payment *illegal* could be immaterial.

Defendants next attempt to distinguish *Rogan* by noting that the Stark Amendment at issue in that case expressly provides that the government may not pay for a health service provided through an illegal referral. *See* 42 U.S.C. § 1395nn(g). But the same is true with respect to CPPC contracting. Federal statutes and regulations prohibit a contracting officer from using the CPPC system of contracting. 10 U.S.C. § 2306(a); 48 C.F.R. § 16.102(c). Paying the other party for its performance under a contract is part of contracting, and therefore, by prohibiting use of the CPPC "system of contracting," federal law prohibits a contracting officer from paying for performance on a CPPC basis.

Defendants also contend that, because courts will sometimes order the government to pay for goods and services received under a CPPC contract, noncompliance with the CPPC prohibition is not necessarily material to the government's payment decision. The cases to which defendants refer recognize that, when the government mistakenly enters into a CPPC contract with a contractor, and the government subsequently catches its mistake and voids the contract, the government still has an obligation to pay the contractor on a *quantum meruit* or *quantum valebant* basis for goods and services the government accepted. *See, e.g., Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1150, 1154–55 (Fed. Cir. 1983). Contrary to defendants' suggestion, these cases do not hold that a government may pay a claim under a CPPC contract. Instead, they recognize that, once the illegal claim is denied, the contractor may submit a separate claim for recovery on a *quantum meruit* or

*quantum valebant* basis. *See id.* at 1150. When the government pays the separate claim, "[t]he contractor is not compensated *under* the contract, but rather under an implied-in-fact contract." *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986). Further, the amount of the claim for recovery on such basis might be different than the claim based on CPPC contracting. Thus, even if the government ultimately pays something to the contractor for its work, the facts concerning CPPC contracting would still have "a natural tendency to influence, or be capable of influencing," payment of the original claim. *Escobar*, 579 U.S. at 192–93 (quoting *Neder*).

Finally, defendants contend that the government's knowledge and approval of Derco's markup precludes it from proving that the omissions were material. Here, defendants rely on the Supreme Court's reasoning that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195. I discuss the government's supposed knowledge and approval of Derco's markup in more detail below, in the context of scienter. As I explain there, no facts suggest that the government officers responsible for approving payment of SSSI's vouchers knew of and approved the CPPC nature of SSSI's subcontract with Derco. Although various officials in different government agencies may have known that Derco added a 32% markup to parts sold to SSSI, no payment officer knew that SSSI had agreed to allow Derco to add a *predetermined* percentage to its *performance* costs, which is the hallmark of CPPC contracting. *See Patzer*, 571 F. Supp. 3d at 989–90. Thus, no payment officer drew the conclusion that SSSI and Derco were engaged in

CPPC subcontracting and decided to pay the claim anyway. (Lamb Decl. ¶¶ 4–6; Simpson Decl. ¶¶ 3–6.)

Defendants argue that the government should be deemed to have had actual knowledge of the CPPC subcontracting because the facts in the government's possession should have caused a payment officer to either draw the conclusion that SSSI and Derco were engaged in CPPC contracting or to investigate further. But this argument about what the government "should have known" is an argument that the government had only *constructive* knowledge of the CPPC violation, which is not *actual* knowledge. *Fish v. Greatbanc. Tr. Co.*, 749 F.3d 671, 679, 685 (7th Cir. 2014). Moreover, as the Seventh Circuit stressed in *Rogan*, "laws against fraud protect the gullible and the careless—perhaps *especially* the gullible and the careless—and could not serve that function if proof of materiality depended on establishing that the recipient of the statement would have protected his own interests." 517 F.3d at 452. "The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers; the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth." *Id.* Thus, even if the Navy's failure to detect the CPPC violation was careless, the government could not be deemed to have paid the claims with "actual knowledge" that the subcontract violated the prohibition on CPPC subcontracting. *Escobar*, 579 U.S. at 195.

Accordingly, I conclude that defendants' failure to disclose the CPPC nature of the subcontract between SSSI and Derco was material to the government's decision to pay SSSI's vouchers. The government's motion for summary judgment on this issue will be granted, and defendants' cross-motion will be denied.

### 3. Knowledge of Falsity

Defendants next move for summary judgment on the scienter element of the government's FCA claims based on the vouchers. The government does not cross-move for summary judgment on this issue but contends that it presents a jury question.

The scienter element of an FCA claim is based on the statute's use of the term "knowingly," which encompasses three mental states. *See United States ex rel. Schutte v. SuperValu Inc.*, __ U.S. __, 143 S. Ct. 1391, 1399 (2023). Under the statute, a person acts knowingly when he or she (1) "has actual knowledge of the information," (2) "acts in deliberate ignorance of the truth or falsity of the information," or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). "In short, either actual knowledge, deliberate ignorance, or recklessness will suffice." *Schutte*, 143 S. Ct. at 1399. The FCA does not require proof that the defendant had "specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). Further, the knowledge element "refers to [defendants'] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Schutte*, 143 S. Ct. at 1399.

Defendants contend that they are entitled to summary judgment on the knowledge element for two reasons: (1) they did not know that the subcontract between SSSI and Derco involved CPPC contracting, and (2) the government's knowledge of Derco's markup negates scienter.

### a. Defendants' knowledge of CPPC subcontracting

When defendants moved for summary judgment, the Supreme Court had yet to decide *Schutte*. In that case, the Supreme Court reversed the Seventh Circuit's interpretation of the FCA's knowledge element. Under the Seventh Circuit's approach, if

a defendant's statement was consistent with any objectively reasonable interpretation of the relevant law that had not been ruled out by definitive legal authority or guidance, then the defendant could not have knowingly submitted a false claim, even if the defendant subjectively believed that the claim was false. *See Schutte*, 143 S. Ct. at 1398–99. In their opening brief, defendants argued for summary judgment based on the Seventh Circuit's approach in *Schutte*—they argued that there was an objectively reasonable interpretation of the CPPC prohibition under which the contract between SSSI and Derco was not CPPC, and that no authoritative guidance warned them away from that interpretation. (ECF No. 233 at 19–23 of 40.) By the time defendants submitted their reply brief, however, the Supreme Court had decided *Schutte*. Thus, in that brief, defendants make a different argument—that, as a matter of fact, defendants did not subjectively believe that the subcontract involved a CPPC arrangement. I will address this argument and ignore the argument defendants made in their opening brief based on the Seventh Circuit's version of *Schutte*.[8]

In their reply brief, defendants argue that the evidence shows that they did not have actual knowledge of a CPPC violation. However, even if that were true, a reasonable jury could find that they acted with deliberate ignorance or with reckless disregard to whether they were engaged in CPPC subcontracting. That is so because, during negotiation of the IWA, Phil Bail specifically warned the executives at SSSI and Derco that their proposal to have Derco generate prices by adding 32% to its performance costs potentially violated the prohibition on CPPC contracting, and a jury

---

[8] Although arguments made for the first time in a reply brief are ordinarily forfeited, *see, e.g., Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 464 (7th Cir. 2021), here the intervening change in the law provides good cause to consider the argument.

could find that the executives responded by burying their heads in the sand and telling Bail to keep quiet.

As explained in more detail in the background section, in Summer 2006, Bail—an employee responsible for overseeing Derco's compliance with government-contracting rules (Bail Decl. ¶ 4)—repeatedly informed the executives negotiating the IWA that their proposal potentially amounted to a CPPC arrangement. One reasonable inference to draw from the evidence in the record is that the executives gave no serious consideration to Bail's concerns and made no earnest attempt to address the risk that they were violating the ban on CPPC contracting. *See U.S. ex rel. Watson v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (to show reckless disregard, a plaintiff "need only show that [the defendants] had reason to know of facts that would lead a reasonable person to realize that [the defendants were] causing the submission of a false claim . . . or that [the defendants] failed to make a reasonable and prudent inquiry into that possibility.") There are no contemporaneous emails or other written documents containing a response to Bail's concerns or a written explanation of why the executives concluded that their arrangement was not CPPC. Although the executives now claim that they had concluded that the arrangement was not CPPC because Derco was to add its markup to its vendors' quoted prices rather than to its actual costs as reflected in vendor invoices, there are no documents from 2006 substantiating this claim, and the jury could reasonably deem the claim a post hoc justification that does not reflect the executives' actual mental states at the time. *See Schutte*, 143 S Ct. at 1404 (scienter may be established by showing that defendants were aware of a substantial risk that their statement was false "and intentionally avoided learning whether their [statements]

were accurate"); *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 946 (7th Cir. 2004) (finding contemporaneous records "more reliable than post hoc justifications given [by defendants' witnesses] in deposition testimony once they are aware they are being sued"). Indeed, Bail avers that, when Derco executives discussed his concerns, they responded not by examining whether the contact was CPPC but by telling him that "if the Navy would simply approve the invoices submitted by SSSI without supporting documentation from Derco showing that Derco added 32% to its vendor cost, then the Navy would not necessarily be able to detect a CPPC violation." (Bail Decl. ¶ 16.)

Moreover, evidence in the record would allow the jury to conclude that the executives encouraged Bail to keep quiet about CPPC contracting. At his deposition, Bail testified that, by August 2006, he was "getting a very strong impression that [he] better quiet down about CPPC," and that he felt he was at risk of losing his job. (Bail Dep. at 81.) And Markus Heinrich avers that he was part of a conversation in which William Ochsner told Heinrich to "serve Bail a cup of shut the fuck up." (Heinrich Decl. ¶ 6.) All of this would support a jury's finding that, in response to Bail's concerns, the executives adopted a stance of deliberate ignorance or reckless disregard to a substantial risk that the contract was illegal and would result in the submission of false claims for payment to the Navy.[9]

_____

[9] Evidence in the record also shows that, during contract performance, other employees, including Dawn Katucki and Chris Piper, raised red flags about whether the subcontract involved a CPPC arrangement. However, because the executives' response to Bail's concerns in 2006 provides a sufficient basis for finding scienter for all vouchers submitted during the life of the Program, I do not separately discuss the other evidence.

### b. Government knowledge

Defendants contend that the government was aware of Derco's 32% markup and that such knowledge negates their scienter. This argument is based on cases recognizing that "[t]he government's prior knowledge of an allegedly false claim can vitiate a FCA action." *U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 544–45 (7th Cir. 1999). According to the Seventh Circuit, "[i]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." *Id.* at 545. "In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA." *Id.*

Defendants' government-knowledge argument depends on facts indicating that, over the years, various officials at different government agencies acquired bits of knowledge about how Derco set its prices. However, to obtain summary judgment on scienter on these grounds, defendants must, at a minimum, show that a reasonable jury would be compelled to find that (1) an official with decision-making authority to approve SSSI's vouchers (2) knew that SSSI and Derco had entered into a subcontract under which SSSI agreed to allow Derco to add a predetermined percentage rate to its future performance costs and (3) communicated his or her approval of that arrangement to SSSI in Summer 2006, before SSSI began submitting vouchers for reimbursement. Each of these elements is required by *FKW*. That case focused on the knowledge of "officials with decision-making authority." 189 F.3d at 544. And scienter was negated because those officials, prior to submission of the allegedly false claim, directed the contractor to submit the claim with knowledge that it would contain the allegedly false

information. *Id.* at 545. Here, there is no evidence that would compel a reasonable jury to conclude that the elements of the government-knowledge defense are satisfied. As explained below, while there is some evidence that various Navy personnel acquired knowledge of certain aspects of Derco's prices over the life of the Program, that evidence does not establish that an official with relevant decision-making authority gave SSSI advance approval to submit vouchers based on the contractual arrangement that I later determined was CPPC.

Defendants' arguments about the government's knowledge can be divided into three categories. The first relates to the knowledge of CNATRA officials. As explained in the background section, CNATRA was the agency that used the aircraft that SSSI was responsible for maintaining. Defendants' evidence shows that some property managers at CNATRA learned during discussions with Derco personnel that Derco was adding a 32% markup to the cost of parts. However, CNATRA was not an agency that had authority to approve or disapprove of SSSI's vouchers. Indeed, the relevant CNATRA personnel were not even familiar with the prohibition on CPPC contracting. (Powers Decl. ¶ 6.) Thus, CNATRA's supposed knowledge of the 32% markup does not preclude the jury from finding scienter.

The second category of supposed government knowledge relates to the Pax River Presentation that SSSI gave to NAVAIR officials in January 2007. One of the attendees of the presentation was Craig Simpson, the procuring contract officer for the T-34/44 Program. As explained in the background section, during this presentation, SSSI used a PowerPoint slide that showed both Derco's cost for a few specific parts, and the price that Derco ultimately charged to SSSI. By dividing the price to SSSI by

Derco's cost, a viewer of the slide could see that Derco was adding a 32% markup to the cost of those parts. Defendants contend that, based on this presentation, NAVAIR had all the information it needed to realize that SSSI and Derco had agreed that Derco could add a predetermined 32% markup to its performance costs. They further contend that, because NAVAIR did not object to the arrangement and instead asked DCAA to suspend its audit of SSSI's costs, NAVAIR must have approved of the subcontract.

There are two problems with this argument. First, the slide showed a 32% markup for only a few parts. While this might have been enough to enable NAVAIR to conclude that Derco was marking up some parts by 32%, it does not compel the jury to find that NAVAIR knew that the subcontract between SSSI and Derco allowed Derco to add a *predetermined* 32% markup to its *performance costs*. As far as the slide revealed, Derco might have been charging SSSI firm-fixed prices for the parts at issue that happened to be based on a 32% markup. Indeed, prior to this presentation, Schulman had provided others in the government with a copy of the IWA between SSSI and Derco, which stated that Derco would be invoicing SSSI based on firm-fixed prices. (Def. PFOF ¶ 108.) Thus, the jury would not be compelled to find that SSSI informed NAVAIR of all the facts it would have needed to know to realize that SSSI and Derco were engaged in CPPC subcontracting.

Second, the jury would not be compelled to find that, in response to the presentation, NAVAIR communicated its approval of the subcontract to SSSI. Defendants point out that, after the presentation, Simpson asked David Lamb of the DCMA to ask DCAA to suspend its audit of SSSI's costs. However, Simpson made this request to ensure that the government would speak to SSSI with one voice, not

because he was necessarily satisfied with SSSI's presentation. (ECF No. 241-103.) Simpson stated that NAVAIR would continue to investigate the issue. Moreover, the issue NAVAIR was investigating was the sudden increase in the cost of parts for the program after the contract was awarded to SSSI. The apparent purpose of the Pax River Presentation was to convince NAVAIR that the cost increase was due to factors beyond SSSI's control, such as Hawker Beechcraft's refusal to extend the same discounts to Derco that it had extended to SSSI's predecessor. Even if NAVAIR was "satisfied with SSSI's explanation" for the cost increase (Def. PFOF ¶ 113), it would have been unreasonable for SSSI to construe NAVAIR's satisfaction as approval of all aspects of its subcontract with Derco.

The third category of supposed government knowledge relates to DCAA's eventual approval of SSSI's incurred cost submissions for 2007. Defendants contend that DCAA's audit revealed that Derco was adding a 32% markup to the cost of parts. Defendants further contend that, because DCAA determined that SSSI's costs were allowable, it must have approved the pricing arrangement between SSSI and Derco. Again, there are two problems with this argument. First, DCAA's main inquiry in the audit was determining whether Derco's work was "commercial." Under the FAR, this inquiry determined whether Derco was permitted to add a markup to the cost of parts, either on a firm-fixed price basis or otherwise. *See* FAR 31.205-26(e). DCAA was not investigating whether Derco's prices were firm-fixed prices in the first place. DCAA's opinion that the costs were allowable as commercial does not imply that DCAA reviewed all aspects of the contractual arrangement between SSSI and Derco and determined that it did not involve CPPC contracting.

Second, DCAA did not complete its audit of SSSI's cost submissions until July 2012. (ECF No. 241-78.) By that time, SSSI and Derco had already abandoned their practice of allowing Derco to add a predetermined markup to its performance costs. As of July 1, 2012, Derco was selling parts to SSSI at cost and charging a separate fee for its logistics services. (USA SAF ¶ 30.) By the time DCAA completed its audit, then, SSSI would already have submitted most, if not all, of the vouchers that were based on the CPPC subcontract. Thus, the audit results do not qualify as evidence that DCAA knew and approved of the CPPC nature of SSSI's claims for payment *before* those claims were presented to the government. *See FKW*, 189 F.3d at 545. Because scienter examines defendants' knowledge at the time the false claims were submitted, DCAA's later conclusions would not prevent a jury from finding for the government on that element.

Accordingly, defendants are not entitled to summary judgment on scienter.

**4. SAC Liability for False Claims Based on Vouchers**

The discussion above shows that the government's FCA claims based on the vouchers may proceed to trial against SSSI and Derco. However, the government contends that SAC is also liable under the FCA. It has two theories. The first is based on SAC's approval of SSSI's cost sheet during the PRC review of the proposal. The second is based on William Ochsner's knowledge of the CPPC subcontract and his holding a position as an executive of SAC in addition to his positions with SSSI and Derco. Defendants move for summary judgment on these theories.

### a. Cost Sheet

The government contends that SAC knowingly caused SSSI to submit the false vouchers by signing-off on SSSI's proposal in January 2006. (Patzer Compl. ¶¶ 110 & 111.a.) According to the government, the SAC executives who signed the cost sheet "approved Deco's CPPC markup." (ECF No. 265 at 25 of 37.) To support this allegation, the government notes that the cost sheet estimated that the proposal would result in a "margin" of 22% on parts. However, no evidence suggests that anyone who signed the cost sheet knew that this margin was based on a CPPC arrangement. In this context, the term "margin" means the difference between the cost of something and the price at which it is sold. *See Profit Margin*, *Black's Law Dictionary* (11th ed. 2019). One can speak of earning a margin on sales made on a firm-fixed price basis. Therefore, the cost sheet's reference to a margin does not in any way imply an intent to contract on a CPPC basis. For all the cost sheet reveals, the SAC executives may have thought Derco was going to sell to SSSI at firm-fixed prices. Accordingly, the cost sheet is not evidence that SAC knowingly caused the submission of false claims.

### b. Ochsner's knowledge

The government next argues that a jury could find SAC liable for causing submission of the false claims based on William Ochsner's knowledge of the CPPC violation. In 2006, Ochsner held multiple positions within the Sikorsky organization. He was President of Derco, the executive in charge of SSSI, and Vice President of SAC.

There is no evidence that, in January 2006, when SSSI was preparing its proposal to the Navy, Ochsner contemplated having Derco sell to SSSI on a CPPC basis. However, as discussed in more detail above, Ochsner learned from Phil Bail in

Summer 2006 that SSSI and Derco executives were proposing to enter into a subcontract that, in Bail's view, appeared to be CPPC. (Bail Decl. ¶ 7.) According to Derco's Markus Heinrich, Ochsner told him to tell Bail to "shut the fuck up" about his concerns over Derco's markup. (Heinrich Decl. ¶ 6.) From this evidence, a jury could reasonably find that Ochsner knew that the subcontract presented a substantial risk of violating the prohibition on CPPC contracting and either adopted a stance of deliberate ignorance or recklessly disregarded that risk.[10]

But Ochsner's knowledge could result in SAC's liability only if he was acting in his capacity as an officer of SAC, rather than as an officer of SSSI and/or Derco. The Supreme Court has recognized that it is a well-established principle of corporate law "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997)). Based on this principle, "courts generally presume 'that the directors are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary.'" *Id.* (quoting P. Blumberg, Law of Corporate Groups: Procedural Problems in the Law of Parent and Subsidiary Corporations § 1.02.1, p. 12 (1983)).

---

[10] Defendants contend that Heinrich's declaration establishes only that the "shut the fuck up" comment was in response to Bail's concerns about drop-shipping parts that Derco never had in its own inventory, not his concerns about CPPC contracting. However, Heinrich states that the discussion was over Bail's concerns about Derco's "mark-up." (Heinrich Decl. ¶ 6.) The drop-shipping concern, in conjunction with this reference to a "mark-up," could reasonably be understood as part of the CPPC concern, in that if Derco was adding a percentage markup to the cost of parts as vendors were shipping them to the airfields, rather than selling parts from its inventory at fixed prices, then Derco would be adding a mark-up to its performance costs.

In the present case, the government contends that a jury could find that Ochsner was acting on behalf of SAC because "[o]nly by acting in his role as a SAC VP could [he] direct SSSI to hire Derco." (ECF No. 265 at 26 of 37.) But this argument assumes a fact the government has not established: that Ochsner "directed" SSSI to hire Derco. The government cites no evidence in support of this fact. Further, Ochsner's response to Bail, a Derco employee, was taken in his capacity as Derco's president, in that Bail's concerns threatened Derco's own markup and profits. Although SAC, as Derco's parent company, indirectly benefitted from Derco's profits, that does not mean that Ochsner also acted on behalf of SAC. If it did, then the distinction between wearing a subsidiary hat and a parent hat would disappear. Accordingly, Ochsner's knowledge of potential CPPC contracting during Summer 2006 may not be imputed to SAC, and SAC is entitled to summary judgment on the issue of its liability for causing SSSI to submit the false vouchers.

**D.    FCA Claims Based on Schulman's 2009 Email**

In a separate claim, the government alleges that Schulman's email to DCMA's David Lamb in August 2009, in which Schulman represented that Derco sold to SSSI at firm-fixed prices, violated the FCA in two respects. First, the government alleges that the email violated 31 U.S.C. § 3729(a)(1)(B) as a "false record or statement material to a false or fraudulent claim." Second, the government alleges that the email amounted to a reverse false claim in violation of § 3729(a)(1)(G). Defendants move for summary judgment on both theories. The government cross-moves for summary judgment on the issue of whether the email was material.

**1.    False Record or Statement**

The government contends that Schulman's email was a false statement material to a false or fraudulent claim because it facilitated SSSI's continual submission of vouchers based on illegal CPPC subcontracting. Under this theory, the vouchers are the false or fraudulent claims, and Schulman's email is the false record or statement.

As discussed in more detail in the background section, Schulman's email was sent in response to Lamb's email to SSSI about the structure of Derco's price for a specific part. Lamb had asked whether the price charged to SSSI represented only what Derco paid for the part, or what Derco paid plus some markup. When Schulman learned that Lamb had asked this question, he emailed all SSSI employees in the email chain and instructed them not to reply to Lamb until the group discussed the question. The next day, Schulman sent the allegedly false email to Lamb, in which he represented that Derco was a "Government directed subcontractor that sells material to [SSSI] at [firm-fixed prices]." (ECF No. 241-145.) Schulman also said that "[h]ow Derco builds up the [firm-fixed price] is a question for the DCAA office assigned to Derco," thus implying that he did not know how Derco built up its prices. (*Id.*)

Under my prior summary-judgment decision, Schulman's statement that Derco sold to SSSI at firm-fixed prices was false: Derco did not sell at firm-fixed prices because SSSI and Derco did not agree to fixed prices prior to contracting. *Patzer*, 571 F. Supp. 3d at 987–89. Defendants contend that they are entitled to summary judgment on the issues of whether Schulman made the false statement knowingly and whether the statement was material to a false or fraudulent claim.[11]

---

[11] Defendants also argue for summary judgment on the issue of whether there was a false or fraudulent claim in the first place, but my determination that the vouchers were false claims disposes of this argument.

Regarding scienter, defendants again invoke the government-knowledge defense. Here, they argue that DCAA personnel had "independently concluded that the IWA was firm-fixed price." (ECF No. 233 at 31 of 40.) But the evidence would not compel a reasonable jury to agree with this assessment. Defendants point to various emails in which DCAA personnel *described* the SSSI-Derco subcontract as firm-fixed price. But those emails do not suggest that DCAA applied the FAR's definition of firm-fixed prices to the subcontract and made an independent determination that the subcontract satisfied the definition. Instead, it appears that DCAA personnel were repeating what SSSI and Derco had represented to the government about their subcontract. For example, one DCAA auditor emailed another to say that "[w]e contacted Derco and it looks like the agreement with [SSSI] was [firm-fixed price]." (ECF No. 241-158.) Further, the IWA between SSSI and Derco stated that Derco would invoice SSSI based on firm-fixed prices. Thus, it would be reasonable for a jury to conclude that DCAA's belief that Derco sold to SSSI at firm-fixed prices was due to statements such as Schulman's rather than to DCAA's independent analysis of the subcontract.

Defendants separately argue that they are entitled to summary judgment as to Schulman's knowledge because the government has not produced evidence that Schulman knew that SSSI had not agreed to Derco's prices prior to Derco's performance. This argument is based on the difference between firm-fixed prices and CPPC contracting. If SSSI agreed to pay a specific price for a part before the parties entered into a contract for the sale of that part, then the resulting contract would be firm-fixed price. In contrast, if SSSI did not know the price of the part at the time of

contracting and instead agreed to allow Derco to add a predetermined percentage to whatever Derco paid for the part during performance, then the contract would be CPPC. *See Patzer*, 571 F. Supp. 3d at 986–87. Defendants argue that the government has no evidence that Schulman knew that SSSI did not know the price of the part at the time of contracting. I disagree. Schulman was one of the principal negotiators of the IWA under which Derco sold parts to SSSI. During negotiations, Schulman recognized that the IWA did not contain firm-fixed prices. (ECF No. 284-8.) Further, the IWA contained no provision requiring Derco to obtain SSSI's agreement to the price of a part before Derco sent SSSI a bill. *See Patzer*, 571 F. Supp. 3d at 988–89. Instead, it provided that Derco would specify prices in its invoices, which Derco could not send until after SSSI signed for the part at an airfield. (*See* IWA § 6.3, ECF No. 284-12 at 3 of 75.) Finally, Schulman received Phil Bail's warning that the IWA might involve a CPPC arrangement. (Bail Decl. ¶ 16 & Ex. H.) A jury could reasonably infer from this evidence that Schulman knew that SSSI had agreed to allow Derco to apply a predetermined markup to the cost of parts and was not approving each individual price before Derco procured the part and sent SSSI an invoice.

Regarding materiality, defendants contend that Schulman's statements to Lamb in the email were not material to the government's decision to pay the vouchers. However, Lamb avers in his declaration that, based on Schulman's representation that Derco sold to SSSI at firm-fixed prices, he concluded that he lacked further authority to investigate Derco's charges. (Lamb Decl. ¶ 10.) A jury could reasonably conclude that, by representing that Derco sold to SSSI at firm-fixed prices when it did not, Schulman persuaded Lamb to discontinue his investigation into Derco's prices, which might have

led to his discovering the illegal nature of the subcontract and stopping further payments. Thus, defendants are not entitled to summary judgment on materiality.

The government cross-moves for summary judgment on the issue of materiality based on the argument that information about a CPPC violation was necessarily material to the government's payment of the vouchers. However, although Lamb was investigating Derco's prices, the record does not *compel* a reasonable jury to find that Schulman's representation about firm-fixed prices sidetracked discovery of the CPPC violation. It is for the jury to consider the full context of Lamb's investigation and his interaction with Schulman to determine whether Schulman's representation about firm-fixed prices was material to the government's decision to continue paying the vouchers.

### 2. Reverse False Claim

Under the FCA, a provision forbidding reverse false claims establishes liability for any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The term "obligation" means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id.* § 3729(b)(3). The government contends that, at the time of Schulman's email, and due to the CPPC violation in the subcontract between SSSI and Derco, SSSI had a contractual, statutory, and regulatory obligation to repay the costs that the government had reimbursed it for under the vouchers, and that Schulman's email concealed this obligation to repay. Defendants move for summary

judgment on this claim, contending that SSSI did not have an established duty to repay the government at the time Schulman made the statement.

Defendants' argument is intertwined with its argument on the measure of the government's damages, which I discuss below. Defendants argue that, to prove that it suffered damages from the CPPC violation (and that therefore SSSI had an obligation to repay at the time of Schulman's email), the government must prove that SSSI and Derco inflated the costs of parts and materials. As I explain below, this argument is incorrect because a CPPC violation renders the contract unenforceable regardless of whether costs were inflated. Had the government known that the vouchers sought reimbursement for parts and materials purchased on a CPPC basis, it would have been required by law to refuse payment. At that point, SSSI could have sought reimbursement on a *quantum meruit* basis for the value of the parts and materials accepted by the government. Thus, the government's damages must be measured by the difference between what it paid under the vouchers and what SSSI could have recovered under *quantum meruit*.

Due to the CPPC violation, at the time of Schulman's email, all payments that the government had made under SSSI's prior vouchers were void as a matter of law. Thus, SSSI owed the government a refund of the entire amount it had received under the vouchers up to that time, subject only to SSSI's making a separate claim for *quantum meruit*. Defendants argue that because no court had fixed the amount of SSSI's liability to the government at the time of Schulman's email, SSSI did not then have an obligation to repay. However, as noted, the FCA defines "obligation" as an established duty, "whether or not fixed." 31 U.S.C. § 3729(b)(3). At the time of the email, SSSI had an

established duty to repay the void payments, just as it had an obligation not to submit additional vouchers in the future and accept reimbursement for materials purchased on a CPPC basis. It is true that SSSI may have been entitled to a *quantum meruit* recovery, but that recovery would have been made under a separate, implied-in-fact contract, not under the subcontract or the original vouchers. *See Amdahl Corp.*, 786 F.2d at 393. This *quantum meruit* recovery might reduce the amount of the government's damages caused by the reverse false claim. But because the original payments were void, SSSI could still be liable for concealing an obligation to repay those payments. Accordingly, defendants' motion for summary judgment on this claim will be denied.

**E.    SAC Liability for Statements Related to SSSI's Proposal**

In addition to its FCA claims based on the vouchers, the government brings FCA claims against SAC based on statements made in the cover letter that accompanied SSSI's original proposal to the Navy. There are two statements at issue. First, in the cover letter, SSSI represented that it selected the four subcontractors that it proposed to use when performing the contract "through a careful process modeled after the Navy's prime contractor selection process," and that, although SSSI's corporate affiliates were considered, an affiliate was not chosen "where the best value solution came from another company." (ECF No. 241-70 at 3 of 30.) The government contends that this statement was false because SSSI never considered any entity other than Derco for the logistics support subcontract. The second statement is SSSI's representation that it "agree[d] with all terms, conditions, and provisions included in the solicitation." (*Id.*) The solicitation included portions of the FAR that required SSSI to follow the practices

contained in a separate disclosure statement. The government contends that its promise to comply with these portions of the FAR were false because, at the time SSSI submitted the proposal, it intended to act contrary to its disclosure statement by engaging in CPPC contracting with Derco.

The government brings these claims against SAC. But the cover letter was submitted by SSSI. The cover letter was printed on SSSI letterhead, and the opening sentence of the letter began with the words "Sikorsky Support Services, Inc. (SSSI) is pleased to provide our proposal. . . ." (ECF No. 241-70 at 3 of 30.) The cover letter was signed by David Adler under the name "Sikorsky Support Services, Inc." using the title "Senior Vice President." (*Id.*) The cover letter did not mention SAC or imply that the statements made in the cover letter were endorsed by SAC.

The government contends that because David Adler was a vice president of both SSSI and SAC, his representations are attributable to SAC. However, as discussed above, an officer holding positions with a parent and its subsidiary can represent the two corporations separately, and courts generally presume that the officer is acting for the subsidiary when doing subsidiary business. *Bestfoods*, 524 U.S. at 69. Here, the cover letter states that it was authored by Adler in his capacity as an officer of SSSI, and therefore SSSI, rather than SAC, would be liable for any false statements. Accordingly, SAC is entitled to summary judgment on this claim.[12]

---

[12] Because the government does not bring a claim against SSSI based on the statements in the proposal, I do not consider whether the statements were knowingly false or material to the government's decision to accept SSSI's proposal.

## F.    Damages

Defendants move for summary judgment on the issue of the government's damages, contending that it cannot prove that the CPPC violation or any fraud resulted in damages. The government moves for summary judgment on the issue of the measure of damages for its contract and FCA claims, contending that damages should be measured as the entirety of Derco's 32% markup plus the portion of SSSI's G&A rate that corresponds to the 32% markup.

As some courts have noted, the legislative history of the FCA states that "[n]o single rule" governs the determination of damages. *United States ex rel. Concilio De Salud Integral De Loíza, Inc. v. J.C. Remodeling, Inc.,* 962 F.3d 34, 42 (1st Cir. 2020) (quoting S. Rep. No. 96-615, at 4 (1980)). Instead, "courts should remain free to fashion measures of damages on a case-by-case basis." *Id.* In general, the proper measure of damages is the amount that "puts the government in the same position as it would have been if the defendant's claims had not been false." *Momence*, 764 F.3d at 710 n.11 (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C.Cir.2010)).

The government contends that it is entitled to recover the entire 32% markup on all parts supplied during the life of the contract because the markup constitutes an "excess, illegal" charge and was not an "allowable" cost under the FAR. (ECF No. 249 at 11 & 13 of 23.) According to the government, Derco's adding the markup to the parts was no different than a situation in which a contractor and the government agree to a price of $100, but the contractor tricks the government into paying $132 for the part. The government's analogy is not apt. Here, the Navy agreed to reimburse SSSI for "the

actual catalog/market price from the vendor" (Prime Contract B-5f), but the Navy and SSSI did not agree on a specific price for the parts at issue. Further, the price that SSSI and Derco agreed to was illegal not because it exceeded the amount the Navy agreed to pay, but because SSSI and Derco engaged in an illegal form of contacting. The existence of the illegal subcontract, if disclosed, would have prevented the Navy from reimbursing SSSI for the costs of parts and materials it procured under that subcontract. So, to return to the government's analogy, if the part had been procured through CPPC subcontracting, the excess, illegal charge would have been $132, not $32. Both the cost of the part to Derco and the markup charged to SSSI (and passed on to the government) were illegal. The Supreme Court indicated as much in *Muschany v. United States*. There, the Court explained that the "danger guarded against" by the prohibition on CPPC contracting was the "incentive to a government contractor" to "pay liberally for reimbursable items because higher costs meant a higher fee to him, his profit being determined by a percentage of cost." 342 U.S. 49, 61–62 (1945). This "incentive" applies to both the cost of the part and the profit, so both the cost and the markup are tainted by CPPC contracting.

In the present case, defendants note that the government has admitted that Derco's buyers did not act on this incentive by intentionally buying higher-priced parts. (Gov't Resp. to RFA #113, ECF No. 241-61.) Based on this admission, defendants argue that the government cannot prove that the CPPC violation was the proximate cause of any harm to the government. They argue that, for the violation to have caused harm, defendants must have "inflate[d] the cost of materials." (ECF No. 235 at 15 of 25.) However, the national policy against CPPC contracting is based on the *incentive* to

inflate costs, and the harm targeted is not simply the intentional inflation of costs, but the lack of an incentive to *control* costs. *See Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1152 (Fed. Cir. 1983) ("The prohibition against cost-plus-a-percentage-of-cost contracts protects against exploitation of the government's resources by contractors who might take advantage of the open-ended system by unduly increasing costs—and thus their profits—or might simply enjoy the spur of an incentive to increase costs (deliberately or carelessly) by being unconcerned, profligate, or wasteful."). For this reason, CPPC contracts are deemed unenforceable without proof that such contracting actually increased the government's costs. *See id.* at 1150; John Cibinic, Jr., et al., *Cost-Reimbursement Contracting* 47 (4th ed. 2014) (contracts violating the CPPC proscription are illegal and thus unenforceable). Once the contract is deemed unenforceable, the contractor may not obtain payment under the contract itself, but the contractor may recover the fair value of goods or services provided to the government on a *quantum meruit* or *quantum valebant* basis. *Urban Data Sys.*, 699 F.2d at 1154; Cibinic, et al., *supra*, at 47.[13]

Keeping in mind that the purpose of FCA damages is to put the government in the same position it would have been in if the defendant's claim had not been false, *Momence*, 764 F.3d at 710 n.11, I conclude that damages should be measured by asking what would have happened had SSSI disclosed the CPPC nature of its subcontract with Derco at the time it submitted its vouchers to the government for payment. The answer is that the government would have refused to pay the vouchers

---

[13] In *Urban Data*, the court distinguished *quantum meruit* and *quantum valebant* by noting that the former applies to services and the latter to goods. 699 F.2d at 1154 n.8. For brevity, I will use the term *quantum meruit* to encompass both goods and services.

on the ground that the costs claimed were illegal and unallowable, and SSSI would have been left to argue for a *quantum meruit* recovery to compensate it for the value it had already provided to the government.[14] Thus, the measure of damages for the FCA claim is the difference between the amount paid under the vouchers and what SSSI could have recovered on a claim for *quantum meruit*. Because the remedy of deeming the contract price unenforceable and leaving the contractor to a potential *quantum meruit* recovery is the ordinary remedy in CPPC cases that do not involve fraud, I conclude that the FCA measure of damages also applies to the government's contract claim.[15]

In *quantum meruit*, the contractor is entitled to recover the value of its performance to the government. *See Scheiber v. Dolby Lab., Inc.*, 293 F.3d 1014, 1022–23 (7th Cir. 2002) (quantum meruit is based on value of performance); *Amdahl,*

---

[14] The government argues that a *quantum meruit* recovery would be inconsistent with the Supreme Court's decision in *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990), in that it would amount to paying funds from the Treasury in violation of a condition that Congress placed on the appropriation, namely, the prohibition on CPPC contracting. However, Congress appropriated funds for the T-34/44 Program. Although Congress prohibits CPPC contracting, that condition is satisfied by invalidating the CPPC contract price. Payment on a *quantum meruit* basis does not involve CPPC contracting, in that the payment is made under an implied contract rather than under the CPPC contract. *See United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986). Accordingly, the *quantum meruit* payment would not circumvent limits imposed by the Appropriations Clause.

[15] The government argues that, in cases involving fraud, a contractor is not entitled to recovery under *quantum meruit*, and it cites some authority that supports the proposition. *See Amdahl*, 786 F.2d at 393 n.8; *K & R Eng'g Co. v. United States*, 616 F.2d 469, 352–53 (Ct. Cl. 1980); *Acting Comptroller General Weitzel to the Secretary of the Army*, 33 Comp. Gen. 533, 538 (1954). However, this rule would not affect the measure of damages under the FCA. As noted, damages are measured by asking what the government would have paid "if the defendant's claims had not been false." *Momence*, 764 F.3d at 710 n.11. If SSSI's vouchers had not been false—that is, if SSSI had disclosed the CPPC violation—SSSI would have been entitled to recovery in *quantum meruit*. Thus, SSSI's *quantum meruit* recovery must still be factored into the government's damages under the FCA.

786 F.2d at 393 (under *quantum meruit*, the contractor's recovery is limited to "the value of the benefits *to the government*"); *Urban Data Sys.*, 699 F.2d at 1155 (remanding for determination of "the value to the Government"). Here, defendants contend that, as a matter of undisputed fact, its *quantum meruit* recovery should be equal to the amounts the government already paid under the CPPC arrangement, because that amount represents the value of the goods and services SSSI provided to the government through Derco. Defendants advance several arguments in support of this approach.

First, they contend that because the Navy purchased some expensive parts from SSSI at fixed prices that included Derco's 32% markup, that markup must represent the value of Derco's performance with respect to all parts sold under the contract. However, the Navy's acceptance of a fixed price on certain parts in no way implies that the reasonable value of Derco's performance can be measured by adding a 32% markup to *all* parts. The price that the Navy agreed to pay for the expensive parts is evidence of nothing more than the value of *those* parts to the government. Further, it is undisputed that SSSI's proposals for the expensive parts did not disclose how SSSI developed the fixed price, and that therefore they did not disclose that Derco had added 32% to the anticipated cost of the part. (USA SAF ¶ 117.) Thus, the Navy's agreement to the fixed price is not even evidence that it thought the 32% markup reflected the reasonable value of Derco's performance with respect to the expensive parts.

Second, defendants contend that the testimony of their expert witnesses establishes that Derco's prices were reasonable. Defendants view their experts as having established that the 32% markup represented the reasonable value of Derco's logistics services plus Derco's indirect costs and a reasonable profit. Initially, it is

important to note that defendants concede that no part of Derco's markup represents the value of the parts and materials that the Navy received. That is, they concede that the amount that Derco paid to its vendor for each part represented the fair market value of that part. (USA SAF ¶ 82 & Defs.' Resp.) Thus, I take it as undisputed that the *quantum meruit* value of the parts and materials is the amount that Derco paid to its vendors. The United States does not seek to recover that amount as damages.

Defendants and their experts contend that part of Derco's 32% markup represents the reasonable value of the logistics services that Derco provided to SSSI and, in turn, the Navy. The problem here is that the prime contract between the Navy and SSSI contains separate line items for on-site logistics services that SSSI agreed to provide to the Navy at fixed prices. (USA SAF ¶ 83.) Those line items provide that the fixed price compensated SSSI for providing "On-Site Support Center Services . . . to support maintenance, logistics, material management and administrative services listed for the T-34, T-44, and T-6 programs as specified in Section 4 and 16 of the PWS [*i.e.,* the Performance Work Statement]." (Prime Contract § C-2(c).)[16] Defendants concede that it was Derco's responsibility to provide those logistics services at no cost to the government beyond the fixed prices paid to SSSI. (Def. PFOF ¶¶ 24, 112.) Because the CPPC violation in the subcontract between SSSI and Derco does not render the prime contract unenforceable, SSSI's agreement to provide on-site logistics services through Derco at fixed prices remains binding. SSSI received the fixed-price payments for those services. For the first year of the prime contract in 2006, the Navy paid SSSI a total of

---

[16] The Bridge Contract contains the same provision but identifies an additional section of the PWS (Section 14) that applies to the fixed-price CLINs. (Bridge Contract § C-2(c).)

$890,796 per month for onsite support center services, including logistics services. (USA SAF ¶ 85.) For the first year of the Bridge Contract in 2011, the Navy paid $1,569,069 per month for onsite support center services, including logistics services. (*Id.* ¶ 86.) SSSI has therefore received all the compensation the Navy owes it for the services that SSSI, through Derco, provided under the fixed-price line items. SSSI cannot claim the value of those services a second time as part of its *quantum meruit* recovery. Perhaps SSSI must pay Derco for providing the on-site logistics services, but that is a matter between SSSI and Derco, and the Navy would not have to reimburse SSSI for those payments by paying more than fair market value for parts and materials.

Defendants seem to believe that Derco provided logistics services to the Navy that were not allocable to the fixed-price CLINs for on-site support services. They, for example, point to evidence showing that "Derco spent a significant amount of time and money to license, populate, and stand-up [a computerized inventory-tracking system known as IFS], which monitored and tracked flight hours, maintenance intervals, repair history, and component condition for every tracked component on every aircraft so that Derco could forecast the maintenance needs, communicate those anticipated needs, and order/restock parts before demand was triggered." (Resp. to USA SAF ¶ 84.) They also point out that Derco's Milwaukee employees "performed a significant portion of the logistics services that were required by the Contract, such as customizing IFS and performing quality assurance, program management, accounting, and inventory support." (*Id.*) However, defendants do not develop a legal argument showing that these services were properly allocable to the cost-reimbursable CLINs. Many of these services sound like "maintenance, logistics, material management and administrative

services" that were properly allocable to the on-site logistics CLINs. (Prime Contract § C-2(c).) Those CLINs reference specific sections of the Performance Work Statement, but that document is not in the record for me to review. However, defense expert Garry Richey testified that much of the work that SSSI subcontracted to Derco fell within Section 4.300 of the Navy's Performance Work Statement. (Richey Dep.at 174:13–175:6.) Because the prime contract designates Section 4 of the PWS as part of the fixed-price CLINs for on-site support (§ C-2(c)), it seems that Derco's services may have been allocable to those CLINs. With respect to the Milwaukee-based personnel, their work would fall within the fixed-price CLINs to the extent they were performing work that was properly allocable to those CLINs. The fact that they worked in Milwaukee rather than on-site is not dispositive of whether they were performing fixed-price work.

Defendants also claim that indirect costs should be included in SSSI's *quantum meruit* recovery. Indirect costs are expenses unrelated to producing a specific good or service, such as overhead expenses. Here, I understand SSSI to be claiming that Derco's indirect costs consist of overhead expenses associated with procuring parts and materials, such as finding appropriate vendors and placing and tracking orders. (ECF No. 241-83 at Derco-0009662–64.) These are services that provided a benefit to the Navy: if the Navy had purchased parts and materials on its own, it would have incurred the labor costs associated with procuring the parts. Because SSSI performed the procurement role through Derco, SSSI's (that is, Derco's) procurement costs may be added to the fair market value of the parts and materials procured. However, SSSI would be entitled to recoup its procurement costs as part of its *quantum meruit* recovery

only if such costs were not properly allocable to the fixed-price CLINs for on-site logistics services.

Finally, SSSI claims that a reasonable profit to Derco should be part of its *quantum meruit* recovery. However, profits are allowed under *quantum meruit* only "to the extent that they may have a bearing upon assessing the reasonable value of the aggrieved party's performance" *W.F. Magann Corp. v. Diamond Mfg. Co., Inc.*, 775 F.2d 1202, 1208 (4th Cir. 1985). We have already established that the fair market value of the parts is what Derco paid for them, so Derco's profit cannot be factored into the cost of the parts. However, if the fair market value of services provided by Derco that are not allocable to fixed-price CLINs includes a profit, then that profit would be recoverable. But in that case, profits would not be awarded separately, but as part of the fair market value of Derco's services.

Defendants are not entitled to summary judgment establishing that their *quantum meruit* recovery is equal to the amounts that the Navy paid under the vouchers. It is established that the fair market value of the parts and materials Derco provided equals the amount that Derco paid its vendors. However, SSSI's entitlement to recover anything in addition to that value is uncertain. Although SSSI, through Derco, provided logistics and procurement services to the Navy, the government has argued that the Navy paid for those services under the fixed-price CLINs for on-site logistics support (ECF No. 266 at 5–6 & 20–21 of 25), and defendants have not responded with a contract-interpretation argument showing that the services were properly allocable to the parts-and-materials CLINs. Further, defendants have not pointed to expert testimony that purports to value the services that Derco provided. Instead, defendants'

experts generally opine that the prices charged by Derco for parts and materials were reasonable. But because Derco's prices are now void, damages will not be measured by asking whether those prices were reasonable. They will be measured as the difference between what the government paid and the actual value of the elements of Derco's performance that are properly allocable to the parts-and-materials CLINs. *See Cities Serv. Gas Co. v. United States*, 205 Ct. Cl. 16, 32 (1974) ("value determined on a quantum meruit basis under an implied in fact contract is not based on costs nor a reasonable return on investment of the seller"); *In the Matter of the Appeal of United Computer Supplies*, GPOBCA No. 26-94, 1998 WL 148845 (GPO Board of Contract Appeals Jan. 23, 1998) ("When a supplier is paid on a *quantum meruit/quantum valebant* basis, the supplier is entitled to the reasonable value of the benefit provided rather than to the price it would have charged if the parties had entered into a valid contract.").

At the same time, the government is not entitled to summary judgment establishing that its damages consist of Derco's entire markup plus SSSI's corresponding G&A rate. The government has not developed a contract-interpretation argument showing that all Derco's logistics and procurement services are allocable to the fixed-price CLINs. To be sure, the government in its cross motion points out that the separate CLINs for on-site logistics services exist (ECF No. 301 at 33 of 43), but it does not show that those CLINs encompass all services that Derco provided. Moreover, the pricing notes in the Bridge Contract suggest that procurement services might be allocable to the parts-and-material CLINs. The notes state that allowable indirect costs, "including any subcontractor mark-ups/burdens" relating to "outsourcing the

procurement service associated with processing the orders for direct parts, repair parts, and/or materials," are included in the estimated ceiling for parts and materials. (Bridge Contract § B-1g.) This note implies that, at least for the Bridge Contract, procurement services were allocable to the parts-and-materials CLINs rather than the fixed-price CLINs for on-site support. If that is so, then SSSI may be entitled to have the value of those procurement services added to its *quantum meruit* recovery, even if Derco's logistics services were paid for under the fixed-price CLINs.

Before leaving the topic of damages, I must discuss defendants' reliance on DCAA's audit of SSSI's 2007 incurred costs. Recall that, during the audit, DCAA was focused on whether Derco was providing commercial items to its corporate affiliate SSSI. Only if the parts were commercial could Derco have charged SSSI a price that included a profit. In July 2012, DCAA auditor Vera Turner issued a report in which she opined that Derco's parts were commercial. (ECF No. 241-78.) In that report, Turner also opined that the amount SSSI paid to Derco was "allowable" under the regulation for determining allowability, FAR 31.201-2. Turner's documented finding of commerciality was necessary to this determination of allowability. However, another element of allowability is "reasonableness." FAR 31.201-2(a)(1). Thus, in finding the costs attributable to Derco's work "allowable," Turner implicitly found those costs reasonable. (Dep. of Vera Turner at 140:7–140:20.) Defendants contend that this implied finding of reasonableness supports its claim that the value of Derco's performance to the Navy includes its full 32% markup.

Defendants are conflating the reasonableness of the price Derco could have charged under a valid contract with the *quantum meruit* measure of damages. During

the audit, Derco represented to DCAA auditors that it provided "material management" to SSSI at firm-fixed prices, and DCAA relied on that representation. (Decl. of Marc Ramminger ¶¶ 5–7, 9) At most, then, DCAA's opinion on allowability implies that Derco's supposed firm-fixed prices were reasonable, which does not establish the value of Derco's performance to the Navy for purposes of *quantum meruit*.

But it is also doubtful that the opinion implies that the fixed prices were reasonable. The audit was focused on the commerciality requirement, and the report discusses only that issue with respect to the cost of direct materials.[17] The auditor does not mention the reasonableness requirement or identify grounds for deeming Derco's prices reasonable. Further, DCAA accepted the auditor's opinions only provisionally, subject to further analysis in its audit of SSSI's 2008 cost submission. (Decl. of Michael Richardson ¶ 7.) During that later audit, DCAA initially informed SSSI that it intended to reopen the 2007 audit and disallow Derco's profit. (*Id.* ¶ 8.) But before DCAA could complete the reopened audit, the Department of Justice asked DCAA to stand down while it investigated the allegations of this lawsuit. (*Id.*) The audit was never completed. Further, even if the audit had been completed, DCAA's opinion would not have been controlling. The DCAA auditor's role is advisory only. *See* 2 Karen L. Manos, 2 *Government Contract Costs & Pricing* § 86:10 (Westlaw, database updated September 2023). Administrative contracting officers, not auditors, make final determinations on matters such as the allowability of costs. *Id.*; *see also* Dep. of Brian Reinhart at 42:13-46:3 (DCAA Rule 30(b)(6) witness testifies that DCAA does not make determinations of cost allowability and that such authority resides in the contracting officer or DCMA). In

---

[17] The report also discusses SSSI's travel costs, but those costs are not at issue.

short, the report was not final, does not assign a fair market value to the parts and materials provided, and does not assess the value of any services that Derco provided to the government. It therefore does not establish the value of SSSI's *quantum meruit* recovery as a matter of law, such that defendants would be entitled to summary judgment on that issue.

To summarize: The measure of damages for the government's contract and FCA claims is the difference between what the government paid under the vouchers and what SSSI could have recovered under *quantum meruit* if it had disclosed the CPPC violation. The measure of SSSI's *quantum meruit* recovery is the value to the Navy of the portion of Derco's performance that is properly allocable to the cost-reimbursable CLINs. This includes the fair market value of the parts and materials, which will be measured as the amount Derco paid its vendors. Any aspect of Derco's performance that is allocable to the CLINs for on-site logistics services (and any indirect costs and profit associated with those services) are not recoverable in *quantum meruit* because the Navy separately paid SSSI a fixed price for those services.

A final word on the burden of proof at trial. Defendants contend that, to prove damages or an overpayment, the government has the burden of proving that the Navy paid more under the vouchers than the *quantum meruit* value of Derco's services. I agree that the ultimate burden of proving damages rests with the government. However, the government's position has been that, other than the value of parts and materials, the Navy received no value from Derco's performance that it did not already pay for under the fixed-price CLINs. To rebut this argument, defendants will have the burden of (1) identifying services that Derco provided that were properly allocable to the parts-and-

materials CLINs and (2) submitting evidence as to the value of those services. In other words, defendants will have the burden of establishing a claim for *quantum meruit* compensation under an implied-in-fact contract. The government may attempt to defeat or reduce the claim of *quantum meruit* by showing that the services were either allocable to the fixed-price CLINs or less valuable than the amount claimed.

## G.    Breach of Contract

The parties have cross-moved for summary judgment on the government's claims for breach of contract. The parties agree that, in light of my prior ruling that the subcontract between SSSI and Derco involved CPPC contracting, SSSI breached the provision in the prime contract that prohibited CPPC subcontracting.[18] The government requests entry of summary judgment establishing SSSI's liability for the breach. SSSI, however, contends that the government cannot prevail on a claim for breach of contract without proving actual damages. Relying on its argument that the government cannot establish damages, SSSI contends that it is entitled to summary judgment on the breach-of-contract claims. The government contends that, even if it could not prove actual damages, it would be entitled to an award of nominal damages.

As I explained in the context of damages, above, the government's actual damages will be measured as the difference between the amount paid under the vouchers and the amount of SSSI's *quantum meruit* recovery. Establishing this amount remains as an issue for trial. Thus, even if defendants' argument that a breach-of-

---

[18] The government brings a duplicative claim for breach of contract in which it argues that, because of the CPPC violation, SSSI also breached a provision of the contract that prohibited submission of cost vouches claiming unallowable costs. Because the CPPC violation was itself a breach of the prime contract and affected all the cost vouchers, I do not separately discuss this duplicative claim.

contract claim requires proof of damages were correct, defendants would not be entitled to summary judgment.

As for the government's cross motion, I will grant summary judgment on the elements of the existence of a valid contract and SSSI's breach of the CPPC prohibition. However, because the element of damages remains open, it would be premature to enter summary judgment on the entire claim.

## H.    Unjust Enrichment

Defendants move for summary judgment on the government's claim for unjust enrichment against Derco. Unjust enrichment requires proof of three elements: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable to do so. *Sands v. Menard*, 379 Wis. 2d 1, 18 (2017).[19] Here, the government contends that because the subcontract between SSSI and Derco involved CPPC contracting, it would be unjust to allow Derco to retain payments for the parts and materials it provided.

This claim is legally unsound because the government did not pay Derco for the parts and materials; SSSI did. Thus, it was SSSI who conferred the benefit on Derco. The government might argue that it reimbursed SSSI for the cost of the parts, and that it would not have done so had it known of the CPPC nature of the subcontract. But that would have affected only SSSI's right to reimbursement. SSSI's obligation to pay Derco the price that the parties agreed to under the subcontract would remain enforceable, as

---

[19] The parties do not raise an issue of choice of law with respect to this claim. I have cited a Wisconsin case, but the same principles would likely apply under any jurisdiction's laws.

it is not illegal for private parties to agree to a CPPC arrangement. Even if the government refused to reimburse SSSI for the parts, Derco could have kept SSSI's payment without violating any principle of equity or justice. Or, if SSSI refused to pay Derco because the government did not reimburse it, Derco could have insisted that SSSI pay the agreed price. This shows that Derco received the benefit from SSSI, not the government. *See Emirat AG v. High Point Printing LLC*, 248 F. Supp. 3d 911, 936–37 (E.D. Wis. 2017) (defendant who receives payment from third party under separate contract is not liable to plaintiff for unjust enrichment). Accordingly, Derco is entitled to summary judgment on this claim.

## I.   Chargeback Claims

In addition to its claims based on CPPC contracting, the government brings breach-of-contract claims based on the chargeback arrangement under which Derco credited SSSI with the labor costs associated with the SSSI employees who were performing Derco work.[20] The government's contract theory is that the labor chargebacks represented something akin to a rebate or credit on the cost of the parts. Under a FAR provision incorporated into the prime contract, FAR 52.216-7(h)(2), SSSI was required to pass on any such rebate or credit to the Navy. The government contends that because SSSI did not do so, and instead sought reimbursement for the full amount of Derco's cost-plus-32% price for each part, SSSI breached this FAR

---

[20] In its complaints, the government also brought claims under the FCA based on the chargebacks. However, after defendants moved for summary judgment on all chargeback claims, the government filed a brief in opposition that does not respond to defendants' FCA-specific arguments. (ECF No. 267.) Based on this omission, I infer that the government has abandoned its chargeback-related FCA claims.

provision and is liable to the government in the amount of the chargebacks. Defendants move for summary judgment on these claims.

The government views the chargebacks as a refund of a portion of the purchase price for parts and materials because Derco credited SSSI with the cost of the on-site labor, which meant that SSSI did not have to pay the full price for parts and materials. However, this overlooks the fact that SSSI still "paid" the balance of the purchase price for parts and materials by paying the salary and benefits of the Derco workers who performed the on-site labor. For example, assume that the cost-plus-32% price that Derco charged to SSSI for parts and materials provided during a given year was $1 million. During the same period, SSSI paid $500,000 to Derco's workers, thus relieving Derco of the financial obligation to do so. If SSSI paid the full cost of the parts to Derco plus the labor costs, it would have provided a total of $1.5 million in value to Derco. When Derco credits SSSI with the $500,000 in labor costs, it retains $1 million in total value: $500,000 in cash and $500,000 in the reduction of its own labor costs. SSSI thus pays Derco $1 million—the full price of the parts and materials. The final result is no different than Derco's paying the labor costs directly and charging SSSI $1 million for the parts and materials.

The government contends that the chargebacks must be viewed as a refund because SSSI and Derco were supposed to provide the on-site labor to the Navy at no charge beyond the fixed price that the Navy agreed to pay SSSI for on-site logistics services. But the accounting arrangement between SSSI and Derco did not affect the prices charged to the Navy. Although SSSI and Derco may have agreed to provide the labor to the government at no charge, someone still had to pay the workers. Under the

subcontract between SSSI and Derco, that someone was supposed to be Derco. When instead SSSI paid Derco's workers, SSSI took on Derco's financial responsibility. This provided value to Derco in the amount of the labor costs. Offsetting that value against the price of parts and materials did not change the price of parts and materials, it just changed how SSSI paid that price. One might say that SSSI paid using a combination of cash and store credit rather than all cash.

Because the chargebacks did not affect the prices that Derco charged SSSI for parts and materials, defendants are entitled to summary judgment on the government's chargeback claims.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment on all FCA claims predicated on CPPC contracting (ECF No. 232) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to the claims against SAC but denied in all other respects.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment on FCA and common law damages (ECF No. 234) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to the unjust-enrichment claim against Derco and denied in all other respects.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment on all chargeback-based claims (ECF No. 236) is **GRANTED**.

**FINALLY, IT IS ORDERED** that the government's motion for partial summary judgment (ECF No. 248) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to the elements of liability for breach of contract other than damages, as to

the falsity of SSSI's cost vouchers, and as to the materiality of the implied false statement in the cost vouchers. The motion is denied in all other respects.

Dated at Milwaukee, Wisconsin, this 17th day of October, 2023.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge